UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 22-1882, 23-1315, 23-1322

UNITED STATES,
Appellee,

v.

LOUIS D. COLEMAN III,
Defendant-Appellant.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

# BRIEF OF DEFENDANT-APPELLANT LOUIS D. COLEMAN III

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

## TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... vii

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 3

ISSUES PRESENTED FOR REVIEW ..... 4

STATEMENT OF THE CASE ..... 5

I. Overview. ..... 5

II. Trial. ..... 9

A. Government case. ..... 10

B. Defense case. ..... 19

C. Closings, instructions, verdict, and sentencing. ..... 22

SUMMARY OF ARGUMENT ..... 24

ARGUMENT ....................................................................................... 28

I. Coleman was convicted based on allegations that were not presented to the grand jury, and the indictment was constitutionally insufficient ....................................................................................... 28

A. The purposes of an indictment ....................................................... 28

B. The admission of evidence that Coleman kidnapped Correia for sexual gratification violated the Fifth Amendment's presentment clause. ....................................................................................... 31

i. Standard of review. ....................................................................... 32

ii. An accused can only be tried based on an indictment returned by a grand jury ....................................................................... 33

iii. Allegations of sexual gratification and sexual assault were not presented to the grand jury. ....................................................... 34

iv. The introduction of evidence of sexual gratification violated Coleman's constitutional rights. ................................................ 36

C. The indictment was constitutionally insufficient. The court erroneously denied the motion to dismiss and the motion for a bill of particulars. ....................................................................... 37

i. Standard of review. ....................................................................... 38

ii. The indictment was constitutionally insufficient. ......................... 38

iii. The court erroneously denied the motion for a bill of particulars. ....................................................................... 41

II. Warrant affidavits did not establish probable cause that a kidnapping occurred or that evidence would be found in the places to be searched. ....................42

A. Standard of review. ....................43

B. The warrant affidavits did not provide probable cause to believe that Coleman kidnapped Correia. ....................44

C. Some of the warrant affidavits did not provide probable cause to believe that evidence of kidnapping would be found in the places to be searched. ....................46

D. The good-faith exception cannot save these warrants. ....................49

III. The court committed various errors related to the government's case. ....................50

A. The court erroneously denied a mistrial when the medical examiner opined that Correia was alive when Coleman brought her into his building. ....................50

i. Standard of review. ....................51

ii. Vershvovsky's testimony caused extreme prejudice requiring a mistrial. ....................52

B. The court erroneously permitted the government to use the term "sexual assault." ....................54

i. Standard of review. ....................55

ii. The term "sexual assault" violated Coleman's constitutional rights to due process and a fair trial. ....................56

C. The court erroneously admitted prejudicial testimony about Correia's plans for the days after the 24th........................................57

i. Standard of review.............................................................................58

ii. Correia's statements to her child's grandmother and shelter employee were more prejudicial than probative.........................59

IV. The government did not present sufficient evidence to sustain Coleman's conviction...........................................................................60

A. Standard of review.............................................................................61

B. There was insufficient evidence to satisfy the seizure element..................................................................................................62

C. There was insufficient evidence that Coleman held Correia against her will for an appreciable time. ........................................64

D. There was insufficient evidence that Coleman held Correia for ransom, reward, or otherwise. .........................................................67

E. There was insufficient evidence that Coleman intended to kidnap Correia. ........................................................................................68

V. The court erroneously prevented Coleman from adequately presenting his theory of defense.........................................................68

A. See the sealed supplemental brief....................................................69

B. See the sealed supplemental brief....................................................69

C. The court erred in not giving the jury instructions Coleman requested....70

i. Standard of review....70

ii. The court erroneously failed to sufficiently inform the jury that it could not consider evidence that had been struck....71

iii. The seizure-element instructions were erroneous....73

iv. Holding-element and purpose-element instructions were erroneous....76

v. Consciousness of guilt instruction was erroneous....77

vi. Other errors....79

vii. Taken together, the instructional errors require reversal....80

VI. Issues of structural racism were not appropriately addressed, resulting in an unfair trial....81

A. The court incorrectly denied Coleman's motion to show jurors a video discussing implicit bias....83

i. Standard of review....84

ii. The importance of educating jurors about implicit bias....85

iii. The court erroneously refused to show the venire a video about implicit bias....87

B. The court improperly excluded expert testimony explaining the impact of negative encounters with police on Black men..............90

i. Standard of review....................................................................93

ii. Coleman's expert disclosure was sufficient..................................94

iii. Fagan's testimony was admissible under Rules 702 and 703..........................................................................................96

VII. The court improperly calculated Coleman's guidelines range........................................................................................100

A. Standard of review....................................................................101

B. The court abused its discretion by determining that the facts of this case constituted first-degree murder......................................102

VIII. Cumulative error..................................................................103

CONCLUSION...............................................................................105

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ..............................106

CERTIFICATE OF SERVICE ...............................................................107

# TABLE OF AUTHORITIES

**Page**

**Cases**

*California v. Trombetta*,
467 U.S. 479 (1984) ....................69

*Chadwick v. WellPoint, Inc.*,
561 F.3d 38 (1st Cir. 2009) ....................93

*Chatwin v. United States*,
326 U.S. 455 (1946) .................... 38, 39, 45, 62, 64, 75

*Commonwealth v. Warren*,
475 Mass. 530 (2016) ....................78

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................91, 96

*Gooch v. United States*,
297 U.S. 124 (1936) ....................39, 44, 45, 76

*Government of Virgin Islands v. Berry*,
604 F.2d 221 (3d Cir. 1979)....................64, 65

*Hamling v. United States*,
418 U.S. 87 (1974) ....................30

*Hattaway v. United States*,
399 F.2d 431 (5th Cir. 1968)....................75

*Hunter v. State of New Mexico*,
916 F.3d 595 (10th Cir. 1990)....................33

*Jeffers v. United States*,
392 F.2d 749 (9th Cir. 1968)....................29, 33

*Lee v. Howard Hughes Medical Institute*,
607 F.Supp.3d 52 (D.Mass. 2022) .....................................................86

*Levin v. Dalva Brothers, Inc.*,
459 F.3d 68 (1st Cir. 2006) ..............................................................96

*Martínez v. United States*,
33 F.4th 20 (1st Cir. 2022) ........................................................95, 96

*Mitroff v. Xomox Corp.*,
797 F.2d 271 (6th Cir. 1986)..............................................................57

*Muskat v. United States*,
554 F.3d 183 (1st Cir. 2009) ......................................................93, 94

*NAACP v. City of Myrtle Beach*,
504 F.Supp.3d 513 (D.S.C. 2020) .....................................................98

*Peña-Rodriguez v. Colorado*,
580 U.S. 206 (2017) ..........................................................................82

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) ..........................................................................81

*Rosario–Urdaz v. Rivera–Hernández*,
350 F.3d 219 (1st Cir.2003) ......................................................93, 94

*Russell v. United States*,
369 U.S. 749 (1962) ............................................. 28, 29, 30, 31, 36, 41

*Steagald v. United States*,
451 U.S. 204 (1981) ..........................................................................44

*Stirone v. United States*,
361 U.S. 212 (1960) ..........................................................................29

*Students for Fair Admissions v. President and Fellows of Harvard College*,
600 U.S. 181 (2023) ....................................................................81, 99

*Tyus v. Urban Search Management*,
102 F.3d 256 (7th Cir. 1996)....................................................................98

*United States v. Acevedo*,
824 F.3d 179 (1st Cir. 2016) ...............................................................44, 45

*United States v. Amaro-Santiago*,
824 F.3d 154 (1st Cir. 2016) ......................................................................79

*United States v. Apicelli*,
839 F.3d 75 (1st Cir. 2016) .................................................................51, 52

*United States v. Ayala-Vazquez*,
751 F.3d 1 (1st Cir. 2014) ..........................................................................51

*United States v. Baird*,
712 F.3d 623 (1st Cir. 2013) ......................................................................71

*United States v. Bartelho*,
129 F.3d 663 (1st Cir. 1997) ......................................................................69

*United States v. Beers*,
189 F.3d 1297 (10th Cir. 1999)..................................................................75

*United States v. Boone*,
959 F.2d 1550 (11th Cir. 1992)..................................................................73

*United States v. Brandao*,
539 F.3d 44 (1st Cir. 2008) ........................................................................29

*United States v. Brown*,
510 F.3d 57 (1st Cir. 2007) ........................................................................55

*United States v. Brunette*,
256 F.3d 14 (1st Cir. 2001) ....................................................................49

*United States v. Bucci*,
525 F.3d 116 (1st Cir. 2008) ..................................................................32

*United States v. Cameron*,
699 F.3d 621 (1st Cir. 2012) ..................................................................38

*United States v. Carta*,
592 F.3d 34 (1st Cir. 2010) ....................................................................32

*United States v. Casanova*,
886 F.3d 55 (1st Cir. 2018) ..................................................84, 87, 88

*United States v. Cecil*,
608 F.2d 1294 (9th Cir. 1979)................................................................31

*United States v. Chancey*,
715 F.2d 543 (11th Cir. 1983)................................................................75

*United States v. Coombs*,
857 F.3d 439 (1st Cir. 2017) ..........................................................43, 44

*United States v. Cordero-Rosario*,
786 F.3d 64 (1st Cir. 2015) ............................................................44, 46

*United States v. Corralez*,
61 M.J. 737 (A.F.Crim.App. 2005) .......................................................66

*United States v. Cruikshank*,
92 U.S. 542 (1875) .............................................................................29, 30

*United States v. Falcón-Nieves*,
79 F.4th 116 (1st Cir. 2023) ..........................................................61, 62

*United States v. Ferguson*,
65 F.4th 806 (6th Cir. 2023) ....................................................................65

*United States v. Figueroa-Lugo*,
793 F.3d 179 (1st Cir. 2015) ....................................................................71

*United States v. Fisher*,
3 F.3d 456 (1st Cir. 1993) ........................................................................32

*United States v. Gamache*,
156 F.3d 1 (1st Cir. 1998) ........................................................................71

*United States v. Garza-Robles*,
627 F.3d 161 (5th Cir. 2010)....................................................................74

*United States v. Gelin*,
712 F.3d 612 (1st Cir. 2013) ..............................................................84, 85

*United States v. Gemma*,
818 F.3d 23 (1st Cir. 2016) ......................................................................69

*United States v. Gillis*,
938 F.3d 1181 (11th Cir. 2019)................................................................73

*United States v. Hall*,
974 F.Supp. 1198 (C.D.Ill. 1997) ..................................................96, 97, 98

*United States v. Henry*,
848 F.3d 1 (1st Cir. 2017) ........................................................................97

*United States v. Hernández-Albino*,
177 F.3d 33 (1st Cir. 1999) ......................................................................79

*United States v. Higgs*,
353 F.3d 281 (4th Cir. 2003)....................................................................73

*United States v. Hillie*,
227 F. Supp. 3d 57 (D.D.C. 2017) ..........................................................33

*United States v. Hitt*,
249 F.3d 1010 (D.C. Cir. 2001) ...................................................29, 33

*United States v. Jackson*,
58 F.4th 541 (1st Cir. 2023) ...........................................................93

*United States v. Jackson*,
24 F.4th 1308 (9th Cir. 2022) ....................................................65, 66

*United States v. Jadlowe*,
628 F.3d 1 (1st Cir. 2010) .............................................................70

*United States v. Kilmartin*,
944 F.3d 315 (1st Cir. 2019) ...............................................58, 59, 60

*United States v. Krivoi*,
80 F.4th 142 (2d Cir. 2023)..............................................................65

*United States v. Leon*,
468 U.S. 897 (1984) .......................................................................49

*United States v. Lowe*,
145 F.3d 45 (1st Cir. 1998) ............................................................62

*United States v. Marchena-Silvestre*,
802 F.3d 196 (1st Cir. 2015) .........................................................101

*United States v. McLellan*,
959 F.3d 442 (1st Cir. 2020) ...........................................................71

*United States v. Meises*,
645 F.3d 5 (1st Cir. 2011) ............................................................103

*United States v. Morillo*,
158 F.3d 18 (1st Cir. 1998) ....................................................................62

*United States v. Moss*,
936 F.3d 52 (1st Cir. 2019) ....................................................................43

*United States v. Mulinelli-Navas*,
111 F.3d 983 (1st Cir. 1997) ..................................................................69

*United States v. Murphy*,
762 F.2d 1151 (1st Cir. 1985) ................................ 30, 31, 33, 34, 39, 40, 41

*United States v. Nance*,
533 F.2d 699 (D.C. Cir. 1976) ................................................................31

*United States v. Nelson-Rodriguez*,
319 F.3d 12 (1st Cir. 2003) ....................................................................38

*United States v. Padilla-Galarza*,
990 F.3d 60 (1st Cir. 2021) ...........................................................51, 103

*United States v. Pagán–Ferrer*,
736 F.3d 573 (1st Cir. 2013) ...........................................................51, 52

*United States v. Paiva*,
892 F.2d 148 (1st Cir. 1989) ..................................................................41

*United States v. Parker*,
872 F.3d 1 (1st Cir. 2017) ..........................................................84, 87, 88

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000)...............................................................31, 33

*United States v. Powell*,
226 F.3d 1181 (10th Cir. 2000)...............................................................75

*United States v. Ranney*,
298 F.3d 74 (1st Cir.2002) ....................................................................70

*United States v. Roberts*,
978 F.2d 17 (1st Cir. 1992) ....................................................................55

*United States v. Rodríguez-Rodríguez*,
663 F.3d 53 (1st Cir. 2011) ..............................................................29, 33

*United States v. Rodríguez-Martinez*,
778 F.3d 367 (1st Cir. 2015) ............................................................61, 62

*United States v. Roman*,
942 F.3d 43 (1st Cir. 2019) ..............................................................44, 48

*United States v. Rosario-Pérez*,
957 F.3d 277 (1st Cir. 2020) ............................................................32, 69

*United States v. Ruiz-Huertas*,
792 F.3d 223 (1st Cir. 2015) ..................................................................101

*United States v. Sanabria*,
645 F.3d 505 (1st Cir. 2011) ...................................................56, 57, 103

*United States v. Sandoval*,
6 F.4th 63 (1st Cir. 2021) ........................................................................97

*United States v. Santa-Manzano*,
842 F.2d 1 (1st Cir. 1988) ...................................................30, 33, 34, 40

*United States v. Sepúlveda*,
15 F.3d 1161 (1st Cir. 1993) .........................................38, 41, 52, 53, 103

*United States v. Sheehan*,
70 F.4th 36 (1st Cir. 2023) ...............................................................43, 44, 49

*United States v. Silva*,
554 F.3d 13 (1st Cir.2009) ....................................................................70

*United States v. Simpkins*,
978 F.3d 1 (1st Cir. 2020) ....................................................................44

*United States v. Spinney*,
65 F.3d 231 (1st Cir.1995) ....................................................................62

*United States v. Tomasetta*,
429 F.2d 978 (1st Cir. 1970) ....................................................................30

*United States v. Torres*,
162 F.3d 6 (1st Cir. 1998) ....................................................................52

*United States v. Trinastich*,
354 F. Supp. 54 (W.D. Mo. 1973)....................................................................31

*United States v. Vigeant*,
176 F.3d 565 (1st Cir. 1999) ....................................................................44

*United States v. Vizcarrondo-Casanova*,
763 F.3d 89 (1st Cir. 2014) ....................................................................33, 77

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999)....................................................................29, 33

*United States v. Ward*,
747 F.3d 1184 (9th Cir. 2014)....................................................................33, 77

*United States v. Wright*,
340 F.3d 724 (8th Cir. 2003)....................................................................75

*United States v. Woodward*,
149 F.3d 46 (1st Cir. 1998) ....................................................................61

*United States v. Young*,
916 F.3d 368 (4th Cir. 2019) .......... 97, 98

*United States v. Zaccaria*,
240 F.3d 75 (1st Cir. 2001) .......... 72

*Wong Sun v. United States*,
371 U.S. 471 (1963) .......... 46, 49

**Constitutional Provisions**

U.S. Const. Amend. IV .......... 43

U.S. Const. Amend. V .......... *passim*

U.S. Const. Amend. VI .......... 29, 31, 37, 38, 54, 69

**Statutes**

18 U.S.C. §1111 .......... 100, 102

18 U.S.C. §1201 .......... 1, 9, 28, 62, 80

18 U.S.C. §3231 .......... 3

18 U.S.C. §3742 .......... 3

28 U.S.C. §1291 .......... 3

**Rules and Guidelines**


Fed.R.Crim.P. 7 ........................................................................29, 36, 37, 38, 41

Fed.R.Crim.P. 16 ..........................................................................................91, 93, 94

Fed.R.Evid. 403 ..............................................................................................59, 93

Fed.R.Evid. 702 ..............................................................................................93, 96

Fed.R.Evid. 703 ....................................................................................................96

USSG §2A1.1 ......................................................................................................100

USSG §2A4.1 ..............................................................................................100, 102


**Articles**


Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4. Harv. L. & Pol. Rev. 149, 149 (2010) ........................85, 87, 88

Gary Blasi, *Advocacy Against the Stereotype*, 49 UCLA L. Rev. 1241, 1243 (2002)...............................................................................................86, 87

Sean Phillip Cotter and Laurel Sweet, *Prosecutor files federal charges against Louis Coleman III in death of Jassy Correia*, available at https://www.bostonherald.com/2019/03/03/prosecutors-coleman-charged-federally-in-jassy-correias-death/ .....................................34, 35

Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945, 951 (2006).......................................85, 86

Elizabeth Hinton, et al., *An Unjust Burden*, Vera Evidence Brief (May 2018), available at https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf .............................81, 82

Jerry Kang & Kristen Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. Rev. 465, 473 (2010) ....................................85, 86, 87

The Honorable Cherron Payne, *All Cases Matter: Mitigating Bias in the Administrative Law Judiciary*, 43 J.Nat'l Ass'n Admin.L.Jud. 1 (2023) ..........................................................................................86

Anna Roberts, *Victims, Right?*, 42 Cardozo L.Rev. 1449 (2021) ......................79

Angela Onwauchi-Willig, *Roberts's Revision: A Narratological Reading of the Affirmative Action Cases*, 137 Harv.L.Rev. 192, 197 (2023) .....................86

**Implicit Bias Videos**

https://www.wawd.uscourts.gov/jury/unconscious-bias .............83, 88, 89

https://www.youtube.com/watch?v=ge7i60GuNRg.............................83, 89

https://www.courts.oregon.gov/how/Pages/jury.aspx.............................83

https://www.cand.uscourts.gov/attorneys/unconscious-bias-video-for-potential-jurors/ ..........................................................................83

**Other**

*Merriam-Webster*, available at https://www.merriam-webster.com/dictionary/inveigle.........................................................74

## INTRODUCTION[1]

Louis Coleman met Jassy Correia outside a Boston club in the early morning on February 24, 2019. Videos showed them walking to his car and her getting in willingly. JA.VIII.1.21-1.26, 9.15-9.23. Two hours later, videos showed him returning to his apartment in Rhode Island and carrying her body inside. JA.VIII.11.01-11.15.

The government did not charge Coleman with homicide. JA.I.63-64. It charged him with kidnapping resulting in death, requiring it to prove, inter alia, that Coleman inveigled or decoyed Correia, held her against her will for an appreciable period, and did so to get some benefit. *Id.*; 18 U.S.C. §1201(a)(1). This charging decision gave the two unrecorded hours between their meeting and his return to his building critical importance. There was evidence that Coleman and Correia had sexual intercourse and an altercation resulting in her death. JA.IV.2312-13, 2332-36. There was no

[1] Citations are as follows: JA.X and SA.X refer to volume X of the joint appendix and sealed appendix; Add. and S.Add. to the addendum and sealed addendum; and DE to a district court docket entry. JA.VIII and SA.IV contain audio and video media; the citations in these volumes correspond to exhibit numbers as listed on the drives.

evidence of what Coleman and Correia said, whether the intercourse was consensual, or where or why the struggle occurred.

The indictment recited the elements of kidnapping without particularizing the seizure, holding, or purpose elements. JA.I.63-64. The government filled this void with allegations that were not presented to the grand jury; that Coleman lured Correia to his car to sexually assault her, did so, and killed her when she struggled. JA.IV.2312-15. Coleman was prevented from adequately presenting his theory of defense, which is discussed in the Sealed Supplemental Brief. He argued that Correia accompanied him willingly, had consensual sex with him, and died when "a sudden and unexpected argument" she initiated turned violent. JA.IV.2326-27. He did not contest that he caused her death. *Id.* Even if the government could have proved homicide, it did not establish kidnapping. Coleman was convicted and sentenced to life imprisonment without the possibility of parole. Add.141-42.

Many of the errors fall into four categories. First, Coleman was convicted based on allegations that were not presented to the grand jury, and the indictment was insufficient. Second, the court made erroneous rulings related to the government's case. Third, the court prevented

Coleman from adequately presenting his theory of defense. Fourth, the court rebuffed Coleman's efforts to make explicit the potential impact of racial bias on his conduct and the judicial process. Each of the errors detailed below requires reversal. This conclusion is strengthened when the errors are considered cumulatively.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, which grants the district courts exclusive jurisdiction over all federal offenses.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which confers jurisdiction to review final district court decisions, and 18 U.S.C. §3742, which provides jurisdiction to review a sentence.

The court entered judgment on November 4, 2022, and a timely notice of appeal was filed on November 10, 2022.[2] JA.VII.4257-58.

---

[2] The court entered a restitution order on March 16, 2023, and amended the judgment on March 31, 2023, and April 6, 2023. Coleman filed notices of appeal on March 30, 2023, March 31, 2023, and April 8, 2023. JA.VII.4259-61.

## ISSUES PRESENTED FOR REVIEW

1. Whether admitting evidence of sexual assault to fulfill the purpose element of kidnapping violated the Fifth Amendment presentment clause where these allegations were not submitted to the grand jury?

2. Whether the indictment was constitutionally insufficient and the court erred by not dismissing it or ordering a bill of particulars?

3. Whether the court erroneously concluded that warrant applications for media devices and accounts provided probable cause to believe that a kidnapping occurred and that evidence would be found in these locations?

4. Whether the court erroneously denied a mistrial after the medical examiner gave unnoticed, unreliable, and prejudicial testimony?

5. Whether the court erroneously permitted the use of the term "sexual assault" where there was no direct evidence of an assault and the facts were contested?

6. Whether the court erroneously admitted prejudicial testimony about Correia's plans after February 24th?

7. Whether the government presented sufficient evidence to establish the elements of kidnapping?

8. See the sealed supplemental brief.

9. See the sealed supplemental brief.

10. Whether the court erroneously denied Coleman's requested jury instructions?

11. Whether, in this trial of a Black man whose defense raised issues of race, the court erred by not educating the jury about implicit bias?

12. Whether the court improperly excluded testimony from an academic explaining research into the impact of negative encounters with police on Black men?

13. Whether the court improperly calculated the guidelines by applying a cross-reference based on a finding that the conduct constituted first-degree murder?

14. Whether these errors, taken cumulatively, require reversal?

## STATEMENT OF THE CASE

### I. Overview.

In February 2019, Louis Coleman was a 32-year-old Raytheon engineer living in Providence, Rhode Island. JA.III.1303-13. He had been sick, but felt better and decided to go out in Boston on the 23rd. JA.III.1312-13; JA.VI.3418-19. He texted friends, but when no one could come, he went

alone. JA.III.1780-84. He arrived in Boston around 1:00am on the 24th, parked his car, and went to Club Venu. JA.VIII.009.01-009.06.

At Venu, Coleman met Lorna Horace, who was there celebrating her birthday. JA.VI.3389-90; JA.VIII.71.1-71.8. Horace led Coleman around by the hand; they danced, kissed, and exchanged truthful personal information. *Id*. When the club closed, Horace's brother and his friend told Coleman it was time for her to leave. JA.III.1701-06, 1713-16. Coleman agreed, was not violent or threatening, and he and Horace continued to exchange text messages. *Id.*; JA.VI.3285-90.

Jassy Correia was also celebrating her birthday at Venu that night with three friends, Yvania Mondesir, Aja Hiltz, and Reginald Thomas. JA.II.872-73, 964; JA.III.1250-52. At Venu, they shared champagne, took some shots, and danced. JA.II.877-79, 969-70; JA.III.1254-55. At some point, Mondesir and Correia began to fight. JA.II.886-87. Outside, after Venu had closed, Correia took off her shoes and told Hiltz "F this, I'm going to fight [Mondesir]." JA.II.948. Correia and Mondesir had a physical altercation that attracted onlookers. JA.II.895-97, 926-28. Hiltz and Thomas left. JA.II.928-30, 974. Mondesir walked away. JA.VIII.1.20. Correia was left with no jacket and no shoes in the cold on the street. *Id.*

Correia approached an Uber, banged on the window, and threatened to call the police, but the driver would not let her in. *Id.*; JA.II.1116-20. Finding the door open, Correia got in. *Id.* The driver pushed her out onto the pavement. *Id.* Correia got up, yelled at the driver, and threw something at the car as onlookers watched. *Id.* After the driver ejected her, Coleman approached her. *Id.* This is when Coleman and Correia met for the first time. JA.VIII.1.20.

After some conversation, Correia walked away with Coleman. *Id.* They walked five blocks to Coleman's car. JA.VIII.1.21-1.26, 9.15-9.23. After walking some distance without shoes, Correia jumped on Coleman's back and rode piggyback. *Id.* When they reached his car, she slid off and got in the passenger door while he got in the driver's side. *Id.* Coleman began driving. *Id.* He parked a short distance away on Tremont Street for approximately 12 minutes before driving on. JA.II.835, JA.III.1808, JA.IV.2311, JA.VIII.9.24. He arrived at his apartment in Providence around 4:00am. JA.VIII.11.01-11.15. He walked to and from his car a few times before taking Correia's body out of his car and carrying it inside. *Id.*

Correia's father and Mondesir reported her missing on February 26th. JA.III.1261-62. Surveillance videos led officers to Coleman. JA.II.1012-

30. Officers found his apartment vacant on February 28th. JA.II.1132-36. Building surveillance videos showed Coleman bringing Correia's body into the building on the 24th and a suitcase on the 27th. JA.II.1164-98; JA.VIII.11, 14, 15, 20, 21. The suitcase appeared to be heavy when he put it in his trunk on the 28th. *Id.*

After finding video showing Coleman's license plate number, officers had OnStar activate the car's tracking device. JA.III.1358-65. OnStar tracking placed the car in Delaware. *Id.* Around 2pm on the 28th, the Delaware State Police pulled Coleman over. JA.III.1367-75. Coleman complied and followed instructions. *Id.*, JA.III.1379, 1381-85, 1554-57. He told officers she was dead and in the trunk. JA.III.1377, 1548. He said that injuries to his face were from "the girl." JA.III.1574-75. There was a suitcase in the trunk containing Correia's body. JA.III.1563-66. An autopsy determined that Correia died by strangulation. JA.III.1443, 1463. She had alcohol, cocaine, and THC in her system. JA.III.1459; JA.IV.2090-98. There were no signs of sexual assault during the autopsy, but later DNA analysis found Coleman's semen in Correia's vagina and his DNA in her rectum. JA.III.1457-58, 1482, 1485, 1493, 1930-32.

## II. Trial.

The grand jury returned an indictment charging Coleman with kidnapping resulting in death in violation of 18 U.S.C. §1201(a)(1) on April 4, 2019. JA.I.63-64. This charge carries the possibility of the death penalty or life imprisonment. §1201(a). On November 4, 2021, the government gave notice that it would not seek the death penalty. DE163.

The parties filed pretrial motions, some of which form the basis for appellate claims and are discussed below.

In opening, the government argued that Coleman "lured [Correia] into his car, confined her there, sexually assaulted her, strangled her to death, and transported her across state lines into Rhode Island, all against her will." JA.II.846. Coleman reminded the jury that he was charged with kidnapping, not murder, manslaughter, or rape. JA.II.852. He explained that he caused Correia's death during an altercation but argued he did not kidnap her. JA.II.853. He said he approached Correia to help, she joined him voluntarily, and his behavior was not consistent with a planned kidnapping. JA.II.861-63, 867.

**A. Government case.**

Hiltz, Thomas, and Mondesir, the friends who went to Venu with Correia, testified. Correia spent the 23rd with Mondesir. JA.III.1250-52, 1268-72. They went shopping and may have smoked some marijuana. *Id*. Correia planned to go out with Hiltz and Thomas that night. JA.II.872-73, 964-66; JA.III.1250-52. After a miscommunication about directions, Hiltz and Thomas arrived at Mondesir's house. *Id*. Mondesir did not know Hiltz or Thomas but decided to join them. JA.II.872-73, 967; JA.III.1251. Hiltz left a gift and balloons for Correia at Mondesir's house. JA.II.873-74; JA.III.1252-53.

Thomas drove everyone to Boston. JA.II.874-75. At Venu, they shared a bottle of champagne, took some shots, and danced. JA.II.877-79, 969-70. Mondesir did not remember anything after this. JA.III.1255-58. Hiltz explained that Mondesir became agitated, yelled, and acted aggressively toward Correia. JA.II.886-87. Thomas said their dispute escalated to an "intense argument." JA.II.971-79. Before leaving, Correia gave the bartender the finger. JA.II.946-47, 988-90. As the club was closing, Mondesir pushed Correia down. JA.II.888-91, 947. Correia told Hiltz "F this, I'm going to fight [Mondesir]." JA.II.948. Correia and Mondesir

continued to fight outside, Mondesir pushed Correia repeatedly, and Correia kicked off her shoes and backed Mondesir against the wall. JA.II.893-97, 947-57; JA.VIII.1.17. After a few minutes, Hiltz and Thomas left, abandoning plans to take Correia to Mondesir's house. JA.II.928-30, 952-53, 974. Mondesir also walked away. JA.VIII.1.20. None of them saw Coleman that night. JA.II.953, 980-81.

Tamer Alquasir was driving an Uber on the 24th. JA.II.1116-20; JA.VIII.1.20. Correia approached, said she wanted an Uber, and tried to get in. *Id.* When he rolled down his window and told her no, she tried to force it down and said she would call the police if he closed it. *Id*. He said he would call the police. *Id*. He put the car in park, the doors unlocked, and Correia got in. *Id.* Alquasir pushed her out. *Id.* Correia fell and threw snow at the car. *Id*. Alquasir saw a man approach her and say that it was not her Uber. *Id*. The man seemed calm and helpful. JA.II.1130. Correia walked away with him. *Id.*

Hiltz testified that Correia had bipolar disorder, did not like her prescribed medication, and used marijuana instead. JA.II.958-60. Coleman was precluded from asking Hiltz and Mondesir questions about Correia

that supported his theory of defense. SA.I.323-42, 348-52. This evidence is discussed in the sealed supplemental brief.

Loveth Anumele, an employee of the shelter where Correia lived, gave Correia a pass to be away until 5pm on the 24th. JA.II.998-1000. Correia planned to meet with Anumele on the 25th, and said her daughter was staying with her grandmother over the weekend. *Id*. Correia's daughter's grandmother picked up Correia's daughter on the 22nd. JA.II.1005-06. They had no plan as to when Correia would get her daughter. *Id*. Correia's manager said she was scheduled to work on February 25th. JA.II.1007. Correia's father and Mondesir reported her missing. JA.III.1261-62.

Ismael Henriquez, a Boston Police Department (BPD) detective, took the report of Correia's disappearance. JA.II.1009-11. He described videos officers gathered from the 24th. JA.II.1012-58, 1074-114. Officers followed Coleman's movements and got his identification. JA.II.1012-30. Videos showed Coleman's car leave, park on Tremont for a short time, turn onto a one-way street (Aguadilla), reverse back up Aguadilla which was blocked by police cars, and get onto the highway. JA.II.1052-58; JA.VIII.9.24, 9.25.

The Providence Police Department (PPD) and BPD investigated at Coleman's apartment. When officers got there and banged on the door, it opened. JA.II.1132-36. There was no one in the apartment, the windows were open, it smelled like cleaning solution, and the shower curtain and some pillow covers were missing. *Id*. The apartment was clean, and the search team did not look for trace evidence or believe that a struggle took place there. JA.II.1213-15. Officers reviewed videos from in and around the building, including footage of Coleman carrying Correia's body inside, taking items, including a suitcase, in and out, and eventually rolling that suitcase out and putting it in the trunk. JA.II.1147-51, 1159-98. One officer noted visible cracks in Coleman's windshield in these videos. JA.II.1169. Officers searched nearby dumpsters and found items including jeans, a belt, a Tyvek suit, plastic sheeting, duct tape, bandaids, face masks, odor eliminators, goggles, and a baking soda box. JA.II.1200-07. Officers collected receipts, videos, and photos showing that Coleman bought pelletized limestone, candles, Tyvek suits, a surgical mask, goggles, tape, three boxes of baking soda, a hand truck, a suitcase, a gas can, and cleaning items. JA.II.1218-28. An FBI forensic accountant's review of Coleman's financial records showed purchases at Venu, purchases of the items

described above, and deposits from Fidelity on the 27th and 28th. JA.IV.1317-49.

A BPD sergeant detective testified about the efforts to find Coleman. Officers asked T-Mobile to "ping" Coleman's phone, but the results yielded limited location information. JA.III.1354. When officers got Coleman's license plate number, they had OnStar activate the car's GPS, which indicated that Coleman was in Delaware. JA.III.1358-65.

Soon after, the Delaware State Police (DSP) stopped Coleman's car. JA.III.1367-75. Coleman pulled over before the trooper activated his lights and was compliant. *Id.*; JA.III.1379, 1381-85, 1554-57. When asked if anyone else was in the car, Coleman said she was dead and in the trunk. JA.III.1377, 1547-48. Officers found Correia's body inside the suitcase. JA.III.1563-66. Officers gathered Coleman's clothes and belongings, took samples, and documented his injuries. JA.II.1570-71, 1581-95. When asked about the injury on his face, Coleman responded that it was "from the girl." JA.III.1574-75. Coleman was cooperative throughout. JA.III.1554, 1571, 1590, 1594, 1647-48.

Roger Cresto, a DSP crime scene investigator, photographed and searched Coleman's car. JA.III.1597-614. The things he found included a

cell phone, computer tower, gas can, charcoal, lighter, air fresheners, ski mask, duffle bag, gloves, pliers, hedge clippers, and a flashlight. *Id*. He took DNA swabs inside the car. JA.III.1626-28. An FBI agent measured and photographed Coleman's car. JA.III.1649-60. He observed that if the car was locked, pulling the interior, passenger-side handle once unlocked it and twice opened the door. JA.III.1654-55, 1663-64. The passenger door had functional controls to lock and unlock the doors. JA.III.1663.

Jennie Vershvovsky, a medical examiner in Delaware, conducted the autopsy. She determined that Correia died from strangulation. JA.III.1443, 1463. She opined that unconsciousness would result after 20-30 seconds of strangulation, brain injury after a minute, and death sometime after that. JA.III.1450-51. She observed abrasions and contusions on Correia's head and body. JA.III.1437-43, 1451-56. Some of these injuries were postmortem, and some could have resulted from falls at Venu. JA.III.1491-93. She did not find any injuries to Correia's internal or external genitalia. JA.III.1457-58, 1493. She did not find sperm or semen. JA.III.1482, 1485. She collected a sexual assault kit and toxicology samples. JA.1422-27, 1458-59. She opined that Coleman's injuries could be consistent with scratches and bite marks. JA.III.1498-1501.

Vershvovsky unexpectedly stated that Corria was "intoxicated but alive" when Coleman carried her into his building because she did not see injuries on Correia's body in the videos. JA.III.1462-63. The court overruled Coleman's contemporaneous objection. *Id*. Before cross-examination, counsel explained that this opinion was inconsistent with the expert disclosure that said she would testify that she could not tell when Correia died. JA.III.1467-72. The court denied a motion for mistrial, but instructed the jury to disregard Vershvovsky's testimony about whether Correia was alive when Coleman carried her into the building. JA.III.1471-72.

Two chemists and the chief forensic toxicologist in Delaware said Correia's toxicology tests were positive for alcohol, cocaine, and THC. JA.III.1691-93; JA.IV.1893-1908.

An FBI agent who examined Coleman's computer tower described searches made after the 24th for, inter alia: hardship withdrawals from a Fidelity account, renter's insurance and front door damage, air fresheners, sanitizing products, IPVanish, IRS audits, turkey basters, RV parks, how to pull a tooth that is not loose, embalming, TOR, and whether a person can fit in a suitcase. JA.III.1738-60.

An FBI forensic examiner who searched Coleman's cellphone described texts, including messages: between Coleman and Horace; to Coleman's mother on February 24th asking to borrow $150; with friends and family on the 27th and 28th in which Coleman said he was going to be in Washington D.C. that weekend; and from the 23rd asking people to come to Boston with him. JA.III.1768-84.

An FBI agent performed a historic cell site analysis of Coleman and Correia's cellphones. JA.III.1787-1800. This data showed that Coleman's phone was near Venu between 12:52am and 2:10am. JA.III.1799-800. It indicated that Coleman and Correia moved toward his parked car between 2:16am and 2:25am. JA.III.1802-04. The car moved before stopping between 2:32 and 2:44am. JA.III.1804-09. The car then got on 93 going toward 95 south. JA.III.1809-12. It turned north for a few minutes at 3:17am before traveling to Rhode Island. *Id*. In the following days, the data showed Coleman going from his apartment to stores and carwashes. JA.IV.1847-55.

An FBI forensic examiner testified that DNA testing revealed semen and DNA consistent with Coleman on the vaginal swab. JA.IV.1930-32. It showed DNA consistent with Coleman, but no semen, on the rectal swab. *Id*. The oral swab contained only Correia's DNA. JA.IV.1923. There was

DNA consistent with Coleman and Correia on the inside of the passenger windshield and door. JA.IV.1932-34. Scrapings from Correia's fingernails contained DNA consistent with Coleman. JA.IV.1940-41. Only Coleman's DNA was found in his fingernail scrapings. *Id*.

Coleman's next-door neighbor heard banging and a door slam early on the 24th. JA.III.1295-99. She heard banging and a sound like "something was being dragged across the floor" early on the 28th. JA.III.1299-1300. That week she noticed a faint smell that faded when she opened her windows. JA.III.1300.

Coleman's supervisor described his work at Raytheon. JA.III.1308-11. On February 19th, Coleman emailed to say he would be out sick. JA.III.1305. On February 25th, Coleman said he was still sick and would be out for a few days. JA.III.1305-07.

Ednel Horace was the brother of the woman, Lorna Horace, Coleman met at Venu. JA.III.1695-1702. He saw Coleman and his sister dancing and talking during the night. *Id*. As the club closed, he decided it was time to go and separated Coleman and his sister. JA.III.1702-07, 1713-16. Coleman agreed and was not violent or threatening. JA.III.1715. The parties stipulated that: videos and messages accurately reflected Coleman's

contact with Lorna Horace; she led him through the club; they kissed; and he gave her truthful personal information. JA.III.1717-19; JA.VI.3389-90.

The property manager who rented Coleman his apartment testified about socializing with him. JA.III.1720-31. She described Coleman as friendly and had never seen him behave inappropriately. JA.III.1730-31.

Coleman filed a Rule 29 motion at the close of the government's case. JA.III.1814-15, JA.IV.1949-50. The court denied this motion. JA.IV.1950-53. He renewed this motion after the close of the evidence, and the court denied it without comment. JA.IV.2271, 2297.

**B. Defense case.**

A defense investigator discussed additional videos from the 24th. JA.IV.1960-68, 2032-38. She described records and video documenting police officers assaulting Coleman in 2013. JA.IV.1968-74, 2020-22; JA.VI.3392-3417, 3430-40; JA.VIII.101. After arresting Coleman for public intoxication and urination, officers took him to a detoxification center. *Id.* During check-in, Coleman repeatedly reached for his cellphone on a counter before officers pulled him to the ground and began to hit him. *Id*. Hospital records documented his injuries. JA.IV.2022-22; JA.VI.3392-3417. The investigator read from records showing that Correia suffered from

substance abuse, depression, anxiety, bipolar disorder, and was not consistent with medication. JA.IV.2022-32. She added some data points to the cell-site map that suggested that Coleman did not drive directly to Providence. JA.IV.2044-54. She photographed damage to the exterior body of his car and marks on the interior roof. JA.IV.2054-62; JA.VI.3441-64.

A forensic toxicologist explained that Correia's toxicology results showed cocaine, alcohol, and past marijuana use. JA.IV.2089-97. He described the effects of these substances, noting that combining alcohol and cocaine can cause violence, paranoia, extreme strength, and increased homicidal ideation. *Id*. He hypothesized that Correia ingested a recreational amount of cocaine one to five hours (most likely two to three hours) before her death. JA.IV.2097-99.

Midtrial, the court decided to permit Mondesir to testify that Correia "engaged in acts of prostitution as needed." JA.IV.2003-06; SA.III.1400-01. Coleman recalled Mondesir. JA.IV.2117-26, 2215-66; SA.III.1420-33. She told the jury that Coleman's questions had "nothing to do with nothing" because "he killed her." JA.IV.2118. When counsel asked "Was [Correia] working as a prostitute on the days immediately before she died?" Mondesir responded "Are you kidding me?" and asked Coleman "What

the fuck you looking at." JA.IV.2118-19. Counsel repeated the question. JA.IV.2119. Mondesir responded "No." *Id*. Mondesir gave nonresponsive answers, spoke over the court, described her trauma, and said the question "has nothing to do with why she's dead." JA.IV.2119-20. The court instructed counsel to "wrap this up." JA.IV.2120. Mondesir stated: "Yes. Hurry up. Don't ask me anything stupid, please." *Id.* Counsel asked: "Did you tell Detective Schroeder in your interview on March 1 of 2019 that Jassy was working as a prostitute on an as-needed basis, mostly on the weekends?" *Id*. Mondesir responded "I plead the Fifth," and her examination ended. *Id.* The government declined the opportunity to cross-examine her. *Id.*

The court instructed that Mondesir's prior statement could be used to assess her credibility, but could not be considered for its truth. JA.IV.2120-21. Coleman objected to the court's instruction, offered the statement under Rule 807, and renewed his motion for a mistrial. JA.IV.2121-22; SA.III.1408-18. The court denied both motions. JA.IV.2215-26; SA.III.1420-33. The court excluded evidence related to Correia that is discussed in the sealed supplemental brief.

### C. Closings, instructions, verdict, and sentencing.

In closing, the government argued that Coleman decoyed and inveigled Correia on Tremont Street. JA.VI.2311. It said Correia fell "into [Coleman's] lap" after he was "shut down" from "getting together with Lorna Horace." JA.IV.2306-08. It argued that Correia wanted to go home and Coleman "wanted to have sex." JA.IV.2308-10. It argued that Correia was held against her will because Coleman must have lied and said he would take her home. *Id*. It said "the holding or detention began at the same time as the inveigling and decoying." JA.IV.2311. It argued that the detention took a different form—force, threats, or coercion—during the 12 minutes the car was parked on Tremont. JA.IV.2311-13. It asserted that the windshield cracks showed that Correia kicked the windshield and that the DNA on the inside passenger door showed "a struggle over her getting out of the car." *Id*. It described Coleman's semen in Correia's vagina and his DNA in her rectum as "consistent with there being a sexual assault there in the car." JA.IV.2313. It described this struggle, assault, and Correia's death as taking "a significant period of time." JA.IV.2314-15. It said this timeline was corroborated by Coleman backing up on Aguadilla Street when he saw police cars. JA.IV.2315.

It noted that the interstate-commerce element could be satisfied if Correia was moved after she died, and she had been in Massachusetts and Rhode Island. JA.IV.2319. It argued that there was evidence that Coleman acted knowingly and willfully because he strangled her to death. JA.IV.2319-20. It said the evidence of Coleman's actions after Correia died showed consciousness of guilt. JA.IV.2320-24.

The defense closing did not contest that Coleman's actions caused Correia's death, but argued that he did not kidnap her. JA.IV.2326-27. It argued that Correia went with Coleman willingly, they had consensual sex, and Correia's death resulted from "a sudden and unexpected argument" that "turned violent." JA.IV.2326. It argued that Coleman's actions after Correia's death showed fear, panic, and distrust of police, not consciousness of guilt. JA.IV.2328-31. It highlighted the two-hour gap that the government could not fill. JA.IV.2331-32. It noted that despite evidence of a violent struggle, there were no injuries to Correia's genitalia, suggesting consensual sex. JA.IV.2334-35. It said that while video showed Coleman's car parked for 12 minutes on Tremont, it did not show it moving, shaking, or the windshield cracking. JA.IV.2335. It argued that Correia started the fight. JA.IV.2335-38. It noted that Coleman did not drive

Correia to a remote area and that his two-hour drive from Boston to Providence showed confusion, not a planned attack. JA.IV.2338-39. It contrasted Coleman's normal behavior that night with Correia's erratic and violent actions. JA.IV.2342-55. It noted that Correia's "original plan had gone out the window" before she met Coleman. JA.IV.2348-49.

After closings, the court instructed the jury. JA.IV.2364-86. Coleman reiterated his objections to the instructions, and the jury retired to deliberate. JA.IV.2386-96. It returned a guilty verdict the next day. JA.IV.2412.

At sentencing, the court imposed the sentence required by the statute: life imprisonment without the possibility of parole. Add.141-42.

## SUMMARY OF ARGUMENT

This case began with a broad, vague indictment that allowed the government to pursue any theory, whether presented to the grand jury or not. JA.I.63-66. For example, it did not specify what ransom, reward, or other benefit Coleman sought. *Id.* At trial, the government argued that Coleman sexually assaulted Correia for sexual gratification. JA.II.846; JA.IV.2309-13. These allegations could not plausibly have been presented to the grand jury because the government did not have evidence of sexual

assault when the indictment was returned. The reliance on allegations not ratified by the grand jury to satisfy a core element of the offense violated the Fifth Amendment presentment clause. The vague indictment violated Coleman's constitutional rights, impaired his trial preparation, and permitted the government to proceed on any theory. The court erroneously denied a motion to dismiss or for a bill of particulars. (Arg.I.)

The indictment errors repeated in warrant applications for Coleman's electronics and related accounts. JA.I.67-243. These applications did not provide probable cause to believe that a kidnapping occurred or that the evidence sought would be found in the devices or accounts. (Arg.II.)

The court made a variety of errors related to the government's case. The indictment gave no details as to when, where, or how Correia died. JA.I.63-66. The government's opening argued that Coleman strangled Correia in his car before driving to his apartment. JA.II.846. The medical examiner unexpectedly testified that she believed Correia was alive at Coleman's apartment. JA.III.1462-63. The court wrongly denied a motion for a mistrial based on this prejudicial and unreliable testimony. JA.III.1467-72. (Arg.III.A.) The indictment did not reference sexual intercourse. JA.I.63-66. There was no direct evidence of whether the

intercourse was consensual. The court erroneously permitted the government to use the term "sexual assault," which assumed critical facts relevant to the purpose element. (Arg.III.B.) The court erroneously admitted testimony from Correia's child's grandmother and a shelter employee about Correia's plans after the 24th. JA.II.998-1006. Their testimony was more prejudicial than probative. (Arg.III.C.) Ultimately, the evidence was insufficient to sustain a kidnapping conviction. (Arg.IV.)

The court violated Coleman's constitutional rights by preventing him from adequately presenting his theory of defense. Two related issues are discussed in the sealed supplemental brief. (Args.V.A.&B.) The court erroneously failed to give Coleman's requested jury instructions, which sought to present his theory of defense and to mitigate errors. (Arg.V.C.).

Coleman, a Black man, was convicted by a jury with no Black jurors. JA.IV.2402. The government argued that Coleman's efforts to conceal Correia's death showed consciousness of guilt. JA.IV.2320-24. Coleman countered that his behavior was explained by his fear of police; he was assaulted by officers in 2013. JA.IV.2328-31. Coleman sought to bring the potential impact of race on his case to light in two ways. He asked the court to show potential jurors a video explaining implicit bias to mitigate its

harm. JA.I.403-14, 534; Add.17-22. He offered testimony from an academic about published, peer-reviewed research documenting the impact of negative police encounters on Black men. JA.I.457-65; JA.IV.1839-41, 1981-91; SA.I.110-56, 221-30. The court erroneously failed to educate prospective jurors about implicit bias and excluded this expert testimony, incorrectly labeling these efforts as contradictory and offensively race-based. Add.17-22; JA.IV.1988-91; SA.I.282-84. (Arg.VI.)

The court miscalculated the guidelines by applying a cross-reference based on its erroneous conclusion that the circumstances of this case amounted to first-degree murder. Add.131-32. This issue is raised for preservation. (Arg.VII.)

Even if these errors do not require reversal individually, their cumulative impact does. These interconnected errors occurred throughout the case, and the government's circumstantial case that Coleman committed *kidnapping* was far from overwhelming. (Arg.VIII.)

## ARGUMENT

### I. Coleman was convicted based on allegations that were not presented to the grand jury, and the indictment was constitutionally insufficient.

The indictment stated:

> On or about February 24, 2019, in the District of Massachusetts, and elsewhere, the defendant, LOUIS D. COLEMAN, III, did unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold, for ransom and reward and otherwise, Jassy Correia, when Ms. Correia was willfully transported in interstate commerce, and when Louis D. Coleman, III traveled in interstate commerce in committing and in furtherance of the commission of offense, resulting in the death of Ms. Correia.
>
> All in violation of Title 18, United States Code, Section 1201(a)(1).

JA.I.63-66. Providing no additional information about the crime alleged, it allowed the government to pursue any theory, whether presented to the grand jury or not. *See Russell v. United States*, 369 U.S. 749, 766 (1962). The court erroneously denied Coleman's motions to preclude evidence of sexual assault that was not presented to the grand jury, to dismiss, and for a bill of particulars.

#### A. The purposes of an indictment.

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury…."

U.S.Const.Amend.V. Indictments also protect citizens from double jeopardy and satisfy the Sixth Amendment's notice requirement. *Stirone v. United States*, 361 U.S. 212, 218 (1960); *Russell*, 369 U.S. at 763-64. This Court explained:

> "[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." To do otherwise would fail "to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's Sixth Amendment right to be informed of the charges against him."

*United States v. Rodríguez-Rodríguez*, 663 F.3d 53, 58 (1st Cir. 2011) (quoting *Stirone*, 361 U.S. at 217 and *United States v. Brandao*, 539 F.3d 44, 57 (1st Cir. 2008)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001); *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury"); *Jeffers v. United States*, 392 F.2d 749, 752-53 (9th Cir. 1968).

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P.7(c)(1). It must "inform the court of the facts alleged, so that it

may decide whether they are sufficient in law to support a conviction…." *United States v. Cruikshank*, 92 U.S. 542 (1875). Inclusion of the statutory language is permissible but not always sufficient. *Hamling v. United States* 418 U.S. 87, 117 (1974); *Russell*, 369 U.S. at 765. If the statute uses broad terms, the indictment must "descend to the particulars" and provide "a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Russell*, 369 U.S. at 765 (internal citations and quotations omitted); *Cruikshank*, 92 U.S. at 558 ("A crime is made up of acts and intent; and these must be set forth in the indictment, with particularity of time, place, and circumstance.").

An indictment that uses broad statutory language without specific factual allegations is constitutionally insufficient. *See Russell*, 369 U.S. at 763-771; *United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir. 1970) (dismissing indictment accusing defendant of threatening unnamed person on particular day in particular city without specifying means); *United States v. Santa-Manzano*, 842 F.2d 1, 2-3 (1st Cir. 1988) (reversing as plain-error indictment that failed to identify what property was object of charged fraud); *United States v. Murphy*, 762 F.2d 1151, 1153-55 (1st Cir. 1985)

(dismissing on plain-error review indictment charging witness intimidation without specifying official proceeding); *United States v. Nance*, 533 F.2d 699, 701-703 (D.C. Cir. 1976) (dismissing indictment that did not specify false pretenses); *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979) (dismissing indictment that tracked statutory language without facts or circumstances of conspiracy); *United States v. Trinastich*, 354 F. Supp. 54, 55 (W.D. Mo. 1973) (dismissing kidnapping indictment that stated victim was "unlawfully seized, confined, inveigled, decoyed, kidnapped, carried away and held…for reward or otherwise, that is for the purpose of sexual gratification"). Indictments must plead "the very core of criminality." *Russell*, 369 U.S. at 764; *see also United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments.").

### B. The admission of evidence that Coleman kidnapped Correia for sexual gratification violated the Fifth Amendment's presentment clause.

This insufficient indictment permitted conviction based on "facts not found by, and perhaps not even presented to, the grand jury…." *Russell*, 369 U.S. at 770. Coleman moved to preclude evidence that he acted for sexual gratification because this allegation was not presented to the grand

jury. SA.I.99-109. The government responded that the indictment was "broad enough to include sexual gratification as one of the purposes of the holding." SA.I.231-32. It argued that there was "significant evidence" of a sexual motive and of sexual assault, but did not assert that this evidence was presented to the grand jury. SA.I.233-34; JA.IV.2183-84. The court concluded the presentment clause was not violated. S.Add.2.

*i. Standard of review.*

This claim is analogous to a pretrial motion raising a constructive amendment. "A constructive amendment occurs when the difference between the indictment and the proof at trial is so great that the defendant was essentially convicted of a charge for which he was not indicted…." *United States v. Rosario-Pérez*, 957 F.3d 277, 289-90 (1st Cir. 2020). "A constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction." *United States v. Fisher*, 3 F.3d 456, 463 (1st Cir. 1993). This Court reviews preserved constructive-amendment and constitutional claims de novo. *United States v. Bucci*, 525 F.3d 116, 131 (1st Cir. 2008); *United States v. Carta*, 592 F.3d 34, 42 (1st Cir. 2010). De novo review applies to this preserved claim. SA.I.99-109; JA.I.244-53, 1532-34, 2179-85.

*ii. An accused can only be tried based on an indictment returned by a grand jury.*

The admission of evidence that Coleman sexually assaulted Correia violated the Fifth Amendment presentment clause. *See United States v. Hillie*, 227 F. Supp. 3d 57, 78 (D.D.C. 2017); *Rodríguez-Rodríguez*, 663 F.3d at 58; *United States v. Vizcarrondo-Casanova*, 763 F.3d 89, 99 (1st Cir. 2014) (explaining rule against constructive amendments protects presentment right); *United States v. Ward*, 747 F.3d 1184, 1189-92 (9th Cir. 2014) (finding constructive amendment where indictment named identity-theft victims, trial discussed named and unnamed victims, and instructions permitted conviction for theft of identity of unspecified "real person"); *Hitt*, 249 F.3d at 1015; *Pirro*, 212 F.3d at 93-94 ("[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime."); *Walsh*, 194 F.3d at 44; *Hunter v. State of New Mexico*, 916 F.3d 595, 598-600 (10th Cir. 1990); *Jeffers*, 392 F.2d at 752-53.

In *Murphy* and *Santa-Manzano*, this Court considered cases involving insufficient indictments where the trial evidence differed from what was

presented to the grand jury. The *Santa-Manzano* indictment did not "specify what property was the object of the charged scheme to defraud." 842 F.2d at 2-4. It alleged that the defendants sold fake certificates of deposit. *Id.* The trial evidence showed that they took money from the victim, failed to pay him in exchange, and used fake certificates of deposit to placate him. *Id.* In *Murphy*, the witness-tampering indictment gave the date of the offense and named the victim but did not specify the proceeding the defendants sought to influence. 762 F.3d at 1153-54. At trial the government "kept its options open" and argued that the defendants tried to influence the witness's testimony in either of two cases. *Id.* There was no way to tell "what official proceeding the grand jury had in mind." *Id.* This Court reversed both convictions on plain-error review. *Santa-Manzano*, 842 F.2d at 3; *Murphy*, 762 F.2d at 1155.

*iii. Allegations of sexual gratification and sexual assault were not presented to the grand jury.*

After Coleman's arrest, the then-U.S. Attorney said, "It does not appear Correia was sexually assaulted," Sean Phillip Cotter and Laurel Sweet, *Prosecutor files federal charges against Louis Coleman III in death of Jassy Correia*, available at

https://www.bostonherald.com/2019/03/03/prosecutors-coleman-charged-federally-in-jassy-correias-death/. The autopsy did not reveal genital injuries, sperm, semen, or other evidence of sexual assault. JA.III.1457-58, 1482, 1485, 1493. The indictment did not allege that Coleman sexually assaulted Correia or sought sexual gratification. JA.I.63-64.

At trial, the government argued that Coleman sexually assaulted Correia. JA.II.846; JA.IV.2309-13. It based this theory on evidence that semen and DNA consistent with Coleman were found in Correia's vagina and DNA consistent with him was found in her rectum. JA.IV.2309-13. This testing could not plausibly have been complete on April 4th at 11:30am when the grand jury returned the indictment. *See* JA.I.54. The sexual assault kit was collected in Delaware. JA.III.1422-27. A DSP evidence technician gave the sexual assault kit to an FBI agent in Delaware on April 4, 2019. JA.1630-31. The testing lab, located in Quantico, Virginia, received the DNA samples from the FBI Boston field office sometime in April. JA.IV.1916; JA.VI 3518. The samples could not realistically have traveled from Delaware to Boston to Quantico, been tested, and the results relayed to the grand jury before 11:30am on April 4th. *See also* JA.VI.3518 (stating DNA report dated August 14, 2019); DE65-1 at 3 (noting defense had not

received results as of October 5, 2019); DE65-2 at 3-4 (asserting DNA analysis done but report not finalized on October 21, 2019); DE65-1 at 7 (indicating DNA report disclosed on November 8, 2019). This timeline shows that evidence of sexual assault was not presented to the grand jury. The government did not argue to the contrary. SA.I.231-38; JA.IV.2183-84.

*iv. The introduction of evidence of sexual gratification violated Coleman's constitutional rights.*

The indictment did not specify what ransom, reward, or other benefit Coleman sought. The government did not present the theory that Coleman sought sexual gratification to the grand jury. It nonetheless used allegations of sexual assault to satisfy the purpose element at trial, making them "essential facts" as contemplated by Rule 7(c)(1). This theory was not ratified by the grand jury, and its use at trial violated Coleman's Fifth Amendment rights. Coleman was "convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell*, 369 U.S. at 770. The court's erroneous admission of allegations not presented to the grand jury requires reversal of the conviction and dismissal of the indictment.

### C. The indictment was constitutionally insufficient. The court erroneously denied the motion to dismiss and the motion for a bill of particulars.

Even apart from the question of what was presented to the grand jury, this indictment violated the Fifth and Sixth Amendments and Fed.R.Crim.P.7(c)(1). JA.I.244-53. Coleman asked the court to dismiss the indictment or to grant a bill of particulars. *Id.* The court denied both motions. JA.I.399-401. It held that the indictment gave "sufficient notice" because it identified the charge, date of the crime, place, and victim. *Id.*

The indictment left the government free to pursue almost any theory, whether or not presented to the grand jury. *See supra* Arg.I.B. It could have argued that Coleman seized, confined, inveigled, decoyed, kidnapped, abducted, or carried Correia away; that he held Correia in any manner for any appreciable period; and that he did so hoping for a reward, ransom, or another benefit. The government argued that Coleman should be ready to meet all these theories. JA.I.284. The indictment violated Coleman's constitutional rights to notice and double jeopardy and required dismissal or a bill of particulars.

*i. Standard of review.*

"The sufficiency of an indictment is a question of law" that this Court reviews de novo. *United States v. Cameron*, 699 F.3d 621, 635 (1st Cir. 2012).

It reviews the denial of a motion for a bill of particulars for abuse of discretion. *United States v. Sepúlveda*, 15 F.3d 1161, 1192-93 (1st Cir. 1993). To prevail, Coleman must identify "a concrete instance of inability to prepare, untenable surprise, or other cognizable prejudice stemming from the trial court's refusal to mandate further particulars." *Id.* at 1193; *see also United States v. Nelson-Rodriguez*, 319 F.3d 12, 31 (1st Cir. 2003).

Coleman preserved these claims. JA.I.244-53, 310-18, 399-401. When the insufficiency of the indictment arose at trial, Coleman reasserted the issue. SA.I.99-109; JA.III.1532-34; JA.IV.2179-85.

*ii. The indictment was constitutionally insufficient.*

This indictment violated the Fifth and Sixth Amendments and Rule 7(c)(1) by alleging broad statutory language without providing factual specificity. *See supra* Arg.I.A. Its omissions go to the core elements of kidnapping. Kidnapping entails "holding a kidnapped person for a proscribed purpose," which "necessarily implies an unlawful physical or mental restraint for an appreciable period." *Chatwin v United States* 326 U.S.

455, 460 (1946). The proscribed purpose includes any benefit to the accused. *Gooch v. United States*, 297 U.S. 124, 128 (1936). This indictment provided no specificity related to these elements. It did not describe how or when Coleman seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away Correia. It did not allege how or when he held her involuntarily for an appreciable period. It did not state what ransom, reward, or other benefit he sought.

It is not sufficient that the indictment provided Correia's name, date, and an indefinite location ("Massachusetts and elsewhere").[3] Unlike the omitted elements, the time and place do not go to the core of the kidnapping charge. *See Murphy*, 762 F.2d at 1153 (finding witness-intimidation indictment naming victim and date insufficient because it did not identify "official proceeding the grand jury had in mind or the defendants must be prepared to meet"). This information did not enable Coleman to foresee the government's theory sufficiently to adequately prepare a defense or the court to evaluate the sufficiency of the allegations.

---

[3] For example, the indictment permitted conviction on the theory that Correia died in Rhode Island. JA.IV.2187-88. ("It has never been clear to [the court] what the government's theory was as to where she was killed except there was a struggle in the car and the windshield was cracked….").

*See* JA.I.284 (government argued that "given that the means of committing the kidnapping are pleaded in the indictment in the conjunctive, the defendant is on notice that he must be prepared to defend against them all"). This Court has found indictments identifying the victim and time but lacking key factual specifications insufficient and plainly erroneous. *See supra* Arg.I.B.

The insufficient indictment caused problems at trial, including errors discussed here. It led to the violation of the presentment clause. *See supra* Arg.I.B. It left room for the medical examiner's prejudicial and unreliable testimony that Correia was alive when Coleman brought her into his apartment. *See Murphy*, 762 F.2d at 1154-55. *Cf.* JA.IV.2187-88. Had the indictment alleged when and how Coleman held Correia, he would have expected this testimony and been prepared to meet it, or it would not have been elicited. This highly prejudicial testimony required a mistrial. *See infra* Args.III.A&V.B.v.

This constitutionally insufficient indictment parroted broad statutory language without indicating how the government intended to prove the core elements or essential facts of the charge. *See Santa-Manzano*, 842 F.2d at 4; *Murphy*, 762 F.3d at 1153-55. It improperly left the government free to fill

these gaps with any theory as the case progressed. The court's erroneous decision to allow the case to proceed requires reversal of the conviction and dismissal of the indictment.

*iii. The court erroneously denied the motion for a bill of particulars.*

Coleman sought a bill of particulars in the event the court denied his motion to dismiss. JA.I.244-53. "[A] bill of particulars cannot save an invalid indictment." *Russell*, 369 U.S. at 770; *see also Murphy*, 762 F.2d at 1154. One should be granted "if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause." *Sepúlveda*, 15 F.3d at 1192-93; *see also United States v. Paiva*, 892 F.2d 148, 154 (1st Cir. 1989); Fed.R.Crim.P.7(f).

The court's denial of a bill of particulars caused unfair surprise and prejudice. *See supra* Arg.I.C.ii. Coleman faced trial without knowledge of the government's theory. The court abused its discretion by denying Coleman's motion for a bill of particulars, and reversal is necessary.

## II. Warrant affidavits did not establish probable cause that a kidnapping occurred or that evidence would be found in the places to be searched.

Coleman moved to suppress the fruits of warrants authorizing searches of his cellphone; records associated with the cellphone; Google records from his cellphone and email account; a laptop and computer tower; and a vehicle information module. JA.I.67-243. He argued that the affidavits did not provide "substantial factual bases" to support probable cause for kidnapping or to conclude that there was a nexus between this crime and the places to be searched. *Id.* For all nine warrants, "the issues are essentially the same and intertwine and overlap to a great extent." Add.6.

The court denied this motion. Add.6-15. Despite noting that the evidence of kidnapping was "circumstantial,'' it concluded that the "magistrate judge could have reasonably inferred" that Correia "was held for some period of time, even if relatively fleeting, against her will in the automobile." Add.7-8. It concluded that the magistrate "could have reasonably inferred…that there was a fair probability that the crime in question occurred." *Id.*

The court said these devices might contain: "GPS movements; text messages, e-mails or similar communications; photos or video; and Internet search information." *Id.* It stated that because Coleman had a phone when he was arrested, it was "an obvious and reasonable inference" that he had it during "the relevant times." *Id.* It held that "common sense and reasonable inferences" supported a conclusion that evidence of kidnapping could be found on the phone. Add.9-14. It noted that the nexus was particularly strong with connection to the computer tower because it was "not something that someone would normally take on a road trip." Add.13. The court held that even if the warrants were defective, officers relied on them in good faith. Add.14-15.

**A. Standard of review.**

"When reviewing the denial of a motion to suppress, [this Court] examine[s] the district court's 'factual findings for clear error and its legal conclusions, including its ultimate constitutional determinations, de novo.'" *United States v. Sheehan*, 70 F.4th 36, 43 (1st Cir. 2023) (quoting *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019)).

Warrants must be supported by probable cause. U.S.Const.Amend. IV. "[P]robable cause 'demands proof sufficient to support a fair

probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched.'" *Sheehan*, 70 F.4th at 44 (quoting *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017)); *see also Steagald v. United States*, 451 U.S. 204, 213 (1981); *United States v. Simpkins*, 978 F.3d 1, 7 (1st Cir. 2020); *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019). While "probability is the touchstone" of probable cause, "suspicion, rumor, or strong reason to suspect wrongdoing are not sufficient." *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999). In "assessing whether such a finding is justified," this Court considers "the totality of the circumstances as they are set forth in the warrant application." *Id.*

### B. The warrant affidavits did not provide probable cause to believe that Coleman kidnapped Correia.

The "probable cause inquiry is shaped by the specific crime for which the police sought evidence." *Sheehan*, 70 F.4th at 45; *see also United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015). These affidavits said the investigation concerned kidnapping resulting in death. JA.I.118-19. This offense requires proof that someone was: "unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away," and held for

"an appreciable period against the person's will" for ransom, reward, or other benefit. *Chatwin*, 326 U.S. at 459; *United States v. Acevedo*, 824 F.3d 179, 184 (1st Cir. 2016); *Gooch*, 297 U.S. at 128; JA.IV.2376-79.

These affidavits do not provide a substantial basis to conclude that there was probable cause supporting these elements. They describe a consensual encounter in which Coleman and Correia walked to and entered his car together. JA.I.110-11. They include no information about what happened between this encounter at 2:16am and Coleman's 4:15am arrival at his building. JA.I.110-16. They do not support the conclusion that Coleman seized Correia or that she was held against her will for an appreciable time. *Id.* The court cited Coleman's injuries, Correia's death, and a broken windshield as evidence that Correia was held. Add.7. None of these factors suffices. Correia's death and Coleman's injuries are evidence of a struggle. They do not suggest the nature of this fight or indicate a seizure or holding. The affidavit did not assert that the windshield was broken from the inside.[4] JA.I.116. Without this

---

[4] At trial, the government used evidence that Correia's DNA was found near the cracks in the windshield to suggest that it was broken from the inside. JA.IV.2312-13. This evidence had not been found at the time of the warrants. *See supra* Arg.I.B.

information, the cracks do not suggest that Correia was held in the car. Nor do the affidavits provide a substantial basis to conclude that Coleman held Correia to secure a benefit for himself.

The affidavits do not provide probable cause to support the elements of kidnapping. The magistrate judge did not have a substantial basis for issuing the warrants, and the fruits of these searches must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

### C. Some of the warrant affidavits did not provide probable cause to believe that evidence of kidnapping would be found in the places to be searched.

Warrant affidavits must provide probable cause to believe that the "enumerated evidence of the offense will be found at the place to be searched." *Cordero-Rosario*, 786 F.3d at 69 (internal citation and quotations omitted). These affidavits did not provide probable cause to believe that evidence would be found on Coleman's cellphone, associated records, Google records, laptop, or computer tower.

The court noted that Coleman had this cellphone when he was arrested, making it fair to infer that he had it throughout. Add.8. However, there are no facts in the affidavit from which to infer that Coleman had *this* cellphone, or any cellphone, with him during the alleged crime. JA.110-16.

Nor are there facts suggesting that he used the laptop or computer tower in connection with it. *Id.* The affidavits made conclusory statements that the cellphone "was used to send or receive relevant e-mails or text messages; to set up or access relevant websites; and/or to communicate with witnesses" and the laptop and tower were used "to communicate with others…to access the internet for the purpose of planning his route…to research various means of cleaning, transporting, and disposing of a human body and trace evidence." JA.I.118, 173. They did not describe messages, e-mails, voicemails, internet searches, calls, or chats that Coleman made or sent. They did not reference anyone other than Correia communicating with Coleman, and their interaction was in-person. They supplied no facts suggesting that Coleman searched the internet, set up or accessed websites, or communicated with witnesses. There was no probable cause that the items the government sought would be found in the phone, records, laptop, or computer tower.

The affidavits made general statements about phones and computers, including that people "carry out, communicate about, and store records regarding their daily activities on equipment like cellular phones," smartphones "function essentially as small computers," and the items the

government sought "are commonly stored" in smartphones. JA.I.117, 148, 173-74. These general inferences do not link smartphones or computers to kidnapping generally or the allegations here. This Court has "expressed skepticism" that general observations can establish probable cause. *Roman*, 942 F.3d at 51, 54 (concluding statement "that [drug traffickers] commonly store relevant evidence in their homes" and observations of "large scale of the [drug] operation," did not provide probable cause to believe evidence would be found in defendant's home). "[T]he inquiry is not whether the owner of the property is suspected of a crime but rather whether there is reasonable cause to believe that the specific things to be searched for and seized are located on the property…." *Id.* at 50 (internal quotations omitted).

The generalized observations here add less value than those in *Roman*. There are not even statements that officers understood that most people have and travel with cellphones or that kidnappers use cellphones, computers, or the internet in connection with their crimes. Although insufficient under *Roman*, such statements would show an effort to tie these devices to kidnapping. These affidavits made no such attempt.

The court erred in concluding that the affidavits provided probable cause to believe that evidence of the alleged kidnapping would be found in Coleman's cellphone, its records, Google records, laptop, or computer tower. The fruits of these searches must be suppressed. *Wong Sun*, 371 U.S. at 471.

**D. The good-faith exception cannot save these warrants.**

The good-faith exception provides that evidence need not be suppressed "if the officer who conducted the search acted in reliance upon the defective warrant and that reliance was objectively reasonable." *Sheehan*, 70 F.4th at 51. "[T]he good-faith exception is not a panacea for every invalid warrant." *Id.* It does not apply "when the supporting affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). "'The government bears the burden of showing that its officers acted with objective good faith.'" *Id.* (quoting *United States v. Brunette,* 256 F.3d 14, 17 (1st Cir. 2001)).

The fact that these warrants lacked probable cause should have been immediately obvious. They did not contain probable cause to support the core elements of kidnapping. Nor did they contain facts, generalized or

specific, providing probable cause to believe that evidence of the crime would be found on Coleman's phone, computers, or related records. The court erroneously applied the good-faith exception. The evidence should have been suppressed, and reversal is required to correct this error.

## III. The court committed various errors related to the government's case.

### A. The court erroneously denied a mistrial when the medical examiner opined that Correia was alive when Coleman brought her into his building.

The government's expert disclosure said Vershvovsky, the medical examiner, would testify that Correia's "death resulted from strangulation, and that the manner of death was homicide" and "that it is not possible to determine with precision the date or time of…death." JA.VI.3515. At trial, the government asked: "When you viewed the video of Ms. Correia being dragged inside the building, were you able to make a determination as to whether she was alive or dead at that point?" JA.III.1462-63. Vershvovsky replied that Correia was "intoxicated but alive" because she did not see injuries on Correia's body in the video. *Id*. The parties expected Vershvovsky to testify that she could not tell when Correia died. JA.III.1467-72.

The court overruled Coleman's contemporaneous objection. JA.III.1462-63. When the government finished its direct, counsel asked to be heard. JA.III.1467-72. Coleman explained that this testimony was contrary to the expert disclosure, unscientific, unreliable, and prejudicial. *Id.* Coleman had consulted an expert who believed it was not possible to tell whether Correia was alive in that video. *Id.* He was not under subpoena because Vershvovsky's testimony was unexpected. *Id.* Coleman argued that striking the testimony and instructing the jurors was insufficient and moved for a mistrial. *Id.* The court denied the motion and told jurors to disregard Vershvovsky's "statement concerning whether [Correia] was alive or dead at the moment that she was taken out of the car and into the apartment." *Id.* Coleman renewed his motion for a mistrial. *Id.*; *see also infra* Arg.V.B.v. The court later prohibited the government from arguing that Correia was alive when Coleman brought her inside. JA.IV.2185-88.

*i. Standard of review.*

"Appellate review of the denial of a mistrial motion is for abuse of discretion." *United States v. Padilla-Galarza*, 990 F.3d 60, 80 (1st Cir. 2021). The inquiry surveys the entire record. *United States v. Ayala-Vazquez*, 751 F.3d 1, 23 (1st Cir. 2014). This Court considers "three factors: '1) whether an

appropriate curative instruction was issued, 2) whether the judicial response was timely, and 3) whether appellants successfully rebutted the presumption that the jury followed the judge's instructions.'" *United States v. Apicelli*, 839 F.3d 75, 86 (1st Cir. 2016) (quoting *United States v. Pagán–Ferrer*, 736 F.3d 573, 586 (1st Cir. 2013)). "When 'a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice.'" *Id.* (quoting *United States v. Torres*, 162 F.3d 6, 12 (1st Cir. 1998)). "Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." *Sepúlveda*, 15 F.3d at 1184.

Coleman preserved this claim and argued that striking the testimony was insufficient and a mistrial was necessary. JA.III.1462-63, 1467-72. He renewed his motion for a mistrial when later testimony strengthened his argument. JA.IV.2130-33, 2215-26; *infra* Arg.V.B.v.

*ii. Vershvovsky's testimony caused extreme prejudice requiring a mistrial.*

In opening, the government argued that Coleman "lured [Correia] into his car, confined her there, sexually assaulted her, strangled her to

death, and transported her across state lines into Rhode Island…." JA.II.846. It argued that Coleman planned to sexually assault Correia from the moment he saw her and that he purposefully killed her. JA.IV.2307-15. Nothing in the indictment bound the government to this theory. Had the court permitted it, the government could have argued that Coleman struggled with Correia in the car and then brought her, intoxicated and incapacitated, to his apartment to kill her.[5]

Vershvovsky's testimony introduced the specter of a substantially more premeditated and disturbing encounter between Coleman and Correia. It suggested that Coleman incapacitated Correia and confined and killed her in his apartment. The judicial response was insufficient. The court overruled a contemporaneous objection to this testimony. JA.III.1462-63. The court's instruction to disregard this testimony came after a break. JA.III.1462-72. *Cf. Sepúlveda*, 15 F.3d at 1185 ("Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony."). The court gave no information about

[5] The court prohibited this argument because the government represented that "[w]e pretty much all agree that the murder occurred inside the car." JA.IV.1838, 2185-88.

why it struck this testimony. This sequence of events may have given the jury the impression that this testimony was being excluded for formalistic reasons.

The court said it would give additional instructions, but later denied Coleman's request for such instructions. JA.IV.2215-16, 2387-88. The jury had to find that Coleman held Correia for an appreciable amount of time. JA.IV.2378. Vershvovsky's testimony indicated that Coleman held Correia during the car ride and in his apartment. Without this testimony there was insufficient evidence of a holding of an appreciable length. *See infra* Arg.III.D. The testimony caused extreme prejudice that was not cured by the court's instruction, and Coleman's conviction should be reversed.

### B. The court erroneously permitted the government to use the term "sexual assault."

Coleman sought to preclude the government from using the terms "rape" and "sexual assault." DE246. He explained that although there was evidence that he and Correia had sex, there was no evidence that it was nonconsensual. *Id*. He argued that the term "sexual assault" was speculative and invaded the province of the jury in violation of his rights to due process and a fair trial under the Fifth and Sixth Amendments. *Id*. The

government responded that there was evidence of nonconsensual sex—DNA, Correia's injuries, damage to the car, and Correia's high blood alcohol content. DE278. It explained that prejudice could be "managed" by instructing "the jury that it is for them to decide whether a sexual assault has occurred."[6] *Id.* The court concluded that "sexual assault" was not unfair or inflammatory. JA.I.453.

*i. Standard of review.*

This Court reviews a ruling "on whether to admit or exclude evidence, including rulings on motions *in limine,* for abuse of discretion." *United States v. Brown*, 510 F.3d 57, 66 (1st Cir. 2007). "[A] district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." *United States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992). Coleman preserved this

[6] The court instructed that "otherwise" can include sexual gratification. JA.IV.2379. It did not state that it was up to the jury to decide if a sexual assault occurred.

argument. DE246; JA.I.453. *Cf.* SA.I.99-109; JA.I.244-53; JA.III.1532-34; JA.IV.2179-85.

*ii. The term "sexual assault" violated Coleman's constitutional rights to due process and a fair trial.*

A critical question at trial was what happened between the time Coleman and Correia got in his car and when he arrived at his building. There was evidence that they had sex and that there was a struggle in Coleman's car. There was no direct evidence that the sex was nonconsensual or about the cause of the struggle. Although Correia had injuries, she had none to her genitalia.[7] JA.III.1457-58, 1493. The evidence was equivocal, or even favored Coleman, and the court erred by permitting the government to use the term "sexual assault."

Allowing the government to characterize what happened as "sexual assault" was unfairly prejudicial and invaded the province of the jury. The government argued that sexual assault satisfied the purpose element of kidnapping. It is up to the jury to decide the ultimate issues. *Cf. United*

[7] The autopsy did not reveal that Coleman and Correia had sex. The ME saw no semen or injuries. JA.III.1457-58, 1482, 1485, 1493. The government did not allege sexual gratification until receiving DNA results post-indictment. *See supra* Arg.I.B.

*States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011) ("[L]ay opinion testimony on the ultimate issue in a case must satisfy Rule 701's helpfulness requirement, and 'seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness'[s]....'" (quoting *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986))). Allowing the government to characterize what happened as "sexual assault" likely predisposed jurors to believe that Coleman seized and held Correia against her will. Permitting use of the term "sexual assault" removed the issue from the jury and presented nonconsensual sex as a fact. This error requires reversal.

**C. The court erroneously admitted prejudicial testimony about Correia's plans for the days after the 24th.**

The government offered Correia's statements to her child's grandmother and to a shelter employee about her plans for the weekend of February 23-24 and after as nontestimonial non-hearsay showing her "intent and state of mind" on the 24th. DE234. In opposition, Coleman argued that the statements were irrelevant because they did not make it more or less likely that Correia went with him willingly or that he lied to her. DE267. He said there was "no reason to doubt" that Correia intended

to return home and that her statements could be consistent with going with Coleman willingly. *Id.*; JA.II.622. He explained that this testimony would be prejudicial because it would introduce information about the "challenging circumstances" Correia faced "as a single mother and a survivor of domestic violence." *Id.*

*i. Standard of review.*

This Court has explained the standard of review:

> Where, as here, objections to evidentiary rulings are preserved, review is for abuse of discretion. Although this standard of review is deferential, it "does not render trial court decisions impervious to scrutiny." As we have observed, abuse of discretion "sounds worse than it really is." It simply means that "when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."

*United States v. Kilmartin*, 944 F.3d 315, 335 (1st Cir. 2019) (internal citations and quotations omitted).

Coleman preserved his objection to the admission of this testimony about Correia's weekend plans. DE267; JA.II.618-23, 875, 996-97.

*ii. Correia's statements to her child's grandmother and shelter employee were more prejudicial than probative.*

"Evidence is relevant as long as it has some tendency to make a fact of consequence more or less probable." *Kilmartin*, 944 F.3d at 335. Evidence should be excluded "if its probative value is substantially outweighed by a danger…unfair prejudice." Fed.R.Evid.403. Courts must "strike a delicate balance between the government's need for the evidence (that is, its probative value) and the risk that the evidence will inflame the jurors' passions (that is, its unfairly prejudicial effect)." *Kilmartin*, 944 F.3d at 336. "[A] lack of dispute or concession of a central allegation may significantly reduce the probative value of particular evidence and, thus, call its admissibility into question." *Id.* at 335.

The defense agreed that Correia intended to return home after the weekend of 24th. DE267; JA.II.622. Going with Coleman, taking a ride from him, and having consensual sex with him, could all be consistent with her plans to stay with Mondesir for the weekend before returning home. Testimony from Hiltz, Mondesir, and Thomas indicated that Correia planned to return home after celebrating her birthday. JA.II.875, 929, 972-73. The testimony from Correia's child's grandmother and the shelter

employee caused unfair prejudice by informing the jury that Correia had a young child, was living in a shelter, and was working to improve her life. This information had no relevance but was calculated to make Correia more sympathetic.[8] *See Kilmartin*, 944 F.3d at 337 ("Just because evidence may have a smidgen of probative value, that bare fact does not give the government free rein to capitalize upon its emotionally laden content, particularly where, as here, the government can easily prove its case without fanning the flames of unfair prejudice."). *Cf.* JA.IV.2308-09. The court abused its discretion in admitting these statements, and their admission requires reversal.

## IV. The government did not present sufficient evidence to sustain Coleman's conviction.

When the government rested, Coleman moved for a judgment of acquittal. JA.III.1814-15; JA.IV.1949-50. The court denied the motion because it concluded that it was a "reasonable inference" that Coleman "intended to confine [Correia] and commit a sexual assault either from the very beginning or soon after." JA.III.1950-53. It believed that these actions

[8] In contrast, the court excluded testimony about Coleman's future. JA.III.1307-09.

occurred while the car was stopped briefly on Tremont Street. *Id.* The court noted that the windshield was cracked. *Id.* It speculated that the absence of Coleman's DNA in Correia's mouth indicated that there had not been "a lengthy romantic kissing interlude." *Id.* It noted that she may have been "confined to prevent her from reporting something to the authorities." *Id*. It said jurors could reasonably infer that she was "held or detained in the automobile for an appreciable period of time prior to her sexual assault, prior to her murder or both." *Id.* Coleman renewed this motion at the close of evidence. JA.IV.2271-72, 2297. The court denied the renewed motion without additional findings. JA.IV.2297.

**A. Standard of review.**

This Court's "review of preserved sufficiency challenges is de novo." *United States v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). "In reviewing a sufficiency challenge, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Woodward*, 149 F.3d 46, 56 (1st Cir. 1998)). During this inquiry, this Court "draw[s] all reasonable evidentiary and credibility inferences in favor of the verdict.

*United States v. Rodríguez-Martinez*, 778 F.3d 367, 371 (1st Cir. 2015). It "must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *Id.* (quoting *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir.1995)). "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction." *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998) (internal quotations omitted); *see also Falcón-Nieves*, 79 F.4th at 126 (finding evidence insufficient on plain-error review).

Coleman preserved the argument that the government presented insufficient evidence. JA.III.1814-15; JA.IV.1949-50, 2271-72, 2297.

### B. There was insufficient evidence to satisfy the seizure element.

The statute lists diverse actions that can satisfy the seizure element. 18 U.S.C. §1201; *Chatwin*, 326 U.S. at 460; *United States v. Lowe*, 145 F.3d 45, 52 (1st Cir. 1998). Seize, confine, kidnap, abduct, and carry away require proof of the physical taking of a victim. JA.IV.2376. Inveigle and decoy are nonforcible takings involving enticement by deceit or fraud. JA.IV.2377.

The government did not present sufficient evidence to establish this element. There was no evidence of a physical taking. Videos showed Correia accompanying Coleman and getting in his car voluntarily. JA.VIII.1.21-1.26, 9.15-9.23. Nor was there direct evidence of what Coleman said to Correia or why she went with him. There was circumstantial evidence that she joined him because he offered her a ride home. It is not incompatible with Correia's desire to return home to believe that she also agreed to have sex with Coleman. There is no evidence that Coleman made false representations, tricked Correia, or intended to sexually assault her.

The court's statement that jurors could infer that Coleman intended to confine and assault Correia from early in the encounter was not supported by the evidence. JA.IV.1950-51. Coleman began the night asking friends to join him in Boston. JA.III.1780-84. He acted appropriately towards Horace, separating calmly from a willing partner when her companions asked him to do so. JA.III.1703-06, 1713-16; JA.IV.2342-55; JA.VI.3389-90. The interactions with Correia show no evidence of planning or forethought. JA.IV.2338-39. Viewing the evidence in the light most favorable to the verdict, it is at least equally likely that Coleman intended

to offer Correia a ride home, had consensual sex with her, and that her death resulted from a sudden struggle.

### C. There was insufficient evidence that Coleman held Correia against her will for an appreciable time.

There was insufficient evidence for the jury to conclude that Coleman held Correia for "an appreciable period." JA.IV.2378 The Federal Kidnapping Act was passed to address an "epidemic" of "[r]uthless criminal bands" that chose wealthy victims, preplanned "seizures and detentions," and crossed state lines to obtain ransom payments while avoiding detection. *Chatwin*, 326 U.S. at 462-63. "The principal danger of overzealous enforcement" of this statute "is that persons who have committed such substantive crimes as robbery or assault which inherently involve the temporary detention or seizure of the victim will suffer the far greater penalties prescribed by the kidnapping statutes." *Government of Virgin Islands v. Berry*, 604 F.2d 221, 226 (3d Cir. 1979). A holding inherent in another crime is not kidnapping. *Id.* Courts have identified factors to determine whether a holding was inherent in another crime:

> (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the

> asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Id.* at 227; *see also United States v. Jackson*, 24 F.4th 1308, 1311-14 (9th Cir. 2022); *United States v. Ferguson*, 65 F.4th 806, 811, 815 (6th Cir. 2023); *United States v. Krivoi*, 80 F.4th 142, 153-54 (2d Cir. 2023).

The government argued that Correia was held during the commission of assault, sexual assault, and homicide. JA.IV.2311-15. To ensure that these crimes were not improperly converted into kidnapping, the government had to prove that any holding lasted longer than the restraint inherent in those offenses. It did not do so. Videos showed that Correia went with Coleman willingly. JA.VIII.1.21-1.26, 9.15-9.23. The passenger door could not be locked to keep her in the car. JA.III.1655, 1663-64. There was no evidence of a holding that lasted longer than the time required for the alleged sexual assault. Correia died from strangulation, which necessarily entailed a holding. There was no evidence that it lasted longer than this inherent restraint. *See Jackson*, 24 F.4th at 1314-15. *Cf.* Add.7-8 (ruling on motion to suppress court noted magistrate could infer Correia "was held for some period of time, even if relatively fleeting, against her will in the automobile.").

The court's inference that the sexual assault, holding, and fatal struggle occurred during the stop on Tremont Street[9] is not supported by the record. JA.IV.1951. Tremont Street was well-lit, and Correia could have opened the passenger door. JA.III.1655, 1663-64. The stop is on tape. JA.VIII.9.24. There is no indication that the car is moving, that doors open, or that the windshield cracks during this time. Coleman drove away at a normal speed. It is equally plausible that Coleman and Correia had consensual sex during this time, and the struggle resulting in her death happened later, during the unrecorded hours. Even if the court were correct, this set of facts does not support the conclusion that Coleman held Correia for an "appreciable period." *Cf. Jackson*, 24 F.4th at 1314 (finding insufficient evidence of kidnapping and describing "seven-minute holding" as "quite brief on the spectrum of possible kidnappings"); *United States v. Corralez*, 61 M.J. 737, 749 (A.F.Crim.App. 2005).

---

[9] The court said this stop lasted 14 minutes. JA.IV.1951. Evidence showed that it was approximately 12 minutes. JA.II.835; JA.III.1804-09; JA.IV.2311; JA.VIII.9.24.

### D. There was insufficient evidence that Coleman held Correia for ransom, reward, or otherwise.

The government was required to prove that Coleman held Correia for ransom, reward, or otherwise. JA.IV.2379. It argued that Coleman held Correia for sexual gratification or to prevent her from reporting a sexual assault to the police. JA.IV.2310-15. Both theories depend on accepting that a sexual assault occurred. There was insufficient evidence of sexual assault. Correia's injuries indicated that a struggle occurred. However, she had no injuries to her genitalia, suggesting that the struggle did not happen at the same time as the intercourse and that the sex was consensual. JA.III.1457-58, 1493; JA.IV.2334-35.

The court stated that it was possible to infer that the sex was not consensual because Coleman's DNA was not found in Correia's mouth. JA.IV.1951. There was no evidence about how long DNA stays in someone's mouth or suggesting that one would expect to find Coleman's DNA in Correia's mouth if they had kissed. Nor would an encounter without kissing indicate a lack of consent. It is just as consistent with a commercial sex transaction or with a quick but consensual encounter between relative strangers. Further, evidence of sexual assault should have

been excluded because these allegations were not presented to the grand jury. *See supra* Arg.I.B.

### E. There was insufficient evidence that Coleman intended to kidnap Correia.

The government had to prove that Coleman *intended* to kidnap Corriea, including that he intended to seize her and hold her against her will for an appreciable time for personal benefit. JA.IV.2376, 2380-81. The government did not introduce sufficient evidence for the jury to infer that Coleman had this intent. Even if it showed that he intended to assault Correia, there was no evidence that he forcibly took her or lied to confine her for an appreciable time to sexually assault her. It is equally plausible to believe that he offered to help Correia, she accepted his help, and their encounter took turns that neither one expected. This evidence cannot sustain a kidnapping conviction and Coleman's conviction should be vacated.

## V. The court erroneously prevented Coleman from adequately presenting his theory of defense.

The court permitted the government to present a factual theory not presented to the grand jury while excluding evidence vital to Coleman's defense. Coleman's theory of defense was that he offered to help Correia,

she accepted, they had consensual sex, and she died when "a sudden and unexpected argument" she initiated turned violent. JA.II.861-63, 867; JA.IV.2326-27. The court excluded evidence related to other aspects of his defense, as described in the sealed supplemental brief. SA.I.75, 81, 108-09; SA.III.1420; *see* Args.V.A&B. The court violated his constitutional rights by preventing him from fully presenting his defense.

"The Sixth Amendment guarantees criminal defendants the right to present a defense…." *United States v. Bartelho*, 129 F.3d 663, 673 (1st Cir. 1997); *see also United States v. Mulinelli-Navas*, 111 F.3d 983, 992 (1st Cir. 1997). The Fifth Amendment "guarantees the right to a fair trial, and courts have 'long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *United States v. Gemma*, 818 F.3d 23, 34 (1st Cir. 2016) (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)). The accused must be allowed to rebut the government's case. *Rosario-Pérez*, 957 F.3d at 294. The court deprived Coleman of these rights and misapplied the rules of evidence.

**A. See the sealed supplemental brief.**

**B. See the sealed supplemental brief.**

### C. The court erred in not giving the jury instructions Coleman requested.

Both parties filed proposed jury instructions. JA.I.496-527. The court prepared draft instructions and held a charge conference. JA.IV.2134-2230. Coleman objected to the draft instructions at the conference, in writing after the conference, and after the court instructed the jury but before the jury retired to deliberate. JA.IV.2134-2270; 2386-2395. Some of the instructional errors compounded the errors discussed above. Others prevented the jury from adequately considering his theory of defense. Whether taken singly or as a whole, these errors require reversal.

*i. Standard of review.*

"Preserved claims of instructional error are reviewed under a two-tiered standard: we consider de novo whether 'an instruction embodied an error of law,' but 'we review for abuse of discretion "whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues."'" *United States v. Jadlowe*, 628 F.3d 1, 14 (1st Cir. 2010) (quoting *United States v. Silva,* 554 F.3d 13, 21 (1st Cir.2009)(quoting *United States v. Ranney,* 298 F.3d 74, 79 (1st Cir.2002))).

"A district court's refusal to give a requested instruction is reviewed de novo." *United States v. Figueroa-Lugo*, 793 F.3d 179, 191 (1st Cir. 2015). "The initial threshold determination we must make is whether the evidence, viewed in the light most favorable to the defense, 'can plausibly support the theory of the defense.'" *Id.* (quoting *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998)). "If the evidence is sufficient, we then move onto a three-part test where the district court is reversed only if the proffered instruction was '(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense.'" *United States v. McLellan*, 959 F.3d 442, 467 (1st Cir. 2020) (quoting *United States v. Baird*, 712 F.3d 623, 628 (1st Cir. 2013)).

Coleman preserved the claims raised here. JA.IV.2386-95; *see also* JA.IV.2134-2270. He prevails under either standard of review.

*ii. The court erroneously failed to sufficiently inform the jury that it could not consider evidence that had been struck.*

Coleman identified three places that he wanted the court to instruct that "[t]estimony or other evidence that has been struck is not evidence,

and it cannot be considered by you": an instruction that the verdict must be based solely on the evidence, one about what is evidence, and one about what is not evidence JA.IV.2238-40, 2387-88. The court added it to the instruction about what is not evidence, but not the other two, because it seemed "exceedingly redundant." JA.IV.2279, 2367-71.

The instruction Coleman requested was a correct statement of law; juries cannot consider stricken evidence. *See, e.g.*, *United States v. Zaccaria*, 240 F.3d 75, 82 (1st Cir. 2001) (noting that evidence court did not strike was before jury). It was critically important that this jury understand that it could not consider testimony the court struck. Vershvovsky gave prejudicial and unreliable testimony that Correia was alive when Coleman carried her into his building. *See supra* Arg.III.A. The court struck this testimony and gave a midtrial curative instruction but denied two mistrial motions. *See id.*; *supra* Args.III.A&V.B.v. While denying the second mistrial motion, the court said it would give curative instructions. JA.IV.2215-16. Coleman requested these instructions in an effort to mitigate the uncurable taint of Vershvovsky's testimony. JA.IV.2387-88. Given the extreme prejudice resulting from Vershvovsky's testimony, the instruction about

disregarding stricken evidence was insufficient. Whether reviewed de novo or for abuse of discretion, this error requires reversal.

*iii. The seizure-element instructions were erroneous.*

Coleman identified several errors in the seizure-element instructions. He asked the court to explain that to prove inveigling or decoying, the government had to prove that he "had the willingness and intent to use physical force to complete the kidnapping if the deception failed." JA.IV.2257, 2389, 2392. This instruction supported Coleman's argument that he did not kidnap Correia and that any use of force was part of a mutual struggle. This instruction was a correct statement of law. *See United States v. Boone*, 959 F.2d 1550, 1556-57 (11th Cir. 1992) ("To determine whether a kidnapping by inveiglement has occurred prior to transportation, a fact finder must ascertain whether the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed."); *United States v. Gillis*, 938 F.3d 1181, 1207-09 (11th Cir. 2019); *United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003) (noting defendant tricked victims and "was prepared to confine them at gunpoint if necessary"). The requested

instruction was integral to Coleman's defense and the court did not convey this information.

The court instructed that inveigle "means to entice, cajole or tempt a victim" and "may include deceitful means, such as false promises or representations, although such false promises or representations are not required." JA.IV.2377. Coleman asked it to explain that inveigle means "to entice, cajole, or tempt a victim by false promises, false representations, or other deceitful means." JA.IV.2257, 2389-90.; *see United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010) (defining "inveigle" as "to lure, or entice, or lead the person astray by false representations or promises, or other deceitful means"). The court misstated the law by instructing that "inveigling" does not require deceit or falsehoods. Colloquially, inveigling can mean coaxing, flattering, or winning someone over by wiles. *Merriam-Webster*, available at https://www.merriam-webster.com/dictionary/inveigle. To support a kidnapping conviction, however, inveigle must include deception or falsehoods. Without deception, the inveigled person gave valid consent.

Coleman asked the court to clarify that the government had to prove that he seized, confined, inveigled, or decoyed Correia without consent.

JA.IV.2256-58, 2388-90. He requested the same addition to the overview kidnapping instruction. *Id*. Lack of consent is a fundamental element of kidnapping. *Chatwin,* 326 U.S. at 464; *see also United States v. Wright*, 340 F.3d 724, 731 (8th Cir. 2003); *United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999); *United States v. Powell*, 226 F.3d 1181, 1194 (10th Cir. 2000); *United States v. Chancey*, 715 F.2d 543, 545–547 (11th Cir. 1983); *Hattaway v. United States*, 399 F.2d 431, 433 (5th Cir. 1968). The court did not convey this information to the jury.[10] This instruction was integral to Coleman's defense because he argued that Correia went with him willingly.

The court explained that the fact that Correia went with Coleman "voluntarily at first does not necessarily mean that a kidnapping did not occur." JA.IV.2377. Coleman objected to the inclusion of "factual scenarios." JA.IV.2258, 2390. This instruction improperly bolstered the government's case and denigrated Coleman's argument that Correia joined him willingly by implying that even if this was true, it did not matter. The court inappropriately suggested the verdict.

---

[10] The court explained that the government had to prove that Coleman *held* Correia against her will. It never instructed that the seizure had to be nonconsensual.

Whether reviewed de novo or for abuse of discretion, the seizure-element instruction failed to convey the theory of defense and may have led to a conviction on improper grounds.

*iv. Holding-element and purpose-element instructions were erroneous.*

Coleman identified errors in the holding-element and purpose-element instructions. JA.IV.2259-61, 2390-93. Following the statutory language, the court instructed that the government had to prove that Coleman held Correia "for ransom or reward or otherwise." JA.IV.2281-82. As with the general kidnapping instruction, Coleman asked the court to replace "otherwise" with "other benefit" to Coleman. JA.IV.2259-61, 2388, 2390-93. The requested instruction is consistent with the law. *Gooch*, 297 U.S. at 128 ("Congress intended to prevent transportation in interstate or foreign commerce of persons who were being unlawfully restrained in order that the captor might secure some benefit to himself."). The court explained that "otherwise" *could* include the government's theories without defining its limits. JA.IV.2379. The instruction bolstered the government's case and permitted a conviction if the jury found that Coleman acted for any reason, including anger, confusion, or fear.

The court stated that "otherwise" could include "sexual gratification." JA.IV.2379. In an effort to address the insufficient indictment and presentment violation, Coleman asked the court to instruct that "otherwise" cannot include "sexual gratification." JA.IV.2261, 2393; *see supra* Arg.I.B. The court's refusal to give the requested instruction violated Coleman's constitutional rights by permitting a conviction based on a theory that was not presented to the grand jury. *Supra* Arg.I.B; *see Vizcarrondo-Casanova*, 763 F.3d at 99 (noting instructions can cause constructive amendments and constructive amendments "are forbidden" in part to protect presentment right); *Ward*, 747 F.3d at 1191 (describing "jury instructions as a reflection of the indictment" in finding constructive amendment).

Whether reviewed de novo or for abuse of discretion, these instructions failed to convey the theory of defense and may have led to a conviction on improper grounds.

*v. Consciousness of guilt instruction was erroneous.*

The court told the jury that it could consider Coleman's actions after the alleged crime in assessing his intent. JA.IV.2380-81. It said these actions might indicate that he believed he was guilty, but that "[m]ere flight,

without more, is not necessarily indicative of feelings of guilt." *Id.* Coleman requested three additions to this consciousness-of-guilt instruction: 1) that his post-event behavior could indicate that he thought he was guilty of "the crime charged" instead of "one or more crimes"; 2) that it was possible that a "fleeing person is innocent but believes that contact with police could be dangerous"; and 3) that "'consciousness of guilt' evidence is never enough by itself to convict a person of a crime." JA.IV.2264, 2393-94.

These requests are consistent with the law. *See Commonwealth v. Warren*, 475 Mass. 530, 540 (2016) ("[F]light is not necessarily probative of a suspect's state of mind or consciousness of guilt. Rather, the finding that black males in Boston are disproportionately and repeatedly targeted for FIO encounters suggests a reason for flight totally unrelated to consciousness of guilt."). Coleman argued that his post-event behavior was driven by fear of the police, not by guilt. He introduced evidence that his fear of police derived in part from his experience being assaulted by officers in San Diego. JA.IV.1968-74, 2020-22; JA.VI.3392-3417, 3430-40; JA.VIII.101. The court excluded his proffered expert testimony about the impact negative encounters with police have on Black men. *See infra* Arg.VI.B. The alleged consciousness-of-guilt evidence was inflammatory.

*See* DE247; JA.I.453-55. It was important to inform the jury that he could not be convicted based solely on this evidence. Whether reviewed de novo or for abuse of discretion, these errors require reversal.

*vi. Other errors.*

Coleman objected to calling him the defendant and Correia the victim. JA.IV.2255, 2388. This language assumed Coleman's guilt, endorsed the government's theory, and depersonalized Coleman and Correia. *See, e.g.*, Anna Roberts, *Victims, Right?*, 42 Cardozo.L.Rev. 1449 (2021).

The court told jurors that it was "important" to reach a verdict and that they should "reconsider" their views if they believed it was appropriate. JA.IV.2382. Coleman objected on the grounds that this instruction was similar to an *Allen* charge. JA.IV.2268, 2395. An *Allen* charge may be appropriate when a jury is deadlocked. *See United States v. Amaro-Santiago*, 824 F.3d 154, 162-63 (1st Cir. 2016). "An *Allen* charge, by its nature, 'can have a significant coercive effect….'" *Id.* at 163 (quoting *United States v. Hernández-Albino*, 177 F.3d 33, 38 (1st Cir. 1999)). "[T]o militate against the inherently coercive nature of an *Allen* charge," it must do three things: 1) suggest that the majority and minority reconsider their positions; 2) reiterate that the government bears the burden of proof; and 3) tell the

jury it may not reach unanimity." *Id.* The court's instruction carried the risks of an *Allen* charge without doing these three things. The court abused its discretion by giving this instruction before the jury started deliberating.

The court instructed that the government had to show that Correia's death resulted from Coleman's acts or conduct. JA.IV.2265, 2394. Coleman asked the court to say that it had to prove that her death resulted from *kidnapping*. *Id*. The requested instruction is consistent with the law. After listing the elements, the kidnapping statute requires a penalty of death or life imprisonment "if the death of any person results." 18 U.S.C. §1201. It requires a link between the death and these elements. *Id.* This distinction was important to Coleman's defense. He did not contest that his actions caused Correia's death, but argued they were not kidnapping. JA.II.853; JA.IV.2326-27. The court's instructions blurred this distinction and impaired the jury's consideration of his defense. Whether reviewed de novo or for abuse of discretion, these errors require reversal.

*vii. Taken together, the instructional errors require reversal.*

Whether reviewed de novo or for abuse of discretion, each of these errors requires reversal. Looking at all the instructions together strengthens this conclusion. The instructions misstated the law, had the potential to

confuse or mislead the jury, and/or failed to convey accurate law integral to the theory of defense.

## VI. Issues of structural racism were not appropriately addressed, resulting in an unfair trial.

As Justice Thurgood Marshall wrote nearly 50 years ago:

> Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. It was unlawful to teach him to read; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave.

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 387–388 (1978). The legacy of slavery, the Civil War, and Reconstruction continue today: "The race-based gaps that first developed centuries ago are echoes from the past that still exist today. By all accounts, they are still stark." *Students for Fair Admissions v. President and Fellows of Harvard College*, 600 U.S. 181, 393 (2023) (Jackson, J., dissenting); *see also* Elizabeth Hinton, et al., *An Unjust Burden*, Vera Evidence Brief (May 2018), available at https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf ("[O]verview of the ways in which America's

history of racism and oppression continues to manifest in the criminal justice system.”).

The Supreme Court has emphasized the role of courts in ensuring “that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy.” *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017). “Racial discrimination in the jury system pose[s] a particular threat both to the promise of the [Fourteenth] Amendment and to the integrity of the jury trial….” *Id.* at 222. “The duty to confront racial animus in the justice system is not the legislature’s alone. Time and again, this Court has been called upon to enforce the Constitution’s guarantee against state-sponsored racial discrimination in the jury system.” *Id.* at 222. “[S]ociety can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution.” *Id.* at 229.

Coleman, a Black man, asked the court to show prospective jurors a video about implicit bias and offered expert testimony describing the impact of negative police encounters on Black men. Both motions sought to recognize the impacts of race so that they did not affect the trial under the

surface. JA.I.403-14, 457-65, 534; JA.IV.1839-41, 1981-91; Add.17-22; SA.I.110-156, 282-85. The court erroneously denied both motions. Add.17-22; JA.IV.1981-91.

### A. The court incorrectly denied Coleman's motion to show jurors a video discussing implicit bias.

Coleman asked the court to show prospective jurors a video discussing implicit bias. JA.I.403-14. He cited studies showing that people have biases of which they are unaware. *Id.* He suggested a video used in the Western District of Washington or one called "What Would You Do."[11] *Id.* The court denied the motion and explained that "the basic concept underlying the video is important, that is, the need for jurors to attempt to be aware of their biases and prejudices." Add.17-22. It called the videos "distracting," "smug and condescending," and "not worth it on balance." *Id*. It said the case was not "particularly racially charged." *Id.*

---

[11] The videos are available at: https://www.wawd.uscourts.gov/jury/unconscious-bias; https://www.youtube.com/watch?v=ge7i60GuNRg. *See also* https://www.courts.oregon.gov/how/Pages/jury.aspx; https://www.cand.uscourts.gov/attorneys/unconscious-bias-video-for-potential-jurors/

The court told prospective jurors that voir dire was meant to ensure that the jurors selected could decide the case free from bias and prejudice. JA.I.575, 582. It said Coleman and Correia were Black, that Coleman could not be judged based on "his ethnicity or race," and asked whether these facts would prevent any jurors from being fair and impartial. JA.II.635-36. Once the jury was selected, it instructed:

> [T]he defendant should be judged based on the evidence, not on his race or gender. But each of you should take extra care to make sure you're doing exactly that, that you're being as honest as you can with yourselves. If you hear yourself thinking inwardly that's what a typical man would do under these circumstances or, worse, a typical black man or a typical woman would do this or a typical black woman, stop yourself, catch yourself, think about what you're doing. Are you making a decision based on the evidence or something else?
>
> I'm not saying it's easy to overcome your assumptions, again, the ones that you're not even thinking about, but it is your duty and responsibility to be as fair as you can and to decide the case based on the evidence and not according to generalized assumptions that you may have.

JA.II.815-16. The court denied Coleman's request for an implicit bias instruction at the end of trial. JA.IV.2196-97.

*i. Standard of review.*

This Court reviews voir dire procedures for abuse of discretion. *United States v. Parker*, 872 F.3d 1, 6 (1st Cir. 2017); *United States v. Casanova*, 886 F.3d 55, 60 (1st Cir. 2018). "The dispositive question [is]…whether our

review of the record leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Gelin*, 712 F.3d 612, 621 (1st Cir. 2013) (internal quotations omitted).

*ii. The importance of educating jurors about implicit bias.*

Research shows that racial bias is not always overt. Nearly all humans have implicit biases—subconscious stereotypes and attitudes that shape their reactions without their awareness. *See, e.g.*, Jerry Kang & Kristen Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. Rev. 465, 473 (2010) ("Implicit biases…are both pervasive (most individuals show evidence of some biases), and large in magnitude, statistically speaking."); Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4. Harv. L. & Pol. Rev. 149, 149 (2010) ("Implicit biases are the plethora of fears, feelings, perceptions, and stereotypes that lie deep within our subconscious, without our conscious permission or acknowledgement. Indeed, social scientists are convinced that we are, for the most part, unaware of them. As a result, we unconsciously act on such biases even though we may consciously abhor them."); Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias:*

*Scientific Foundations*, 94 Cal. L. Rev. 945, 951 (2006) ("Implicit biases are discriminatory biases based on implicit attitudes or implicit stereotypes. Implicit biases… can produce behavior that diverges from a person's avowed or endorsed beliefs or principles."); Gary Blasi, *Advocacy Against the Stereotype*, 49 UCLA L. Rev. 1241, 1243 (2002) ("The behavior of real human beings is often guided by racial and other stereotypes of which they are completely unaware."); The Honorable Cherron Payne, *All Cases Matter: Mitigating Bias in the Administrative Law Judiciary*, 43 J.Nat'l Ass'n Admin.L.Jud. 1 (2023); *Lee v. Howard Hughes Medical Institute*, 607 F.Supp.3d 52, 65 (D.Mass. 2022) ("It has been 'long recognized' that unlawful discrimination can spring not only from conscious animus but also from stereotypes and unconscious bias."); *see also* JA.I.403-14.

One way to mitigate the impact of implicit bias is to educate people—implicit bias exists, it is normal, and it operates without awareness. *See, e.g.* Angela Onwauchi-Willig, *Roberts's Revision: A Narratological Reading of the Affirmative Action Cases*, 137 Harv.L.Rev. 192, 197 (2023) ("Implicit bias research reveals that making race salient in the assessment of people…may be a necessary precursor to reducing the effects of nonconscious racial bias."); Kang & Lane at 500 ("[B]eing aware of potential biases, being

motivated to check those biases, and being accountable to a superior (as a jury feels toward a judge) should have some effect on the translation of bias to behavior."); *Blasi* at 1275 ("Awareness by targets of these paths to prejudice is generally a condition precedent to reducing their effects.").

One federal judge wrote:

> [E]fforts can be made to educate attorneys and potential jurors of the possible impact of implicit biases. For example, I now include a slide about implicit bias in the PowerPoint presentation that I show before allowing attorneys to question potential jurors. As some of the "shooter bias" studies and the recent study of unconscious racial bias in trial judges have demonstrated, such information may mitigate the effect of the bias. Beyond informing various participants at the start of trial, jury instructions could include a brief discussion of implicit bias and urge jurors to attempt to control or eliminate them. Many of my colleagues are unreceptive to this idea, fearing that implicit biases will only be exacerbated if we call attention to them. However, the positive outcomes of studies attempting to teach actors about their implicit biases leave me undeterred.

Bennett at 169.

*iii. The court erroneously refused to show the venire a video about implicit bias.*

Courts must ask voir dire questions about racial prejudice in cases raising related concerns. *Parker*, 872 F.3d at 6-7. This voir dire need not be individual; group voir dire is sufficient. *Id.* at 8; *Casanova*, 886 F.3d at 61-62. Coleman does not argue that particular voir dire questions were necessary

or that they had to be asked individually. Unlike in *Parker* and *Casanova*, the court did not provide a sufficient substitute for the requested implicit bias videos. The court asked potential jurors if they could set aside prejudice and told them it was important to do so. JA.I.575, 582; JA.II.635-36, 815-16. After the jurors were selected, it cautioned them to be aware of their "assumptions," but did not ask if they could do so. JA.II.815-16. These questions and instructions did not sufficiently address or explain implicit bias. *Cf.* Bennett at 160 ("[J]udges commonly ask questions such as, 'Can all of you be fair and impartial in this case?' This question does not begin to address implicit bias, which by its nature is not consciously known to the prospective juror. Thus, a trial court judge schooled in the basics of implicit bias would be delusional to assume that this question adequately solves implicit bias.").

The court's statements about the videos indicate abuse of discretion. The court dismissed and criticized these videos, calling them "distracting," "smug," and "condescending." Add.17-22. The Washington video, produced by a federal court, strikes a neutral, informational tone. *See* https://www.wawd.uscourts.gov/jury/unconscious-bias. It explains implicit bias, including the reasons it may exist, using simple, non-racially-

charged examples. *Id.* The other video is a sociological experiment showing passersby reacting to a white man, then a Black man, and then a white woman trying to cut a lock off a bike. *See* https://www.youtube.com/watch?v=ge7i60GuNRg. It illustrates, rather than explains, implicit bias. *Id.* Nothing in these videos merits the court's derision.

The court erred in stating that this was not "a particularly racially charged crime." Add.17-22. Race was a fundamental part of this case. Coleman is Black, as was Correia. Coleman was convicted by a jury that contained no Black people. JA.IV.2402. The government argued that Coleman's efforts to flee and to hide Correia's death showed consciousness of guilt. JA.IV.2320-24. Coleman argued that his reaction resulted from his experience as a Black man in America. JA.IV.2328-31. In 2013, he was beaten by officers who arrested him for public urination and intoxication. JA.IV.1968-74, 2020-22, 3392-3417, 3430-40; JA.VIII.101. A video of this assault shows that he was not threatening or belligerent and that the officers' response was out of proportion to the situation. JA.VIII.101. The court erroneously precluded expert testimony about how negative encounters with police impact Black men. *See infra* Arg.VI.B.

Given the history of racial bias in America and the importance of ensuring that the judicial system is as unbiased as possible, these developments in the understanding of prejudice should have been part of voir dire. People can be motivated by unknown biases, and drawing their attention to these biases mitigates their impact. Educating potential jurors about implicit bias was an important facet of Coleman's defense. The court abused its discretion by not doing it, and reversal is required.

### B. The court improperly excluded expert testimony explaining the impact of negative encounters with police on Black men.

Coleman offered expert testimony from Jeffrey Fagan to support his argument that he fled from the police because of fear, not consciousness of guilt. SA.I.113, 221-30. He included Fagan's CV and explained that the professor would testify that "impacts upon Black persons of involuntary police confrontation, false accusations by police, and threatening police behavior extend beyond liberty interests to include the fear of grievous bodily harm and possibly death," and "that fear, anxiety, and impaired perception and social judgment occurs so that flight may be unrelated to consciousness of guilt." SA.I.226-27. He stated that Fagan would "explain empirical studies showing that the impacts of threatening police

interactions extend beyond the violation of a Black person's liberty interests to include fear of bodily harm and possibly death." SA.I.113.

The government argued that these disclosures did not satisfy Rule 16 because they did not include the studies Fagan would testify about or the basis for his opinions. SA.I.226-30, 457-65. The court described this testimony as "problematic" because it was "like an expert opinion that people of a particular race or ethnic group or whatever have certain characteristics." JA.I.458. Coleman argued that he had satisfied the requirements of Rule 16 and that Fagan's opinion was based on "his years as both a professor, a researcher, and an academic on the topic." JA.I.460-63. The government said it would be "great" if Coleman could "point" "to what [Fagan] has done that is relevant to the rather brief description of the testimony he plans on giving." JA.I.463-64. The court invited supplemental filings. JA.I.464.

A few days later, the court opined that Coleman's disclosure was not sufficient under Rule 16 because "You can't just opine. You have to indicate what the basis of your opinion is." SA.I.282. It said that there might be *Daubert* issues. SA.I.282-84. It noted that this might not be a "valid subject for expert opinion" because courts generally "don't permit racial or general

propositions that black people are more likely or less likely to do this or not do that." *Id.* The court indicated it would permit argument about tension between law enforcement and Black communities, but that this testimony goes further and is "a stereotype opinion." *Id*. It suggested that this testimony ran counter to Coleman's request for the implicit bias video because it asked the jury to conclude that he was likely to have certain characteristics based on race. *Id.*

Coleman filed a supplemental expert notice. JA.VI.3523-26. It repeated the first notice and explained that Fagan would base his testimony on various articles. *Id.* It cited 11 articles that Fagan authored or coauthored and 6 other articles he relied on. *Id*. Each article described a study, including its methodology and results. Coleman provided these articles to the court and government. JA.VII.3556-4206. The court repeated its concerns:

> I have issues with the adequacy of the notice, but even putting that aside, I have lots of questions about the methodology, about the conclusion, even assuming that it's adequate social science. You know, I certainly have a problem with using, you know, what is in effect a race-based conclusion to try to prove a fact.

JA.IV.1840. Coleman responded that Fagan's testimony was based on peer-reviewed and published studies showing that "police are more likely to use

force on black people" and that anxiety results in Black men, particularly those who have had negative encounters with police. JA.IV.1982. He explained that this testimony countered the government's consciousness-of-guilt theory and provided information not typically understood by jurors. JA.IV.1981-91.

The court excluded Fagan's testimony. It described his testimony as "just a generalization based on race" and "propensity based upon…race." JA.IV.1987-91. The court stated that it was "impossible" "to assess even what the precise opinion is, what the methodology is," and that it did not know whether the studies cited were reliable. JA.IV.1988. It called the testimony "troublesome," "offensive," and "problematic in the extreme." JA.IV.1988-91. It excluded the evidence "under Rule 702 and Rule 403, and at least in part on Rule 16, for the lack of full disclosure." JA.IV.1987-91.

*i. Standard of review*

This Court reviews a court's decision to admit or deny expert testimony for abuse of discretion. *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 48 (1st Cir. 2009); *Muskat v. United States*, 554 F.3d 183, 193 (1st Cir. 2009); *United States v. Jackson*, 58 F.4th 541, 550 (1st Cir. 2023). A court abuses its discretion when it "'considers improper criteria, ignores criteria that

deserve significant weight, or gauges only the appropriate criteria but makes a clear error of judgment in assaying them.'" *Muskat*, 554 F.3d at 193 (quoting *Rosario–Urdaz v. Rivera–Hernández*, 350 F.3d 219, 221 (1st Cir. 2003)).

*ii. Coleman's expert disclosure was sufficient.*

Expert disclosures must contain:

> • a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief;
> • the bases and reasons for them;
> • the witness's qualifications, including a list of all publications authored in the previous 10 years; and
> • a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

Fed.R.Crim.P.16(b)(1)(C). These disclosures are meant to give "a fair opportunity for the government to meet the defendant's evidence." Fed.R.Crim.P.16(b)(1)(C)(ii); *see also* Commentary to 1993 Amendment ("The amendment is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.").

Coleman satisfied these requirements. He explained that Fagan would "testify that the impacts upon Black persons of involuntary police

confrontation, false accusations by police, and threatening police behavior extend beyond liberty interests to include the fear of grievous bodily harm and possibly death" and that "fear, anxiety, and impaired perception and social judgement occurs so that flight may be unrelated to consciousness of guilt." JA.VI.3523-25. He explained that Fagan would base this testimony on his "training and experience." *Id.* He provided 17 articles, 11 of which Fagan wrote or cowrote, as well as citations and summaries of each article. *Id.*; *see also* JA.VII.3556-4206. Coleman provided Fagan's CV, which included cases in which he had given expert testimony. JA.VI.3527-3555.

The disclosures informed the court and government of Fagan's opinion and of the research, studies, and articles he relied on. This information gave the government a fair opportunity to cross-examine Fagan. No more was required. Each study explained its methodology. JA.VII.3556-4206. To the extent the court was nonetheless unable to assess Fagan's methodology or to determine whether the studies were reliable, these concerns go to the admissibility of the testimony, not the sufficiency of the disclosure. *See Martínez v. United States* 33 F.4th 20, 24 (1st Cir. 2022) (noting difference between unreliable opinion and one jury may deem unpersuasive). The proper mechanism to explore questions about

reliability is a *Daubert* hearing. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).

*iii. Fagan's testimony was admissible under Rules 702 and 703.*

A qualified expert may give opinion testimony if it "will help the trier of fact to understand the evidence or determine a fact in issue." Fed.R.Evid.703. "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. Judges play a gatekeeping role and must "determine that 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Martínez*, 33 F.4th at 24 (quoting *Daubert*, 509 U.S. at 597). "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).

Fagan's testimony was reliable. He is an academic researcher with decades of training and experience. JA.VI.3527-55. "[S]ocial scientists testify from a practical standpoint about the human behavior they observe" and "write scholarly articles about their observations which are subjected to peer review by others in their profession." *United States v. Hall*, 974 F.Supp. 1198, 1203 (C.D.Ill. 1997) (admitting expert testimony about coercive

interrogation techniques and false confessions). One court suggested the following parameters for evaluating social-science testimony:

> In any field of social science, an expert should have to testify, at a minimum, to the longevity of that particular field, the amount of literature written about the subject, the methods of peer review among its scholarly journals, the quantity of observational or other studies conducted in that field, the comparative similarity of observations obtained, the reasons why those studies are deemed valid and reliable, and the general consensus or debate as to what the raw data means. In addition, the particular expert who wishes to testify must establish that he is sufficiently familiar with the topics mentioned above to render an informed opinion about them. It would also be helpful, but not necessary, to show that the proposed expert personally contributed to the field about which he is testifying, either through personal observation or by publication of an article, book or treatise on the subject.

*Id.* Fagan had years of expertise in this area, had published many articles on the topic, and could have testified to any of these topics.

Courts routinely admit expert testimony based on training and experience even when unaccompanied by the scientific method or peer-reviewed publications. *See United States v. Henry*, 848 F.3d 1, 11-12 (1st Cir. 2017) (permitting expert testimony about drug slang and quantities from agent based on training and experience); *United States v. Sandoval*, 6 F.4th 63, 86-87 (1st Cir. 2021) (allowing agent's testimony about MS13 research); *see also United States v. Young*, 916 F.3d 368, 379-81 (4th Cir. 2019) (admitting

professor's testimony about convergence between Nazism and radical Islam); *NAACP v. City of Myrtle Beach*, 504 F.Supp.3d 513, 517-18 (D.S.C. 2020) (allowing expert opinion that permit denial was race-based). Fagan's testimony was not based solely on training and experience; he had conducted multiple studies related to the impact of negative police encounters on Black men. JA.VI.3523-55. These studies resulted in published and peer-reviewed articles. *Id.* His testimony was reliable.

Fagan's testimony was relevant. The government argued that Coleman's flight indicated consciousness of guilt. JA.IV.2320-24. Coleman countered that it was explained by fear of the police rooted in his experiences as a Black man, including having been assaulted by officers. JA.IV.2328-31. Fagan's testimony would have helped the jury understand the evidence and decide the facts by providing a background against which to understand Coleman's defense. *See Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir. 1996) ("Social scientists in particular may be able to show that commonly accepted explanations for behavior are, when studied more closely, inaccurate. These results sometimes fly in the face of conventional wisdom."); *Hall*, 974 F.Supp. at 1202-06 (holding that social-science testimony about false confessions challenged common

misperceptions and would help trier of fact if defendant showed use of coercive interrogation techniques).

The court's belief that Fagan's testimony was offensive, race-based, or grounded in predisposition was unfounded. JA.IV.1988-91. *Cf. Students for Fair Admissions*, 600 U.S. at 334 (Sotomayor, J., dissenting) ("Ignoring race will not equalize a society that is racially unequal. What was true in the 1860s, and again in 1954, is true today: Equality requires acknowledgment of inequality."). Studies performed by Fagan and others indicate that Black men, particularly those who have had negative encounters with police, may fear grievous bodily harm and death at the hands of the police, which may manifest as flight. JA.VI.3523-3555; JA.VII.3556-4206. Coleman, a young Black man, was assaulted by police. JA.IV.1986-74, 2020-22; JA.VI.3430-40, 3392-3417; JA.VIII.101. He attempted to counter the government's consciousness-of-guilt narrative by explaining that his flight was driven by fear. JA.IV.2328-31. Fagan's testimony would have put Coleman's defense into a larger context. Standing alone, Coleman's assertion that he ran because he was afraid of the police may have seem counterintuitive or far-fetched to the nearly-all-White jury. *See* JA.IV.2402. Placing it in the context of social-science studies showing that

such fears are widespread would have helped the jury understand this important part of the case.

Fagan's testimony was reliable, relevant, and would have helped Coleman counter the government's case. Like an implicit bias video, Fagan's testimony would have made plain the ways race and prejudice manifest themselves in our society, thus providing Coleman with a fairer trial. The exclusion of Fagan's testimony was erroneous and had a substantial negative impact on Coleman's case. Some of the most disturbing and prejudicial evidence in this case related to Coleman's efforts to conceal Correia's death. *See* DE247; JA.IV.2328-31. Rebutting the government's narrative about these acts was critical. Fagan's testimony was an important part of explaining an alternate motivation. Its exclusion impaired Coleman's right to present a defense and requires reversal.

**VII. The court improperly calculated Coleman's guidelines range.**

Section 2A4.1 applies to kidnapping offenses and includes a cross-reference: "if the victim was killed under circumstances that would constitute murder under 18 U.S.C. §1111…, apply §2A1.1". U.S.S.G. §2A4.1. The PSR applied §2A1.1(a) and found a total offense level of 43. SA.III.1527-28. Coleman objected. SA.III.1541; Add.130-33. He argued that

this cross-reference should not apply because Correia's death "resulted from sudden mutual combat that is inconsistent with the offense of first-degree murder," making the total offense level 36. *Id.*

The court noted that this issue was "technical" because the statue required a life sentence. Add.132. It concluded that the "actions here would constitute first degree murder," and found a total offense level of 43. Add.132. Counsel objected. *Id.* Coleman recognizes that the statute requires life imprisonment irrespective of his Guidelines offense level. He raises this issue to preserve it in case relief is available in the future.

**A. Standard of review**

A claim that the court miscalculated the Guidelines is a claim of procedural error. *United States v. Marchena-Silvestre*, 802 F.3d 196, 200 (1st Cir. 2015). "When mulling the procedural reasonableness of a sentence, we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion." *United States v. Ruiz-Huertas*, 792 F.3d 223, 226 (1st Cir. 2015). Coleman preserved the argument that the cross-reference and higher offense level did not apply. SA.III.1541; Add.130-33.

### B. The court abused its discretion by determining that the facts of this case constituted first-degree murder.

The cross-reference applies "if the victim was killed under circumstances that would constitute murder under 18 U.S.C. §1111." U.S.S.G. §2A4.1. Section 1111 provides: "Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. §1111. It explains that murder "perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate,…kidnapping,…aggravated sexual abuse or sexual abuse,…is murder in the first degree." *Id.*

The evidence did not show that Coleman acted with malice aforethought or that he kidnapped or sexually assaulted Correia. *See supra* Arg.III.D. The evidence showed that Coleman and Correia had sex, but not that it was nonconsensual. *Id.* Correia went with Coleman willingly; he did not seize her or hold her for an appreciable time or for a proscribed purpose. *Id.* Coleman did not contest that he caused Correia's death, but argued that it resulted from a sudden and unexpected argument that turned violent. JA.IV.2326-27. The evidence did not support the conclusion

that his acts constituted first-degree murder, and the court erred in applying the cross-reference.

**VIII. Cumulative error.**

"Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect." *Sepúlveda*, 15 F.3d at 1195-96; *see also United States v. Meises*, 645 F.3d 5, 23-25 (1st Cir. 2011) (reversing based on cumulative error); *Sanabria*, 645 F.3d at 516-19. "[C]laims under the cumulative error doctrine are *sui generis*." *Id.* This Court considers them:

> [A]gainst the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case.

*Id.* "[S]uch claims are typically raised—as here—for the first time on appeal." *Padilla-Galarza*, 990 F.3d at 85.

Each of the errors described above requires reversal. However, even if none alone suffices, the cumulative-error doctrine demands reversal. The court made errors throughout trial; the errors described here include pretrial rulings, issues related to jury selection, evidentiary errors (of

admission and exclusion), and problems with jury instructions. The errors include two motions for mistrial based on highly prejudicial testimony and witness conduct. The errors were interconnected. As this brief explains, there are four main categories of error: 1) errors related to the insufficiency of the indictment and presentment clause violation; 2) errors made during the government's case allowing it to fill in gaps in evidence with allegations not presented to the grand jury; 3) errors connected to the court's refusal to permit Coleman to present a full defense, violating his constitutional rights; and 4) errors surrounding Coleman's efforts to mitigate the impact of racial bias on this case.

The government's *kidnapping* case was not strong; it was largely circumstantial. *Cf.* Add.7-8. Coleman did not contest that he caused Correia's death. JA.IV.2326-27. The evidence did not, however, support the conclusion that he *kidnapped* her. *See supra* Arg.III.D. On the 23rd, Coleman tried to find friends to go to Boston with, but ended up going alone. JA.III.1780-84. He danced with a woman at Venu, was respectful toward her, and said goodbye when her brother asked her to go. JA.III.1695-1719; JA.VI.3389-90; JA.VIII.71.1-71.8. Correia acted erratically that night, including fighting with a friend and giving a bartender the finger.

JA.II.886-97, 946-57, 971-79, 988-90. When she tried to force her way into an Uber and the driver pushed her out, she and Coleman crossed paths. JA.II.1116-30; JA.VIII.1.20. The government argued that what ensued was premeditated sexual assault and murder. JA.IV.2306-15. The evidence did not support that conclusion and is at least equally consistent with Coleman's theory: Coleman and Correia had consensual sex, and Correia died during a sudden and unexpected argument that turned violent. JA.VI.2326-38. The government's evidence is not strong enough to overcome the number of interconnected errors that occurred in this case. Reversal is required.

## CONCLUSION

For the foregoing reasons, as well as those contained in the sealed supplemental brief, Coleman asks this Court to vacate his conviction and order the court to dismiss the case or to vacate and remand for a new trial.

Respectfully Submitted,

*/s/ Christine DeMaso*
Christine DeMaso
Assistant Federal Public Defender
51 Sleeper St.—5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 1168061

Dated: December 29, 2023

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   this Court issued an order, dated December 18, 2023, granting leave to file oversized briefing such that the opening brief and sealed supplemental brief, together, may contain no more than 25,000 words.

   combined, this brief and the opening brief contain 24,724 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Book Antiqua font.

*/s/ Christine DeMaso*
Christine DeMaso

Attorney for Louis D. Coleman III

Dated: December 29, 2023

**CERTIFICATE OF SERVICE**

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, Randall Kromm, as identified on the Notice of Electronic Filing on December 29, 2023.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

Excerpt from 3/1/22 Motion Hearing—Denial of Motion to Dismiss or for a Bill of Particulars .......... Add. 1

Excerpt from 3/11/22 Status Conference—Denial of Motion to Suppress Evidence .......... Add. 5

Excerpt from 4/8/22 Status Conference—Denial of Motion to Show Implicit Bias Video .......... Add. 16

Excerpt from 4/13/22 Status Conference—Denial of Motion to Preclude Term "Sexual Abuse" .......... Add. 23

Excerpt from Trial Day 3 5/9/22—Admission of Hearsay Regarding Correia's Plans .......... Add. 27

Excerpt from Trial Day 8 5/20/22—Denial of Mistrial Motion .......... Add. 33

Excerpt from Trial Day 11 5/25/22—Exclusion of Work Records and Mental Health Evidence .......... Add. 40

Excerpt Jury Trial Day 11 5/25/22—Denial of Motion for Judgment of Acquittal .......... Add. 46

Excerpt from Trial Day 11 5/25/22—Exclusion of Fagan's Expert Testimony .......... Add. 52

Excerpt from Trial Day 12 5/26/22—Denial of Motion to Admit Mondesir Statements Under Rule 807 .......... Add. 63

Excerpt from Trial Day 12 5/26/22—Exclusion of Some Mental Health Evidence .......... Add. 74

Excerpt from Trial Day 13 5/27/22—Denial of Renewed Mistrial Motion .......... Add. 80

Excerpt from Trial Day 14 5/31/22—Denial of Renewed Motion for Judgment of Acquittal ........ Add. 93

Excerpt from Trial Day 14 5/31/22—Jury Instructions ........ Add. 95

Excerpt from Sentencing Transcript 10/11/22—Calculating Guidelines Offense Level ........ Add. 128

Judgment ........ Add. 134

Amended Judgment ........ Add. 141

Second Amended Judgment ........ Add. 149

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

HEARING ON MOTION TO SUPPRESS

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

March 1, 2022
11:00 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

How about Monday, the 18th?

MR. HOOSE: Sure.

THE COURT: Did you have marathon plans that day?

MR. HOOSE: No, those are well in the rearview mirror.

THE COURT: All right. I apologize. Just sometimes this sort of thing happens, so let's say April the 18th, and we'll say at, again, we'll say at 9:30 in the morning, and hopefully we can get you out of there

12:39PM and have your afternoon off, perhaps.

All right. The final thing I want to take up is I'm going to rule from the bench on defendant's motion to dismiss the indictment or in the alternative for a Bill of Particulars, which is Docket Number 168.

I'm going to deny the motion on the papers. As I'm sure counsel is aware, the requirements of an indictment are to provide sufficient notice so that defendant can mount an effective defense and to permit him to plead double jeopardy as a bar.

12:40PM The indictment here indicates obviously the charge, the crime committed identified by a statutory reference, the date of the crime, which is February the 24th, 2019, the place, which is Boston, Massachusetts, and the victim who was Jassy Correia.

I think there was no question that that is

constitutionally adequate, and I don't see that a Bill of Particulars is necessary for the defendant to prepare a defense, avoid surprise, or protect against double jeopardy.

In substance, what the defendant is saying is that there is not sufficient evidence that the victim was confined, abducted, seized or whatever else the statute requires, or that the defendant did so for a prescribed purpose, ransom, reward or otherwise.

12:41PM I cannot dismiss an indictment before trial for lack of evidence, and if the evidence at trial proves insufficient, then, obviously, we'll take it up at that time, but the indictment is certainly constitutionally adequate, and a Bill of Particulars is not necessary, again, to help prepare a defense, avoid surprise, or protect against double jeopardy, so that motion is denied.

And the other two motions, 161, the motion to suppress, I will take under advisement, and 162, the motion to suppress to warrantless realtime tracking will await the 12:41PM outcome of an evidentiary hearing, which is scheduled for Monday, the 7th at 9:30 a.m.

If that proves to be problematic, contact Mr. McKillop and we'll try to find a date where everyone can make it.

MR. ZOLYNSKI: Just for purposes of the record, we

would object to the Court's denying the motion to dismiss, particularly with regard to the Sixth Amendment's grand jury clause.

THE COURT: So noted. All right. Anything further for the moment, Mr. Zolynski?

MR. ZOLYNSKI: Judge, I think there's a Rule 17 motion that is under the Court's consideration right now. It is under seal so I don't know that it's anything that we can talk about.

12:42PM THE COURT: Yes, I noted that, and I will take that up separately.

Anything from the government?

MR. RICHARDSON: No, thank you, your Honor.

THE COURT: Thank you. We'll stand in recess.

THE CLERK: All rise.

(Whereupon, the hearing was adjourned at 12:42 p.m.)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

HEARING CONDUCTED BY ZOOM

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

March 11, 2022
2:00 p.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

was a trespass theory applicable to the GPS tracking?

THE COURT: It does not appear to be applicable. The trespass theory is this physical trespass where, you know, you put a gismo on the car, it does not seem to be implicated here as near as I can make out. Again, I can't guarantee that's where the law is going to wind up, but it doesn't seem to me to be in play here.

MR. ZOLYNSKI: That's all the questions I have, your Honor.

02:22PM THE COURT: Meaning the police did not crawl underneath the car and put a device on it, they didn't surreptitiously enter the car or put something in the glove compartment or under the hood. Whatever else is going on here, it does not seem to be physical trespass as opposed to an electronic device.

All right. Let me turn to the motion to suppress. There's a motion to suppress nine warrants. The government says it's six, but I think however many we're talking about here, I think the issues are essentially the same and 02:23PM intertwine and overlap to a great extent.

Obviously, the probable cause standard applies. There must be probable cause to believe that the information in the affidavit is sufficient to warrant a person of reasonable caution to believe that evidence of a crime would be found in the location to be searched.

There has to be a sufficient nexus between the location to be searched and the items sought considering the totality of the circumstances, which must establish a fair probability that the items sought would be found at the location indicated.

The principal issue here is, obviously, the warrant to search the cell phone itself. It is a cell phone of the defendant. Beginning with the probable cause issue, the facts of the affidavit, defendant contends it fails to show probable cause that there was a kidnapping resulting in death based on the evidence, defendant contends that there was a consensual entrance to the vehicle, and that there is insufficient evidence that she was held against her will or that the defendant did so for ransom, reward or otherwise.

It is true that the evidence here is certainly circumstantial. The evidence of a kidnapping is that she did enter the vehicle, that she during a relatively short duration of about two hours, some of which was at least half of that taken up in a drive from Boston to Providence, somewhere along the way, there appears to have been a violent struggle that resulted in cracks in the windshield and an injury to the defendant's face and what appears to have been the killing of the victim.

The magistrate judge could have reasonably

inferred, and I'm required to give deference to her judgment, that she was held for some period of time, even if relatively fleeting, against her will in the automobile.

As far as the ransom, reward or otherwise requirement, any benefit to the defendant will suffice. That would include not only ransom or reward but the word "otherwise" is in the statute as well, and other benefits could include not only things like personal gratification or sexual gratification but preventing a victim from 02:26PM reporting his conduct or filing a police complaint or something of that sort, and, again, the magistrate judge could have reasonably inferred from all of the circumstances that there was a fair probability that the crime in question had occurred.

As far as the nexus is concerned, the issue there is is there a fair probability that the cell phone contains evidence of that crime? There are four principal areas I think implicated here: GPS movements; text messages, e-mails or similar communications; photos or video; and 02:26PM Internet search information.

The defendant, of course, had the phone with him when he was stopped. It's an obvious and reasonable inference that the magistrate judge was entitled to make that he had his phone with him during most or all of the relevant times.

GPS location information is obviously potentially relevant, where was he at a particular point in time and when. Photos and videos may also be implicated. The government -- rather, it was a fair probability that there might have been evidence concerning, for example, a photograph taken in the night club, a photograph with the victim.

The government at that point didn't know whether he had met her before, whether he had met her earlier that evening, did he have any kind of relationship with her for which photographic evidence would have been quite telling, indeed, and, again, it can't be judged by hindsight. The fact that such photographs did not apparently occur does not mean that there was not a fair probability that such evidence might be located.

The same applies to messages. Did he communicate with her in any way? Did they have any kind of pre-existing relationship of any kind or any connection of any kind? And Internet searches is, of course, also implicated. For example, was he following news stories about her disappearance? Did he conduct searches concerning disposal of a body, which is not something within the common knowledge of an ordinary person.

The magistrate judge, again, whose judgment is entitled to deference, could reasonably conclude based on

the information in the affidavit as well as common sense and reasonable inferences that there was a fair probability that evidence concerning the crime of kidnapping resulting in death could be found on his phone.

The defense also objects that the warrant was overbroad. There's an issue concerning punctuation. The suggestion is that the limitation of evidence, fruits and instrumentalities applies only to tangible objects. It is true that that sentence is not punctuated properly, but a 02:29PM common sense reading, as opposed to a hypertechnical reading, would suggest that that limitation applies to all records, not just tangible objects and would, therefore, include everything on the phone.

There's an objection as to the temporal span of February 23rd to February 28th, which appears perfectly appropriate. The defendant presumably arrived at the night club or in the vicinity of the night club on February 23rd; even if events occurred after midnight on February 24th, and there's no unduly broad temporal scope.

02:29PM In terms of the types of information requested, again, getting into GPS location, messages, Internet searches and so forth, I've discussed that already. I think it was all fairly encompassed by the relevant standard, and, in any event, the remedy for an overbroad search is not to suppress everything but to suppress the

evidence collected that was outside the time frame or otherwise outside the proper scope of the warrant or any fruits thereof, and defendant has pointed to no evidence that requires suppression on that ground.

As far as the execution of the search itself, my understanding is that the FBI made a duplicate copy of all digital information on the phone and that performed data extraction on that duplicated version.

That is not only entirely reasonable, it's the

02:31PM best practice and it is to be encouraged so as not to disturb or destroy the original digital information, and from that point forward, the FBI was entitled to examine all files on the phone.

Once it has a warrant to search a house can search every closet or drawer. It has the right to search all files on the phone once it has the authority to enter the phone and search for some evidence, and with computer files, unlike physical objects, you can't tell without opening the file.

02:31PM There's an argument that when you're searching a house, for example, and you're looking for a rifle, you don't need to open up the silverware drawer because the rifle couldn't possibly be in there. There's really no accurate analog of that in the digital world because evidence of any kind can be found in almost any kind of

file, and so I find nothing improper about the execution of the search.

There were warrants other than the basic cell phone warrants. They largely present the same issues. There was a warrant for T-Mobile records concerning the defendant's cell phone. The time frame there is broader. It's from February 17th to March 1st.

The affidavit indicated that law enforcement wanted to investigate whether the defendant and the victim had been in contact or at the same location. Certainly that was a reasonable inference from the evidence. That tends to show possible planning or motive.

The magistrate judge again exercised common sense and reasonable inferences could reasonably conclude that any such information could be evidence of the crime, and, in any event, again, if it is overbroad, the remedy is to suppress the information collected from the period that is overbroad and any fruits of that portion of the search, and the defendant has not identified any such evidence.

The laptop and computer towers were also the subject of warrants. To a large extent, that overlaps the probable cause for the cell phone. And, of course, the government doesn't know whether electronic evidence will be located on a particular piece of equipment, one or the other, or both, or all of them.

The evidence concerning the computer tower is even more compelling. This is not something that someone would normally take on a road trip. An obvious inference from the fact that the defendant took it with him on his flight is that there was something on there that he wished to hide, which was evidence of consciousness of guilt, and suggested that something of evidentiary value was likely located on the computer tower, and the laptop itself is very much like the phone in terms of the kind of files that 02:34PM are stored on them.

The Google records warrant, this is, I think, a Rhode Island warrant, Google records associated with the use of the cell phone. This is, as I understand it, essentially location information from February 28th, I'm sorry, 23rd to February 24th, as well as web history, search history and e-mails.

Where he traveled during the critical period was obviously quite relevant evidence. What searches he conducted on the Internet, for example, a search of the 02:34PM defendant by name or searches how to dispose of a body are obviously potentially relevant. The people with whom he communicated are potentially relevant.

Again, under the circumstances, the magistrate judge to whom deference is owed could reasonably conclude that evidence would be found at that location, and then,

finally, the Buick information module would contain not only evidence of the location of the vehicle but its movement, things like whether or not doors were opened, the ignition was turned on or off, and given the circumstances here, including the obvious inference that the kidnapping and killing occurred inside the vehicle, that information was clearly relevant, and that there was both probable cause and the relevant nexus.

So, under the circumstances, I conclude as to all 02:35PM of the warrants that there was probable cause to believe that relevant evidence would be found at the location to be searched, that there was a nexus between the location to be searched and the crime and the items sought, and, therefore, I find all of the warrants survived scrutiny.

And, finally, in any event, of course, even if any or all of the warrants were to prove defective, the good faith standard of *Leon* would apply. There's no issue as to whether false information was supplied to obtain the warrants or that the magistrate judge wholly abandoned her 02:36PM role as a neutral judicial officer.

The warrants are not so lacking in probable cause that law enforcement's belief in its validity was entirely unreasonable and not so facially invalid that officers could not have presumed that the warrants were valid, and so, again, even if there is an issue as to any or all of

the warrants such as they were defective under the Fourth Amendment, the police officers clearly were entitled in good faith to rely on the existence of those warrants within the meaning of *Leon* and its progeny, so the motion to suppress will be denied.

All right. Anything from the government further on that?

MR. RICHARDSON: Your Honor, the only thing in discussing the Google warrant, I think you meant to say there was probable cause to believe there might be a search of the victim by name, and you said defendant.

THE COURT: Well, actually, what I meant to say inartfully was whether the defendant would be monitoring new stories about her disappearance, so it's really him or her or both, I think it would be a reasonable inference under the circumstances. That's the kind of thing you would search for in a disappearance-type case.

Mr. Zolynski.

MR. ZOLYNSKI: I have nothing specific other than to permit the record to reflect our objection to the Court's findings, that's all.

THE COURT: All right. While I have you here, I think there's an issue about the final pretrial conference, Mr. Hoose's schedule. I'm happy to move the final pretrial conference. I'm leaving the country on April 20th. I may

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

STATUS CONFERENCE CONDUCTED BY ZOOM

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

April 8, 2022
9:00 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

opposed to individually, but the questionnaires ought to cover I think enough of the issues to take us to individual voir dire.

Let me take up the defendant has proposed that I show an unconscious bias video based on the Western District singular. There's different iterations of the video, but I'm going to refer to it in the singular as a single video. I'm not inclined to do this. I think, obviously, the basic concept underlying the video is important, that is, the need for jurors to attempt to be aware of their biases and prejudices and listen to all of the evidence and be as fair as they can under the circumstances, that is, obviously, the most important focus, I think, of the jury impanelment process, and, of course, what I say to them and how I say it I think is important in that respect.

Some of this is implicit in the structure of the jury itself. It's one reason we have 12 people, not 1, to get different views and to try to cancel out some of this.

I don't think the video moves the needle as far as I'm concerned very far, particularly the longer one. There are distracting things on there that I think are not particularly useful or relevant. I didn't like the tone of some of it, which I found to be a little condescending.

The defendant's memo talks about a recent case or cases where jurors had made racially-biased remarks during

deliberations, which came out later. That's not implicit bias, that's explicit bias, and I don't think this video does do much for someone like that if they make it onto the jury, but there it is. It doesn't promote the cause of justice.

09:12AM I think that a common mistake that Judges make is the idea that it doesn't matter how long this process takes, it doesn't matter if jurors become impatient during the jury impanelment process or feel that the Court is being disrespectful to them, or to them, as the case may be.

I'll give a personal example. I could give others. I was on state court jury duty last summer. The Judge did individual voir dire. I was the 16th juror called, and it took till 3:30 in the afternoon to do that with no lunch, and there were probably 40 of us in the beginning, and people were in almost open rebellion at the end, at least by the time I left, why is this taking so long, this is terrible, you know, we should do something about this.

09:13AM Everything is a balance. If you take time to do something, there's a cost to that, and, obviously, it is time consuming, you know, but we shouldn't make it any longer than necessary, so the idea like, well, this can't hurt. It's not worth it on balance.

I also know, for what it's worth, to the extent we're talking about racial stereotyping, in a particularly

racially charged crime, the victim is also black. There's no issue of cross-race identification or anything like that, but I think the bottom line here is how do you communicate the idea among the jurors that they should not have biases, including ones that are baked in, which, of course, everyone has, and how do they -- how should they be reminded of the importance of fairness and listening to the evidence, and I think that I'm going to address concepts those orally, not through this video.

09:14AM I don't have a problem, I guess, with the underlying idea that all of us have implicit biases, and they can be dangerous under some circumstances, but I didn't like the way the videos presented that, and it would irritate or alienate the jurors by wasting their time. There's a lot of time wasting inherent in the jury process, and I am disinclined to do that unless I think it's necessary, so that's how I propose to handle that.

MS. PEACHY: Judge, a few words?

THE COURT: Yes.

09:15AM MS. PEACHY: I obviously respectfully disagree, and I'm not exactly sure what the U.S. Attorney's Office, what their position is on this. I've tried to reach out to the leadership there, the new leadership there, and I don't know how they feel, but I was hoping that they might join in this sort of request.

I think any concerns about inconvenience are out. We can have people who have not been educated or even heard that word as lawyers. If the jury does a training on unconscious bias, we've all heard of it, but if you've never heard of it, it's even harder to be aware of it, and I think the point of the video is to get people to think about the way unconscious bias might affect their decision-making, and if you've never heard of it, then you're not going to be aware of it, and routed out in a room of 12 people, I'm 09:16AM sure, like you said, it's not explicit bias, it's going to be localized. It's unconscious bias that's going to influence people's decision-making in other ways.

Again, Mr. Coleman is African-American. He's a black man, as you pointed out, and that the decedent, Ms. Correia, is African-American as well, and people might have biases that would affect their decision-making, that would affect decision-making on both sides here, so it's a common interest in this case.

I don't agree that a case where race is an issue -- 09:17AM I mean, one thing that we've raised in one of our motions is Mr. Coleman's prior experiences in the U.S. in San Diego and how that might help explain why as a black man with a prior history of being assaulted by the police he would be apprehensive about going to the police.

There are going to be issues, I think, if your

Honor allows us to introduce that type of evidence.

THE COURT: Let me pause here so I can catch up and respond to some of the comments. First off, you're conflating, I think, whether this is an issue that needs to be addressed and whether the video is the way to address it, okay.

I'd say it's part of the process, you know, however directly the topic is approached. I think the basic idea is correct in terms of the people to address it. That doesn't 09:18AM mean the video and the thing about, well, you know, here's a list of color, hello, you know, that doesn't have anything to do with etiquette, and on the tone of some of this to be smug and condescending, which is not the tone I want to set, particularly for people who are worried about it.

Again, if there's an explicit racist on the jury, this video is not going to do anything. It's really more a way of like reinforcing the concept of fairness with ordinary people, well-intentioned people who just need to consider some of these points, and I don't think the video 09:18AM in my mind was very effective in doing that, and I did not say that race was not any part of this in an unusually racially charged case is my point, and we'll get, you know, whether this thing in San Diego is admissible or not, we'll get there in due course, but I'm not saying that, you know, none of these issues matter.

I'm saying I didn't like the video, and I don't think it was worth it, and there's a lot of stuff in there that I think is just unnecessary. You know, in the future, if like a better video were produced, I don't know, we'd play it, maybe that would be right, but, again, I'm using the singular, but I didn't like it, and they are not at the issue, and, again, you know, you can only go so far, obviously, with some of these things.

I mean, all you can do is to try to make people 09:19AM aware of, you know, that these things may be out there, and that might be influencing their decisions, and that's really about as far as you can take it.

You know, and I'll just say this is a bit of a tangent, but I feel like in the impanelment process what I say and how I say it is almost as important as what I ask, and, again, part of it is like sort of, I don't know, reminding people, stiffening their spines sometimes or just pointing out what matters and making sure that they're not taking any of these things casually, that they're 09:20AM considering everything carefully and being as fair as they can, so I certainly strongly believe that all of that is important, but I'm not going to show this video. Sorry, I interrupted you.

MS. PEACHY: No, that's fine. I don't need to say anything more on that subject.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

United States of America, Plaintiff,

vs. Case No. 19-cr-10113-FDS

Louis D. Coleman, III, Defendant.

BEFORE: The Honorable F. Dennis Saylor, IV

Video Conferenced Motion Hearing

April 13, 2022

Marianne Kusa-Ryll, RDR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, Massachusetts 01608-2093
508-929-3399 justicehill@aol.com
Mechanical Steno - Transcript by Computer

THE COURT: Okay.

MR. SHINE: -- and forward to the Court.

THE COURT: Okay. All right. I want to talk about some of the motions. Like I say, I don't think we're going to resolve everything. There's particularly what I'll call the intersection of Rules 404, 405, and 412, which is presented in a number of different ways in this case, in ways that are a little bit complicated. I want to make sure I understand everything, but there are some things, I think, I can deal with up front. In fact, I'm going to resolve two of them now. We don't really need any argument on it.

No. 246 is defendant's motion to preclude the use of certain terms during trial. The first piece of that is use of the term "victim." I'm going to permit its use. It is a fair comment that the word "victim" can suggest guilt. Of course, a victim could be a crime victim, which is interpreted that way; there's a conclusion that a crime occurred, and it could be construed further to be that this crime occurred as opposed to, you know, a different uncharged crime.

But, of course, one can also be a victim of an accident or neglect or a victim of a heart attack. There's other ways in which the word can be used. I will permit it because it's a very convenient and common shorthand, but I think it's fair that I'm going to -- fair for me to advise the jury as to this issue that they should not conclude that any

judgment of any kind has been made by mere anyone else that the defendant is guilty because the government is using the word "victim," or I'm using the word "victim" as a shorthand and that, you know, reminding them that that's -- you know, the basic point that the government has to prove the defendant guilty beyond a reasonable doubt, and use of the word "victim" should not be taken as a suggestion otherwise, but I don't think it's unfair or inflammatory, and the alternatives are awkward, I think, under the circumstances. So I think I'm going to permit it. So that is the first point.

The second point is to preclude any suggestion that witness YM was drugged. It seems to me that if YM testifies, I will permit her to say that she doesn't remember things -- you know, she'll testify -- she can testify as to her physical and mental condition. I felt like I was drugged, something like that; however, I will not permit any suggestion of any kind that the defendant drugged her in any way, shape, or form; and I will be unhappy if the witness or the government goes anywhere near that. It seems to me that her ability to perceive, her ability to remember is obviously important; and if there's a limitation on it because she felt drugged, I think that's fair for her to say so or for someone to elicit, but I want no suggestion of any kind from the witness or anyone else that the defendant had anything to do with that because there's no evidence of that as far as I'm aware.

**The third issue raised by the defense is they're seeking to preclude the use of the words "rape" or "sexual assault." I think, as I understand it, the government says that there is evidence that sexual intercourse occurred; that Ms. Correia had a very high level of intoxication, at least measured by her alcohol blood level -- her blood alcohol level and that a violent struggle took place in the car. I think under the circumstances it is not unfair for the government to use the term "sexual assault." My understanding is they do not intend to use the word "rape." I don't think it's unsupported by the evidence even though, as I understand it, there's no evidence of things like vaginal abrasions or similar proof of forcible penetration, but I don't think the term "sexual assault" is unfair or inflammatory under the circumstances. So 246 is -- you'll say granted in part and denied in part.**

**And the other motion I'm going to take up front is No. 247, which is defendant's motion to exclude certain evidence under Rule 401, 403, and 404(b), which basically relates, although not entirely to -- well, it does relate entirely to we'll call it post-event behavior, Internet searches, purchases, and so forth, which comes under the heading of, I think, consciousness of guilt evidence.**

**The consciousness of guilt evidence requires that the -- it -- that the fact finder be able to draw reasonable inferences from the evidence that are probative of guilt; and,**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| vs. ) | Criminal Action |
| LOUIS D. COLEMAN, III, Defendant ) | No. 19-10113-FDS |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 3

JURY IMPANELMENT

SEALED TRANSCRIPT

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 9, 2022
8:30 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

requires a ruling before the opening, I will make that ruling.

MR. RICHARDSON: It doesn't affect the opening. I think it may affect the first couple of witnesses.

THE COURT: All right. I will come to rest on that then.

MS. NUZUM: Your Honor, the next issue we had to raise was the Court's ruling on the government's motion in limine to introduce certain statements by Ms. Correia about

08:39AM her intent the evening of February 23rd.

Your Honor had ruled that those statements could come in but had said that we should not introduce the information about the child. We're not planning to say anything other than this was her daughter and her age. We won't use her name. Your Honor also indicated that we shouldn't get into detail about the shelter that she was staying at. I just wanted to clarify that.

One of the government's witnesses is the case manager at the shelter. We don't have any reason to get

08:40AM into the reason that she was at the shelter, but we do want to introduce the fact that she was at a shelter merely because she had a case manager to explain that relationship.

She is the one who gave her the two-day pass, which, again, goes back to Ms. Correia's intent to come back on Sunday because she was required to come back on Sunday.

This witness is also expected to testify that Ms. Correia had been working on a resume' for a job interview that she had on Monday, that she had been expecting her to pick up that resume' on Sunday, and that would be yet another reason the government wants to introduce these statements showing her intent to be back at the shelter on Sunday.

THE COURT: All right. My view is that the fact she has a child and the fact she was living at a shelter are admissible in the sense that otherwise you can't make any sense of this evidence, and it reflects on her intentions as to what she might have been thinking when she got into the automobile at two in the morning, but having said that, there's obviously a great or a substantial, I should say, possibility of unfair prejudice if we get into the details here, why are you at a shelter, what happened to you.

Obviously, I do not want a picture of the child or details of the child. I mean, this would be grossly prejudicial, and I want no more than the bare minimum necessary for the point to be made that she had plans on Sunday as opposed to spending the night in Providence and coming back on Monday morning or whatever, you know, the government's theory is, so I'll permit it but only the bare minimum.

MS. NUZUM: Thank you, your Honor. One very

technical point. Your Honor had said that when the government has sub exhibits on its exhibit list that your preference is for decimal points, 1.1, 1,2. We're told that under the JERS system, it needs to be a dash, and we wanted to make sure that that would be okay.

THE COURT: That's news to me. Matt, you're shrugging?

THE CLERK: I think it's easier that way for them to look at it.

08:42AM THE COURT: With a dash?

THE CLERK: Yes.

THE COURT: Okay. That's fine.

MS. NUZUM: Thank you, your Honor.

THE COURT: The point being I guess, again, if you have a mountain of records, let's say medical records of X Hospital, it's just much easier to say they're all Exhibit 17 and pull something out and it has a sub number as opposed to numbering each one of those things individually, which is cumbersome.

08:43AM MS. NUZUM: Understood, your Honor, and that is how we are doing the exhibit lists. We also did want to confirm that it is okay to have exhibits that are, for example, a batch of photos that all go together simply as one exhibit and then we'll refer to them by page number.

THE COURT: Okay.

MS. NUZUM: Thank you.

THE COURT: Anything from the defense? Ms. Peachy.

MS. PEACHY: On the issue of the motion in limine about Ms. Correia's statements and her intent to return to the shelter, I just want to make sure that the Court knows our continuing objection to that. We think it has minimal probative value. There's a cumulative amount of evidence here being introduced on this topic, and it's in a way an appeal to sympathy, I think, for the victim, talking about 08:43AM how she's trying to get a new job, talking about how she was going to go to work, how she was going to go back to the shelter.

All of these things are kind of hammering home this point that is not much -- we're not saying she had the intent to, you know, run off and go live with Mr. Coleman that night, so it's barely probative, I think, and is really an attempt by the government to try to appeal again to the jurors' sympathies, and there's a lot of it as well, and I don't think we need that much.

08:44AM THE COURT: Two quick responses. It isn't cumulative yet until I see it, so I don't want it to be cumulative, and I don't think we need to get into anything beyond, you know, that she had a resume' she was going to pick up, not that she was looking for a new job, starting a new life. All that is all unnecessary and I think would

fall under the heading of an unnecessary appeal to sympathy, but the mere fact it was a resume' I think I will allow.

MS. PEACHY: Turning to today's jury's selection, your Honor, there are a few other questions that we'd like you to ask of the panel. One you already thought of was since Monday have you heard or read or seen anything about the case because there has been some additional publicity, but also is there anything since last Monday that you would like to add or change about your responses to the questionnaire?

08:45AM

THE COURT: Okay. Hold on.

MS. PEACHY: We already had one juror who did that.

THE COURT: I think that's a fair question. Let me write it down.

Okay, go ahead.

MS. PEACHY: Since Monday, have you spoken to anybody about the case? I know you instructed them, but sometimes it's good to check.

THE COURT: Okay.

08:47AM

MS. PEACHY: I think both parties had proposed a question of the jurors about the graphic images, video that they're going to see.

THE COURT: I'm going to address that as well. I'm going to sort of remind them what the nature of the charge is and talk about the possibility of graphic images,

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
vs. ) Criminal Action
)
LOUIS D. COLEMAN, III, ) No. 19-10113-FDS
Defendant )
)
)
)

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 8

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 20, 2022
8:45 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

that clip, could that have caused any of the injuries that you described in your testimony?
A. It appears as if she fell on her right side here, so maybe some injuries on the right can be attributed.
Q. Could any of the falls that you observed in the videos that you reviewed cause the injuries that you saw on Ms. Correia's neck?
A. No.
Q. And are any of them consistent with the injuries that you saw on her head?

10:53AM

A. No.
MS. NUZUM: Could I have one moment, your Honor?
THE COURT: Yes.
MS. NUZUM: I have no further questions at this time.
THE COURT: All right. Why don't we take a break, and as I indicated, this may take a little bit longer because of the procedures I'm implementing. We will take a break, again, as close as 10 minutes as we can make it.
THE CLERK: All rise.
(JURORS EXITED THE COURTROOM.)
( A recess was taken.)
MR. HOOSE: Your Honor, I'd like to be heard.
MS. NUZUM: Should the witness step down, your Honor?
THE COURT: Yes. Go ahead. Mr. Hoose.
MR. HOOSE: Your Honor, I just want to elaborate on my

objection to portions of this witness' testimony and in particular her testimony that Jassy Correia was alive when she was dragged into that apartment. That is nowhere contained in the expert disclosure that was provided by the government, and, in fact, they stated that she was unable to give an opinion with any precision as to the date or time of Ms. Correia's death, so that is flatly contradicted by what is in her disclosure.

And I'll tell you, your Honor, in preparation for this 10:55AM trial, I have, of course, consulted with a medical examiner, forensic pathologist, and I can tell you that had I known that testimony was coming, I would have him under subpoena to testify that it is not possible to determine from that video whether she is dead or alive.

Obviously, I can't add into the witness list now or bring him in on short notice, so the defense is prejudiced by this, and I suggest that it also unreliable, unscientific, barred by the principles of Daubert, and the Court should instruct the jury to disregard that aspect of her testimony.

10:56AM THE COURT: Ms. Nuzum.

MS. NUZUM: Your Honor, the government's view is that what Dr. Vershvovsky testified to is not inconsistent with the expert disclosure, the statement that she cannot say when the death occurred is not inconsistent with her testifying today that in her opinion she was not dead at that moment in time.

THE COURT: What does it actually say in the disclosure that the government made to the defense?

MS. NUZUM: If I could have a moment, your Honor. It's a little lengthy. I could pass it up to you. On this particular topic, Dr. Vershvovsky will opine that it is not possible to determine with precision the date or time of Ms. Correia's death. The death certificate in this case simply states the date her body was recovered, as described in her report, the autopsy revealed decompositional changes in the

10:57AM body, and she's going to testify about several factors that can affect that. I will say the government was expecting a more equivocal answer from the doctor.

THE COURT: A what?

MS. NUZUM: A more equivocal answer. I was not necessarily expecting her to say that. I would say she is subject to cross-examination on that topic. If there are reasons that the defense has looked into and spoken to an expert about as to why that would not be a reliable observation, they are with welcome to pursue that on cross. At

10:58AM this point, we expect this will continue through the end of next week. There is still time for an additional expert.

THE COURT: It seems to me that this is a pretty important opinion that she offered, that the victim was still alive when she was being dragged into the apartment, and, you know, it may not be inconsistent with her report, but it's not

in the report, which it seems to me is problematic.

I mean, you know, she could have opined that I don't know -- well, I won't put up a silly hypothetical. I mean, the point is the government made a disclosure, it contained certain opinions, this opinion was not one of those opinions. It's not on a minor or collateral matter, it's pretty important, and it seems to me that that's a problem, and that that opinion ought to be struck.

Do you have some other reason why I should -- why I should not do that, Ms. Nuzum?

10:59AM

MS. NUZUM: No, your Honor, other than the opportunity, the alternative being the opportunity for the defense to retain their other expert.

THE COURT: All right. I'm going to strike that, and I'll instruct the jury when they return to disregard it. All right. Thank you, we'll stand in recess.

THE CLERK: All rise.

(A recess was taken.)

THE CLERK: All rise. Thank you. You may be seated.

11:11AM

MR. HOOSE: Your Honor, can I be heard further on the issue?

MS. NUZUM: The doctor is on the stand.

THE COURT: Is it a legal argument?

MR. HOOSE: Yes, it is.

THE COURT: In other words, do we need to discharge

the witness? Well, anyway, let me hear you.

MR. HOOSE: I want to move for a mistrial, your Honor, because I appreciate the Court's efforts at remediation here, but, frankly, I think it's not going to be sufficient to remove this damage to the defendant's case, and as a part of the motion for mistrial, I want to offer a copy of the expert disclosure to be marked for identification, if I may do that.

THE COURT: Yes. The clerk has stepped out, but I will accept that for identification. We'll give whatever letter is up next.

11:12AM

Hold up, Matt. We have something to mark for identification. What letter is that? Is that A?

THE CLERK: Yes.

THE COURT: Yes, to be marked A for identification.

(Exhibit A was marked for identification.)

MR. HOOSE: In short, your Honor, this is proverbial trying to unring the bell. The jury has already heard this. It is damaging to defendant's case. It is without adequate basis in science in my judgment, and, again, I appreciate the effort the Court makes in striking it from the jury's

11:13AM

attention, but it's really hard to get this out of the jurors' mind, and it is difficult to know how to properly cross-examine having the jury, having heard this, so for all of those reasons I think the only adequate remedy is for the Court to declare a mistrial as much as we all really hate to do that.

THE COURT: All right. The motion is denied. Okay. Matt.

THE CLERK: All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE CLERK: Thank you. You may be seated. Court is back in session.

THE COURT: Welcome back, ladies and gentlemen. Before we begin the cross-examination, the witness issued or made a statement concerning whether the victim was alive or dead at the moment that she was taken out of the car and into the apartment shown on the video.

11:15AM

I am going to strike that from the record and instruct you to disregard it. And when I say disregard it, that means it's not part of the evidence in this case, that you may not consider it in any way directly or indirectly in your consideration of the evidence in this case.

All right. Mr. Hoose.

MR. HOOSE: Yes, your Honor, before I question, just renew the motion I made earlier.

11:15AM THE COURT: Yes, it's denied.

CROSS-EXAMINATION

BY MR. HOOSE:

Q. Good morning, Dr. Vershvovsky.

A. Good morning.

Q. So your first time in observing the body that you

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 11

SEALED TRANSCRIPT

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 25, 2022
8:30 a.m.

Valerie A. O'Hara
Kathleen Mullen Silva
Official Court Reporters
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

THE COURT: Rest at the end of the day, middle, any sense of that?

MR. SHINE: Possibly before noon.

THE COURT: Okay. And there will be a defense case?

MS. PEACHY: Yes, your Honor, and our first witness would be our staff investigator, Alicia Hutton, through whom we would intend to introduce several of our proposed exhibits, and I understand that the government has objections to some of those, so I don't know if you want to talk about that now.

08:38AM THE COURT: We probably ought to talk about that.

MS. PEACHY: I guess Number 1 on the list, and I'm not sure if the government objects or not, but it would be excerpts, heavily redacted excerpts of Ms. Correia's medical and mental health records that we tried to prepare in conformance with your Honor's ruling yesterday morning, so I can give your Honor a copy of what we proposed as an exhibit as well.

THE COURT: Okay. Yes.

MR. SHINE: We received them late last night, and we 08:39AM will make every effort this morning at some point to review them, but we only got them very late. We haven't had a chance to fully scrutinize them. I'm comfortable we can come to a resolution.

THE COURT: Okay.

MS. PEACHY: Another exhibit that we would seek to

introduce through Ms. Hutton is Ms. Correia's employment records from Del Frisco's. As you recall, the government called the manager of Del Frisco's as a witness in their case to testify that Ms. Correia was an employee there and that she was expected at work on Monday morning, the 25th of February, 2019.

We've obtained her employment records from Del Frisco's that contain her application for employment, her hours worked, and her wages there, and I believe the government

08:40AM objects to us using those as an exhibit.

MR. SHINE: I don't see any possible relevancy. The manager of Del Frisco's testified and it was examined that she worked there. We agree she worked there. The number of hours she worked are inconsequential and her employment application.

Let me cut to the chase, I'm concerned that, twofold, in her employment for application, she listed reference of Aja Hiltz. Ms. Hiltz has testified, and Ms. Correia put in the record -- Ms. Correia put in the application, we believe, that Aja Hiltz was a supervisor for a job she had.

08:41AM Ms. Hiltz was asked did you ever supervise Ms. Correia, and she said no. That was the record. That's what stands.

In Jassy Correia's application, she said she was a supervisor. It doesn't go to impeach Ms. Hiltz because Ms. Hiltz didn't fill out the form or anything else.

The second thing, which I'm very concerned about, is it talks about the number of hours she works and her hourly rate. I don't want to get into a conversation that she was working four to five hours per shift and she made $14 an hour. I'm worried that that then could be argued down the line, well, of course, she was prostituting, she didn't make enough money, look how little money she made. It's just a way of back dooring in that she was working as an escort or as a prostitute, so I would oppose it on relevancy grounds and on 08:41AM the other two bases I just provided.

THE COURT: All right. Ms. Peachy.

MS. PEACHY: Your Honor, the government has, you know, attempted to overall paint this picture of Ms. Correia as a, you know, employed, law-abiding, kind of innocent victim in this case, and what these records --

THE COURT: I don't think there's -- well...

MS. PEACHY: Well, what these records show is that in February of 2019, despite the testimony that we heard that she was expected at work on Monday, and that would be unusual for 08:42AM her not to be there, I forget exactly what the testimony was, that she only worked one day in February of 2019, and she earned about $52 for that one day that she worked in February of 2019, and that, the amount of wages that she earned at that job is also relevant because, as you know, part of the defense is that she didn't have any money for a ride home from

the club that night, and that would give her a reason to go consensually, willingly with Mr. Coleman for the purposes of getting a ride that night.

MR. SHINE: Again, your Honor, it's a back door way of saying, therefore, she must have been prostituting that night, and, therefore, it opens up the window to allege that she's prostituted on other occasions.

There is a statement that's coming in. The statement stands by itself. This doesn't show anything, and it's going 08:43AM to be argued, and you know it's going to be argued that she didn't make any money, therefore, she was hooking or prostituting or setting Mr. Coleman up because she needed money. That's just not appropriate.

THE COURT: Also, the application for employment, I can't imagine why that would be relevant. Her credibility is not at issue. She's not a witness, and whatever value it might have if she were to take the stand, it has no relevance that I can see, and as to her hours worked and her wages, I think I agree with the government, it's either entirely irrelevant or 08:43AM collateral at best and raises Rule 403 issues, and I'm going to exclude it.

MS. PEACHY: Just note our objection, your Honor.

THE COURT: Yes.

MS. PEACHY: The government has already put her employment into play in this case.

THE COURT: Well, the issue was that she was -- her manager expected her to show up for work on the following Monday or whatever the date was.

On the medical records, I've looked through them quickly. Obviously, they're heavily redacted. I'll have to wait and see if the government -- well, we'll see. The government needs to have a fair opportunity to see what's in here.

MR. SHINE: I promise you, we'll do it, we just

08:44AM haven't had a chance to get to it. We'll get to it this morning, I promise.

THE COURT: Okay. And I take it there's no issue in terms of authenticity or hearsay, the question is relevance and prejudice, correct?

MR. SHINE: Fair.

THE COURT: Okay. Ms. Peachy, anything else?

MS. PEACHY: Your Honor, the next exhibits that we would seek to introduce through Ms. Hutton in our case would be records that were obtained from the City of San Diego Police

08:45AM Department. It contains a -- we've obtained certificates of authenticity, which I understand, again, the government's objection is not related to authenticity of these records that certify that a video that was kept in the records of the City of San Diego Police Department depicts Mr. Coleman having interaction with the police in 2013 where the video pretty

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 11

SEALED TRANSCRIPT

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 25, 2022
8:30 a.m.

Valerie A. O'Hara
Kathleen Mullen Silva
Official Court Reporters
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

**END OF SEALED PORTION OF TRANSCRIPT**

MR. HOOSE: Your Honor, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, I'm filing a motion for judgment of acquittal. I do not feel the need to be heard at any great length on this, other than to say that it is our contention, as is reflected in the body of the motion, that no rational finder of fact could find beyond a reasonable doubt the elements of kidnapping.

12:14PM We have stressed from the outset that this is, in fact, a kidnapping charge.

MR. SHINE: Your Honor, should we reopen the Court for the Rule 29 hearing?

THE COURT: Yes, I think we should. That's a good point.

MR. SHINE: I apologize.

THE COURT: Yes.

(Pause.)

THE COURT: Go ahead.

12:16PM MR. HOOSE: Yes, Your Honor. Given the government's announced intention to rest, we have filed a motion for a judgment of acquittal pursuant to Rule 29 of Federal Rules of Criminal Procedure. In support thereof, we renew all our prior objections, all our adverse rulings on motions in limine, and any other adverse ruling, and request entry of a finding of not

guilty.

As we have tried to stress from the beginning of this case, this is a case that alleges a federal crime of violation of the Federal Kidnapping Act. There are specific elements that the government has to prove. This is not a case about whether Mr. Coleman is responsible in some way for the death of this young woman. It is not a case about whether he handled himself properly after her death or whether he did things that were illegal, inappropriate after that, and that, frankly, has been where the bulk of the government's evidence has lied.

I would suggest that none of these things are determinative on the elements of the kidnapping allegation. For that reason, the Court should enter a judgment of acquittal.

THE COURT: All right. I'm going to deny the motion.

Viewing the evidence most favorable to the prosecution, and recognizing that this is a kidnapping statute with very specific requirements, I think the evidence is such that a reasonable jury could find that the victim was enticed into the vehicle with the promise of a ride, but that defendant's purpose was to hold or detain her for purposes of sexual gratification, that it's a reasonable inference that he intended from the beginning of the episode, when he approached her on the sidewalk and they began talking, that he had a goal to sexually assault an intoxicated and attractive young woman

who was separated from her friends late at night. It is possible, of course, that the requisite intent was not formed before she got into the car but formed -- or rather formed during the walk to the car or after she got into the car. But regardless, I think there's sufficient evidence under the circumstances that that intent was formed.

The car, according to the evidence or a reasonable inference from the evidence, it was stopped for a period of about 14 minutes on Tremont Street. We don't know exactly when

12:19PM she was murdered, but the most likely scenario is that it happened in the car during that time period. The time period between the initial contact between the defendant and victim and the sexual episode and murder is so short, measured in minutes, that I think it's a reasonable inference -- not the only inference -- but a reasonable inference that the defendant intended to confine her and commit a sexual assault either from the very beginning or soon thereafter.

There was, of course -- or there is evidence of a violent struggle inside the vehicle, that the victim was beaten

12:20PM and therefore bruised. The windshield was cracked in two places on the passenger side, likely as a result of the victim kicking it with her bare feet. The defendant's semen is found in her vagina. There's no male DNA in her mouth, suggesting there was not likely a lengthy romantic kissing interlude.

The defendant suffered cuts and scratches, confirmed

by DNA results that he was scratched by the victim, and what appear to be bite marks suggesting the victim was resisting, and, of course, there's evidence that she was strangled.

Kidnapping requires, among other things, that the victim be held or detained for a prescribed purpose. An automobile certainly is a confined space. One issue or question that is obviously raised is why didn't she just get out of the car rather than, for example, kicking the windshield, and a reasonable inference is that she was not free

12:21PM to leave the car. The defendant weighed 200 pounds, has a muscular build. The victim weighed I think 115 pounds or thereabouts, was heavily intoxicated. For what it's worth, there were automatic door locks controlled in part on the driver's side. You have to pull the handle twice or push the button if you're a passenger. It might not have been obvious to her, especially in an intoxicated and panicking and struggling passenger to do that.

I'm not sure what to make of the factor that his DNA and her DNA were on the inside passenger door, but it's

12:22PM certainly consistent with a struggle and consistent with his body being against the door in some fashion or another. It is true we don't know exactly what happened and in what sequence. The victim, of course, is not available to testify. But there is at least this 14-minute interval for the critical events to have occurred.

There are alternative scenarios, for example, that she was confined to prevent her from reporting something to the authorities and so on, but a reasonable jury could draw the reasonable inference that the victim was held or detained in the automobile for an appreciable period of time prior to her sexual assault, prior to her murder or both, and under the circumstances presented here, it is sufficient for these purposes to go to the jury, and therefore I deny the Rule 29 motion.

12:23PM Let's talk, as long as the jury is out, about timing from this point forward.

Assuming -- well, I guess we don't know what's going to happen with regard to this inmate and that remains to be seen, trying to locate him, interview him, possibly subpoena him or bring him in.

I think a reasonable scenario is if you decide his testimony is favorable to the defense or you want to call him, that that's not likely to happen before Friday. Right? I mean, today's Wednesday. Tomorrow's Thursday. It seems 12:24PM unlikely you'll get it done that fast. Fair?

MR. HOOSE: Yes.

THE COURT: And assuming that I exclude Mr. Fagan and that the defendant does not testify, ballpark how much testimony do you think you have for tomorrow for the defense, enough to fill the day?

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 11

SEALED TRANSCRIPT

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 25, 2022
8:30 a.m.

Valerie A. O'Hara
Kathleen Mullen Silva
Official Court Reporters
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

probably, too, for purposes of the record.

It's our position, your Honor, that Mr. Fagan's testimony is going to be relevant. It's not going to be long. I can explain to the Court what it is we believe the testimony will be.

The empirical studies that Dr. Fagan will testify to have been peer reviewed and publicized, so they're able to be objectively tested, and they are generally accepted in the scientific community. And typically, you know, what he's going 03:41PM to be testifying to is that once stopped, police are more likely to use force on black people. There are empirical studies that come to that conclusion. In fact, black people are more than two times as likely to be killed by police as any other racial or ethnic group if they have an interaction with police officers.

From that flows an anxiety, and there's studies to show that the more anxiety that is reported in young black men, there's more anxiety reported by those who have had negative impacts with the police, like Mr. Coleman has, and there's also 03:42PM studies to show that the greater the intrusion, meaning the greater the force that was used, the greater that the anxiety that there is, and that is including symptoms associated with PTSD, and that all comes to the conclusion, your Honor, that unlike what the government is going to be arguing is that all of those steps that Mr. Coleman took after the incident with

Ms. Correia, there is an alternate explanation, which is not necessarily consciousness of guilt, and that alternate explanation is a fear for one's physical safety or even life in going to the police in this sort of situation.

It may seem, I think it's important, I do think that it is relevant, and I think it is important for one reason that maybe it may not seem apparent initially is that I think most of us in this courtroom right now, our intuition would not be the same as the sort of interactions that young black men or 03:43PM black men have with police, so we tend to think that that's not the case, and the research shows that that is the case, and I think the jury should be able to learn that research and to be able to apply that research as it comes before them because Mr. Coleman has had that sort of experience, which they have now seen.

It is not knowledge I think that is typically understood by the common juror. I think it's also because it is against the intuition of most people, I think it would be helpful to the jury on an issue having to do with consciousness 03:44PM of guilt or fear for safety of one's life.

THE COURT: Isn't this a race-based generalization as opposed to something -- it's one thing, if, for example, Mr. Coleman had a diagnosis of PTSD or, you know, something like it, but isn't this just a generalization based on race that black people are more likely to have a particular

characteristic, and is there any other context in which we would even think about doing this?

I mean, for example, the idea that African-Americans are more likely to do something bad, more likely to commit violence, we would not only not allow testimony like that, it would be outrageous or repugnant, and why is the inverse true? If it's helpful to the defense, we get to make race-based generalizations, but if it's not, we don't?

MR. ZOLYNSKI: I don't think, your Honor, that it is a 03:45PM race-based generalization. I will agree with your Honor that there's, of course, race-based generalization built into this, and we can't deny that. Mr. Coleman is sitting right before us, and he is a black man.

We cannot deny the experience that that segment of the population has, so I don't think that it is race-based in the sense that inherently a black individual is going to fear police upon birth. It really has much more to do with the way that the black community and people of color are policed in those types of communities and how that sort of information is 03:45PM then transferred through friends, through family, through experiences in the media to a -- and then their own experiences into a fear, so it's not that Mr. Coleman is born with a fear because the color of his skin is darker than mine.

And I do think, your Honor, that it is different than the instance that your Honor just spoke about where we would be

claiming that, you know, black men are more violent than white men.

First of all, I don't think that you would find studies to prove that, and I think the question before the Court is whether this is evidence that is proper through an expert, and so I don't think that it is the same thing, and I don't think it is exactly race-based.

THE COURT: What if it were positive? What if he were East Asian? Could you call an expert to say East Asian people 03:46PM are more likely to be law-abiding and respect law enforcement? Again, no way we would allow that, right, no chance I would even think about that for more than a second.

Even if it's true, and you probably, you know, if anybody were bothered to study it or want to study it, we could probably, you know, at some level or another prove that it seems repugnant to me to the criminal justice system to be making, again, these race-based generalizations whether they're positive or negative, whether in favor of a defendant or against a defendant.

03:47PM It's different if the particular person says if he were to take the stand and say because I'm African-American or had these experiences or whatever, I, therefore, fear the police, but you're saying because he's a black man, he's more likely to fear law enforcement.

Even if that is statistically true, it still seems

wrong and improper. How could we have testimony based on race if people -- you know, we talk about propensity, we've spent a lot of time talking about propensity in this case, propensity of individuals, which is troublesome enough, but propensity based upon their race.

MR. ZOLYNSKI: Your Honor, I disagree that it is based on race and especially that it is based on race solely. The Court can't deny the fact that Mr. Coleman is a black man.

THE COURT: But that's his race. How can you say that's not race? I would say that is his race.

03:48PM

MR. ZOLYNSKI: Indeed, indeed it is, but that doesn't mean that it also factors in his experience as it occurred there in San Diego and that it also --

THE COURT: Which you can argue, I'm letting it in, and you can argue it what happened in San Diego.

MR. ZOLYNSKI: The importance of Dr. Fagan when linked with the video and the photos is to show that it is consistent with the research that has been done that a fear of police or fear for one's safety and the fear for one's life results from this sort of action.

03:48PM

THE COURT: Does someone from the government want to respond?

MR. RICHARDSON: Your Honor, the government agrees with the Court's take on this. Beyond that, what Mr. Fagan is going to testify to is not so much elusive, but it is the

studies that we have been -- to which we have been cited or that have been cited to us, a lot of them seem to have nothing whatsoever to do with the situation here.

This isn't a young black teenager in a park one evening when the police roll up with lights flashing and runs because he's scared of the police in the inner city, this is somebody who didn't go to the police after having done something wrong. A lot of the studies have to do with or at least one of them has to do with PTSD suffered by or the 03:49PM effects of PTSD suffered by black males who have been subjected to a number of intrusions by the police who end up with things like low math scores. That certainly is not this defendant.

We know of one incident he had, not multiple intrusions, which some of these studies deal with, so I think the big picture is what your Honor spoke about. I don't think it's a proper basis for expert opinion to talk about what a class race, any large group, particularly race or gender or something like that, does that doesn't relate to a specific individual. It's not like a psychiatric study that's been done 03:50PM of him or anything of that nature.

THE COURT: All right. Let me -- I'm going to exclude it, but let me start by observing I am, of course, very much aware of the history of African-Americans in this country and in particular the history of interactions with law enforcement, both historically and at present, and I have no doubt that at

some level, young African-American men are more likely to fear the police than say suburban white teenagers. That, of course, feels right, and I don't really have any reason to doubt it.

But starting at the beginning, first, it's by no means clear to me that Rule 16(b)(1)(c) has been followed. That requires, if the government requests, that the defense provide a written summary of expert testimony, including a description of the witness' opinions and the bases and reasons for those opinions and the witness' qualifications. The witness' 03:52PM qualifications have been provided and the opinions at a high level of generality, but it's impossible for me to assess even what the precise opinion is, what the methodology is.

Apparently, he's intends to summarize various studies, which I don't know how to assess them. I don't know how they were conducted. I don't know what data they're based on, what principles they involved, whether they were reliable principles, reliably applied and all the rest of it, but even moving beyond the Rule 16 requirement, let me assume all of that has been complied with, and assuming that this is 03:53PM something that may not be known or understood by an average Joe, that is, the basic idea that African-Americans are more likely to fear the police based on their race or ethnicity, if you want to call it that.

Again, this is the broadest form of propensity evidence. The basic argument is that a particular group of

people based on their race or race and gender have certain characteristics or attitudes or behavior. It is a race-based generalization, which I find troublesome. I certainly would not allow the government to call an expert to testify about some negative quality of African-Americans. That would be again outrageous and repugnant to our justice system, even if it were supported by statistics.

I can't imagine permitting this, such testimony in any other context for a defense witness, again, to say Asian 03:54PM Americans are better behaved or some other racial stereotype, even, again, if it's statistically supported it seems repugnant to me. Why would I allow it here? I don't see any reason to do so, and I think it's troublesome and offensive.

I could conceive hypothetically why expert testimony might be appropriate to explain let's say a foreign culture to United States juries, perhaps under the right circumstances to provide a context that otherwise might not be available. It's not this case.

Even Mr. Fagan's testimony might in some context have 03:55PM some use, for example, if it were a probable cause analysis where probable cause was based in part on the flight of a young person from a police cruiser, to use the analogy the government uses, the teenage boys who scatter from the park when they see the cruiser with the blue light maybe, that is not this case, and, again, we don't -- to my knowledge, no court has ever or

ought to permit race or ethnic generalizations.

I'm trying to think of other cases where flight was involved. Whitey Bulger, I presume, would not have been permitted to call an expert to say because I'm an Irish American, I'm more likely to be mistruthful of authority, and that's why I fled. It seems to me that that would never be permitted.

Anyway, we don't have to speculate about hypotheticals where conceivably testimony along these lines might be useful to some fact-finder in some context. This is not a group of teenagers scattering from the police. This is a highly educated Raytheon engineer in his 30's who did an awful lot of things over three or four days, such as buying pruning shears and pliers and all the rest of it as part of an elaborate plan to dispose of the body, which I strongly doubt was a product of his race or the experiences of black people generally in the United States.

He has offered, and I've permitted, despite some misgivings, I'm permitting him to put in this evidence of what happened in San Diego, for whatever it might reflect on his own state of mind. If he had some PTSD diagnosis or something similar, I might permit that, but the general proposition that black people are more likely to fear the police, and, therefore, that's why he did what he did, that's why he wrapped her in duct tape and put her in a suitcase. However you want

to frame that argument it seems to me is problematic in the extreme, and is, again, propensity evidence based on race or racial characteristics that I think is not admissible, and, therefore, I'm going to exclude it under Rule 702 and Rule 403, and at least in part on Rule 16, for the lack of full disclosure.

And if you want to mark the disclosure and his C.V. as an exhibit, why don't we do that now before we forget, Exhibit C.

03:58PM THE CLERK: Yes.

THE COURT: We'll call the letter dated April 28th Exhibit C and the CD Exhibit D.

(Exhibit C and D was marked for identification.)

MR. ZOLYNSKI: The Court mentioned methodology and reliability. For the record, I'll also be providing for the Court what I've already provided to the government, which is a copy of every one of those studies that include the methodology within the study, and I can do that electronically probably because they are so long, if that's the Court's preference.

03:59PM THE COURT: Whatever works for you to preserve the record, again, as long as the record is clear what we're talking about.

What else do we have to talk about? Anything from the government?

MR. SHINE: Nothing, your Honor, thank you very much.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
vs. ) Criminal Action
)
LOUIS D. COLEMAN, III, ) No. 19-10113-FDS
Defendant )
)
)
)

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 12

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 26, 2022
8:30 a.m.

Valerie A. O'Hara
Kathleen Mullen Silva
Official Court Reporters
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

I think what we're going to do is use Courtroom 20 on the seventh floor because it's set up for jury deliberations in terms of how the tables are formatted and everything. It means that we have to have jurors on elevators or the stairs, you know, as they're coming and going, which will add a slight day, but I think it's the easiest of our options, so that will be the deliberation room, and, of course, it will be treated like any other deliberation room. There will be a court security officer outside and all of that.

08:35AM It's also a little trickier in terms of access to bathroom facilities and all of that, but we've been dealing with this in one form or another for two years, so I think that's what we'll do.

All right. Let's talk about the schedule. I'm trying to figure out what the next two or three court days are going to look like. Mr. Hoose and Ms. Peachy, what do you think is going to happen today in terms of the witness lineup?

MR. HOOSE: Well, I can start, and Ms. Peachy can chime in. Obviously, we have to finish Ms. Hutton. I have 08:36AM Dr. Isenschmid. I told him to be here at 9:30.

Again, I don't know what the government intends to do on cross-examination. I can't imagine he's going to be more than an hour or so total. The other thing that we need to deal with this morning is yesterday I informed you, I think, that we were attempting to negotiate a stipulation about Nia Mondesir

and what she would say about Jassy Correia's prostitution activities.

Last night, the government told us, informed us, that they would not stipulate to her testimony and offered to have a subpoena served upon her requiring her presence here this morning.

She is present. She is quite hostile, as is the gentleman who was accompanying her, would not talk to me. I would suggest to the Court that we really not need to do this because what I am seeking to admit, and I think what the Court has already agreed could be admitted, is the statement that she made to Detective Schroeder and Evans in the wake of Ms. Correia's disappearance.

It's a very limited statement. The statement is simply that Jassy was prostituting on an as needed basis, mostly on the weekends. I would suggest that that statement is independently admissible under Rule 807, the residual clause of the 800 series of rules on hearsay.

To me, it is sort of a classic case. What could be a more trustworthy statement than a statement coming from someone who is trying to help the police find her best friend, who is missing, and all of the other aspects of the rule that there's no better way to produce the evidence, and that the government has been provided notice are met, so I would offer the statement under Rule 807.

I would simply read that to the jury that Nia Mondesir, when interviewed on March 1st by Detective Schroeder, she was asked the question and her answer, so I think the Court could admit it that way.

If the Court declines to do that, we're going to have to go through the process of putting Ms. Mondesir on the stand. I have no idea what she will say when I ask her the question. She may deny it, she may admit it, I have no idea. She won't talk to me.

08:39AM THE COURT: Mr. Richardson.

MR. RICHARDSON: Well, two things, your Honor. First, she was actually talking to the police after Ms. Correia's body had been found, for what that is worth. I don't think this falls under the residual clause, it's sort of double hearsay. It's, I guess, perhaps for the reason that she was not trying to help them find the body, she was talking to them about what happened.

The proposed part of the statement is also incomplete because if you read the entire thing, and I'm paraphrasing, but 08:39AM basically what Ms. Mondesir's understanding was that she was escorting with regular customers.

The detective suggested the as needed language. I think she adopted that, but it was regular customers. She wasn't standing on street corners meeting with random strangers.

THE COURT: All right. I'm not going to admit it pursuant to the residual clause of Rule 807. It's either going to come in by stipulation or by witness testimony or not at all, and we'll just have to see how it goes. Again, this is -- I may be outside the rules of evidence to admit this at all, so I'm going to clearly keep it limited, assuming it comes in in some form or another, but we'll just have to see how that goes.

MR. RICHARDSON: Your Honor, two issues with respect to that. One is, as Mr. Hoose indicated, Ms. Mondesir is present now. If it would be possible to interrupt Alicia Hutton's testimony to take her, might as well take her early if she's going to be called as a witness by the defense.

08:40AM

The other thing is I do intend, if what is going to be elicited from her on direct is the statement simply that she was prostituting on an as needed basis, we would seek to cross-examine to clarify that, that it was as I said, and in our view, that would not open the door to any specific acts.

THE COURT: I would agree as a general proposition. Obviously, the devil is always in the details, but that's how I view it.

08:41AM

Mr. Hoose, do you think it's a good idea to take her out of order?

MR. HOOSE: To be perfectly honest, your Honor, I'm really not inclined to accommodate her. I mean, she doesn't

**YVANIA MONDESIR, sworn**

THE CLERK: Thank you. You can have a seat. Please speak into the mic.

DIRECT EXAMINATION

BY MR. HOOSE:

Q. Good morning, ma'am.

Would you state your name for the record, please.

A. Yvania Mondesir.

Q. Could you spell your last name for the stenographer, please.

11:55AM

A. M-o-n-d-e-s-i-r.

Q. Are you the same Yvania Mondesir that testified here last week?

A. Yes.

Q. All right. You are not happy to be here today, are you?

A. What do you think? I'm getting retraumatized again. I'm here with my son.

Q. You were served a subpoena; is that correct?

A. Yes.

11:55AM

Q. And that's the only reason you're here, correct?

A. Yes.

Q. I mean, you did not come voluntarily, correct?

A. Obviously not.

Q. Right. And when I tried to speak with you this morning, you refused to speak with me?

A. Why would I want to talk to you? Why are you dragging me back here to answer questions that has nothing to do with nothing? He killed her. It doesn't matter what you ask me. It doesn't matter.

MR. HOOSE: Your Honor.

THE COURT: All right. All right.

THE WITNESS: No, you guys are putting me through this for what? Why do I have to keep going through this?

THE COURT: All right. Let's stop there. Put a question to the witness.

11:56AM

BY MR. HOOSE:

Q. You know why I brought you back here?

A. No, I don't.

Q. Do you know the question that I'm going to ask you?

A. No, I don't. Can you just ask it so I can get off the stand.

Q. I will ask the question. Was Jassy working as a prostitute on the days immediately before she died?

MR. RICHARDSON: Objection.

11:56AM

A. Are you kidding me?

MR. RICHARDSON: Objection.

THE COURT: Overruled.

Q. That's my question.

A. What the fuck you looking at?

Q. I'm asking you a question.

A. What did you say?
Q. Was Jassy working as a prostitute in the time period shortly before she died?
A. No.
Q. I think last week when we spoke I asked you some questions about being interviewed by the Boston Police. Do you remember that?
A. (Pause.) Yes.
Q. Okay. And one of the questions that -- and this was on March 1, shortly after her death, correct?

11:57AM

A. I don't remember.
Q. All right. Last week I showed you a document which was a transcript of what you said to Detective Schroeder. Do you remember that?
A. Why do I have to do this?
THE WITNESS: Your Honor, why do I have to do this?
THE COURT: Well, I'm --
THE WITNESS: Come on. This is unfair.
THE COURT: I'm --

11:58AM

THE WITNESS: You guys, come on. You don't think my life is ruined enough? Now I got to sit here and look at him staring at me. What is this? This is not okay. What about my mental health? When this is over, how am I supposed to move on with my life? Retraumatizing me over and over. You already got my name in the Herald. Everybody's still talking about me

and now you want to ask me a question which has nothing to do with why she's dead.

THE COURT: All right. Let's see if we can wrap this up.

THE WITNESS: Yes. Hurry up. Don't ask me anything stupid, please.

Q. Did you tell Detective Schroeder in your interview on March 1 of 2019 that Jassy was working as a prostitute on an as-needed basis, mostly on the weekends?

11:59AM A. I plead the Fifth.

Q. Did you say that or did you not?

A. I plead the Fifth.

MR. HOOSE: Okay. That's all I have, Your Honor.

THE COURT: All right. Any cross?

MR. RICHARDSON: No, Your Honor.

THE COURT: All right. Thank you. You may step down.

All right. Ladies and gentlemen, let me give you an instruction, just to make sure you understand this.

The fact that a witness made a statement or may have made a statement on an earlier occasion that might be different from what she said on the witness stand may be considered for whatever weight you choose to give it in assessing her credibility, but -- and this is important -- that prior statement, if you believe it was made, may not be considered for the truth of its contents.

So to try to explain the difference, let's say that -- I'll use a hypothetical not related to this case. A witness says on the witness stand that a car was a Ford. On a prior occasion she said it was a Toyota. You can consider the fact that the witness said two different things in assessing the witness's credibility, but that prior statement cannot be taken as true. So in my hypothetical there is no evidence that the car was a Toyota. There's evidence that the car was a Ford. There's evidence that the witness changed her story for 12:00PM whatever weight you would want to give to that, but there's no evidence that the car was a Toyota.

All right. Anything further for today?

MR. HOOSE: I need to be heard further on this, Your Honor.

THE COURT: All right. Let's use the -- do we need to let the jury out or --

MR. HOOSE: I think it would be better to do that.

THE COURT: All right. We'll take a quick recess.

THE CLERK: All rise.

12:01PM (Jury exits).

THE COURT: Mr. Hoose.

MR. HOOSE: Yes, Judge, I specifically object to that instruction you just gave.

THE COURT: What's wrong with it?

MR. HOOSE: Because the statement should be

independently admissible under Rule 807.

THE COURT: That's overruled.

We have rules about prior inconsistent statements, as I'm sure you know. In the federal system, a prior inconsistent statement made under oath is outside the definition of hearsay under Rule 801(d)(1)(A) and is, therefore, independently admissible. There's no evidence that the statement to the police was made under oath and, therefore, it can only be used to assess the witness's credibility. I'm not going to use the catch-all exception of Rule 807 to do a complete end run around the rules of hearsay. So overruled.

MR. HOOSE: I want to offer for the record the segment of her interview with the Boston Police Department, and I will say again, as I stated this morning, this is under conditions that I suggest are highly likely to be trustworthy, and I also want to offer the audio segment of her saying to Detective Schroeder that Jassy was working as a prostitute on an as-needed basis. I think this is critical stuff for the defense, Your Honor, and I object to it being excluded or limited in any way.

THE COURT: All right. You can make that as an offer of proof, the written statement and the audio portion of that.

Matt, what's the next -- well, let's -- we have a number of things that need to be marked. We'll deal with the marking tomorrow, but we can make that part of the record.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 12

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 26, 2022
8:30 a.m.

Valerie A. O'Hara
Kathleen Mullen Silva
Official Court Reporters
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

a rebuttal case, assuming that the case plays out in the way you expect?

MR. RICHARDSON: I think it depends if there's any rebuttal, I think it will be very short, but it kind of depends on what comes out today.

THE COURT: Okay. Remind me, Dr. Isenschmid, what's the general scope of his testimony?

MR. HOOSE: He's a toxicologist, your Honor. He will testify about cocaine, he will an offer an opinion as to the likely time that the cocaine was ingested, and some opinions about the use of cocaine and alcohol together.

THE COURT: All right. So that will be the plan then. We will accomplish today whatever we can accomplish, which presumably won't take the full trial day. I'll tell the jury they're going to have Friday off. We may or may not have a witness on Tuesday morning, and assuming we do not, we'll go directly into closing arguments, jury charge, and deliberation, and we'll do a charge conference tomorrow. Okay. Anything, Ms. Peachy? You stood up faster than Mr. Zolynski.

MS. PEACHY: Ms. Hutton is still on the stand, and as I brought to your attention yesterday, there were several exhibits that the government objected to that I wanted to try to introduce through Ms. Hutton. The list is shortened since yesterday, but what remains first are the medical records. The government sent these, what we proposed back to us with some

added redactions suggested. There are three proposed redactions that we do not agree on.

THE COURT: Okay. Why don't we work through that. I have the original version that was handed to me I think yesterday.

MS. PEACHY: So the first one is on page 9. The government would like redacted the sentence at the bottom of that page, "Her sleep issue last night... multiple awakenings and DFA, a worrisome possibility of bipolar escalation of mood."

08:50AM

THE COURT: Okay. What's DFA an acronym for?

MS. PEACHY: I honestly don't know, your Honor, but I believe this is relevant to her diagnosis and treatment, which I know that the Court has kind of limited this type of evidence to. It mentions the possibility of further diagnosis, and so we think that part is relevant.

THE COURT: Okay. And this is from 2015? Is that part of the same record?

MS. PEACHY: Yes, it is.

08:51AM

MS. NUZUM: Yes, your Honor. Do you want us to respond as we go along?

THE COURT: Yes.

MS. NUZUM: This redaction, the government thinks that this is cumulative, the reference to bipolar escalation. There's plenty of references to bipolar diagnosis throughout

the records without this, and the concept of her multiple awakenings in 2015 being relevant to bipolar escalation at that point in time with this DFA that nobody knows what it means in the middle, the government just thinks this isn't relevant or necessary. The fact that she has a bipolar diagnosis is reflected in multiple other places. What was going on with her sleep one night in 2015 is really not relevant.

THE COURT: That may be true, but I'll allow it. That's on page 9.

08:52AM MS. PEACHY: The next one is on page 10, your Honor. The eight or nine lines at the bottom, starting with diet, which, you know, I guess we don't really mind so much about redacting diet and activity, but what we do want in, I think should come in are the additional instructions, which is part of the treatment that's been prescribed or recommended to her, "Additional instructions: 1, continue medication as prescribed; 2, if you have problems sleeping, try a hydroxyzine. If you need to do this, consult your medication doctor, if your sleep deteriorates, do not use any street

08:52AM drugs," et cetera.

So we think those additional instructions there are part of the treatment that's being recommended and that that should be part of the record.

THE COURT: Ms. Nuzum.

MS. NUZUM: Again, the objection is this was from

2015. It's regarding at this point a mood disorder, substance abuse diagnosis, and this is the instruction being given at that point in time with that particular diagnosis.

The government just doesn't believe that this is relevant at this point. The government notes there's an additional note here that there's a question of bipolarity, but this is an open issue, so this is reflective of a different diagnosis earlier in time before the bipolar issue that has been allowed in this case was even solidified, so we don't think this is actually relevant to the diagnosis at play here.

08:53AM

THE COURT: I'll allow this as well. It occurs to me, since there is no expert who is going to talk about what these records mean, the defense witness can say these are the records and can read from them verbatim, and your cross-examination can say, for example, this is from 2015, right, but it has to be verbatim. She's not obviously a medical professional or someone who can interpret it, the point being both on direct and cross, all you can really do is point out what they say.

MS. PEACHY: That's all I was going to do, your Honor.

08:54AM

THE COURT: Ms. Peachy.

MS. PEACHY: Last one.

THE COURT: I thought you said there were four?

MS. PEACHY: I'm sorry, I misspoke, there were three, good news, there's only three. Page 14, again, the bottom unredacted portion starting with brief intervention note.

Again, we don't really care that much about the top five lines, but the service date, and then the box that's checked off that says, "Patient refused brief intervention." Again, this is part of the treatment that she's receiving. It's relevant to the treatment that she's receiving or not complying with, and so we think that this should be part of the record.

MS. NUZUM: The government's view this is not part of the treatment, this is her declining to meet with a social worker.

08:55AM THE COURT: All right. I think that's a little far afield. Let's redact that one on page 14. Okay. Anything else on Ms. Hutton's testimony?

MR. SHINE: Your Honor, just the one. We anticipate not a rigorous cross of Ms. Hutton, but if the Court is so inclined to allow Ms. Hutton's non-expert opinion, or apparently she's drafted some charts and maps relative to the telephone pinging. I was going to ask if that is admitted as an exhibit, although we still oppose it, that Mr. Richardson be allowed to cross on those as his expertise in that area far

08:56AM exceeds mine.

THE COURT: My understanding is what she's going to do in some form or another is to say I plotted these additional points.

MR. SHINE: Yes.

THE COURT: I'm not going to let her opine on

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
vs. ) Criminal Action
)
LOUIS D. COLEMAN, III, ) No. 19-10113-FDS
Defendant )
)
)
)

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 13

JURY CHARGE CONFERENCE

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 27, 2022
9:06 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

and respect people's travel or holiday plans.

Again, one way or another by the time the evidence closes Tuesday and you argue, and, of course, they'll be a renewed opportunity at the close of all the evidence if additional instructions are required, but you obviously have the right to know exactly how I'm going to instruct the jury.

I will permit you to incorporate verbatim sections of any instructions in your closing argument. In 11:21AM other words, I will permit you to say I expect Judge Saylor will instruct you and then read something verbatim. I think that's fair. No elaboration on that, obviously, and you don't have to do it, but I will permit it as long as it's verbatim and taken from obviously the final written instructions, which you will have.

All right. Let's take up the renewed motion for a mistrial, which I have read. Let me start with the testimony of Dr. Vershvovsky. I did strike her comment and instructed the jury to disregard it. I was not asked 11:22AM to give a different instruction to the jury, a mistrial was requested.

If the defense wishes, I can either repeat that instruction or give a different version of it, that is, I think under the heading of a strategic choice for the defense to either call attention to it or not.

I have indicated I will not permit the government to argue given the circumstances here that she was still alive when she was dragged into the apartment.

So to the extent the defense is asking for a mistrial based on that statement in whole or in part, I'll deny it, and I will consider any further instruction.

As to the testimony of Ms. Mondesir, just to I guess repeat or state how we got to that point, when she first testified, I had not yet resolved the issue of

11:23AM whether or not I would permit any evidence whether the victim had ever engaged in prostitution activities. I was inclined to disallow it because it seemed to me to be clearly in violation of Rule 412.

I elected, as set forth in the record, to change my mind and decided to permit what was effectively reputation testimony or a character trait construed in a very broad fashion, and the way it played out is she was recalled to ask basically a single question.

She was, obviously, a hostile witness. Her

11:24AM answers to the questions were not responsive necessarily. She was angry, obviously. I'm sure her anger was increased by the fact she had to sit outside on the bench for a couple of extra hours, but she was angry. She said what she said. There was no request to strike anything she said, no request for an instruction to disregard it,

no request for an instruction to control her in some way, no request for a recess.

After a number of questions, counsel still had not asked her the one question that she was there to answer, and when she was asked it, she denied having said it, was confronted with her prior inconsistent statement and said in effect that she took the Fifth Amendment, and she was then excused.

Obviously, the record is what it is. I'm
11:25AM paraphrasing it. Again, I was not requested at that point to do anything further with regard to her testimony. I instructed the jury sui sponte on the meaning of what it meant when a witness was confronted with a prior inconsistent statement, which was an accurate statement of the law that I stand by.

As to whether her assertion as to the Fifth Amendment was in good faith or not, I note simply that prostitution is a crime, aiding and abetting is a crime, failing to report, it's surely a crime, and it's by no
11:26AM means clear to me that that was a bad faith assertion of a Fifth Amendment right.

In any event, again, if the defense wants me to give some kind of curative instruction to the jury or strike it, strike anything that she said, I will consider that, but I was not asked to do so at the time, so I'm

going to deny the renewed motion for a mistrial based on that, that is, whether it's Dr. Vershvovsky or Ms. Mondesir's testimony or comments, and I'm prepared to consider whatever curative instruction is requested or instruction to disregard something and to strike it from the record and so forth, but I have not been so asked at this point. Counsel.

MR. HOOSE: Judge, I do want to be heard on this.

MS. NUZUM: Your Honor, may the government request that this portion be sealed and the courtroom be cleared if this is going to get into anything that was not that narrow topic?

11:27AM

THE COURT: I don't see why we need to get into anything that's not in the record. Again, the defense has made an offer of proof of certain other information, and I'm not admitting it, and I don't think we need to get into that, but Mr. Hoose.

MR. HOOSE: Judge, I just want to put on the record as to how this resulted from my perspective, and if I am wandering into something that should be sealed, I don't have any objection to the court being sealed.

11:28AM

THE COURT: Well, let's talk about what happened in court.

MR. HOOSE: All right. Well, what happened in court is we had a witness that was completely out of

control, and I have to inject here, your Honor, that I did everything humanly possible to avoid this. I knew that this is exactly what we were going to be dealing with. We all knew that she had made this statement to the Boston Police Department under terms that I would suggest are far more likely to lead to reliability than any I have ever encountered.

I offered, suggested that we stipulate to her testimony. I can't force the government to stipulate. I thought that they would do so just to avoid the scene that we had yesterday. They declined to do so.

At some point, I think it was Mr. Richardson suggested that, well, she meant that she was prostituting only with regulars. I would have been happy to consider accommodating that in a stipulation just to avoid what we dealt with yesterday.

MR. RICHARDSON: I'm sorry, your Honor, I'm not sure that was in open court.

THE COURT: All right. Continue, Mr. Hoose.

MR. HOOSE: I'm sorry, I don't remember what was in open court at this point or not. I later suggested that I believe this statement was admissible under Rule 807. I continue to press that, your Honor. You said in your ruling that it wasn't a sworn statement. There's no requirement under 807 that it be a sworn statement, and

I suggested that the government could not oppose my motion. They declined.

Again, I can't make them do this. I was left with no choice but to bring Ms. Mondesir in. As you know, we had tried to get this evidence before the jury in several different forms, and the Court's ruling limited us to this particular statement, so I had no choice but to have her take the witness stand.

When she arrived here yesterday morning with FBI, I didn't even recognize her. An FBI agent approached me, at least, I think she was an FBI agent, and told me she was there, that she was in the room, if I wanted to go in and talk to her. I went in and tried to talk to her, and, frankly, my goal was simply to say, look, I know this is unpleasant for you, this is all I want to ask you, this one question, if you can just agree that you said this, we'll be done and have you on your way.

I didn't even get my mouth open before her male companion said, "You have no right to be in here. What are you doing here?" I told him why I was there. "She has nothing to say to you. Please leave the room." So I had no opportunity to even talk to her, again, to try to avoid the situation that happened yesterday.

Now, I know that none of us really wanted that situation, but I'm articulating this because I'm, frankly,

trying to deflect the notion that the defense is somehow to blame for this. I think we're the least to blame, but I'm not really interested in having a discussion as to blame.

As to what happened in court, your Honor, and with all due respect to the Court, I have a great deal of respect for you as a Judge and for this court. I think it is your obligation to control witnesses. I don't think I have to tell you, Judge, you should call a recess, and, 11:32AM frankly, I was about to ask for a recess when you said, "Wrap it up, put a question."

Apparently, wrongly, I interpreted that as to we know where you're going and we're going to let this in without me going through what I did with her the week before.

You know, your Honor, that I know how to get evidence in as past recollection recorded because I did it with this witness the week before. I can't imagine that you or anybody in this courtroom wanted me to try to 11:32AM approach her to do that yesterday.

Frankly, I think she would have physically assaulted me if I had gone up to her. So I took the Court's direction, I put the question, and I sat down assuming that the Court was going to admit it as past recollection recorded without me going through the same

exercise that I went through the week before, and, frankly, she had already acknowledged the week before that that document was -- that the things in that document were accurate, so that's additional ground as to why it should be admitted.

But having said all of that, where we are left now, regardless of who is to blame for it, is we now have this jury, who has evidence before it that everybody in this courtroom knows is false, and I'm not going to 11:33AM articulate what it is because we all know what it is, and I think that it is incumbent upon if not the government, and I think it is incumbent on the government, it's incumbent on the Court to not let this jury go to the deliberation room with false evidence.

It has to be corrected, and the way it should be corrected is to simply admit for all other reasons I've already articulated that five-line statement that I think everybody anticipated was going to constitute the evidence as to that aspect of the case.

11:34AM THE COURT: The evidence that's false is her denial that she had made that statement? I want to be sure what the false evidence is.

MR. HOOSE: The evidence that is false is that Ms. Correia was not working as a --

THE COURT: No, I'm not going to accept that as

false. If you want to say that the evidence we all know is false that she made the statement to the Boston Police, that's one thing, but, anyway, go ahead.

MR. HOOSE: I say it's false, your Honor, because it's corroborated not only by the statement that she made to the Boston Police but by all the other evidence that the Court excluded on this point. We had a number of items in the bucket on this. We had the stuff from Georgia.

11:35AM MS. NUZUM: Objection.

MR. RICHARDSON: Objection.

THE COURT: Sustained. And I don't agree it's false. I don't think the information from Georgia or, you know, the text messages you've been talking about, I mean, you're arguing inferences from those things, but they don't say what you keep saying they say. But, anyway, I'd rather not close the courtroom. Let's talk about -- let's talk about what happened and what, if anything, you want me to say to the jury going forward.

11:35AM MR. HOOSE: Well, I don't know what I want you to say to the jury because, frankly, whatever you say to the jury is not going to be sufficient to cure the damage. The only thing that's going to be sufficient to cure the damage is to admit that statement for all the reasons that I have given or to declare a mistrial.

THE COURT: All right. As to whether it's past recollection recorded, that requires, of course, the witness to say that she has no memory, and that predicate was not laid. It is certainly my obligation to control the court, and for that matter, to ensure a fair trial. It's also defense counsel's obligation to request relief. I don't think I've denied a single request for a sidebar or for a recess to be heard. If you had requested me to strike it, I would strike it.

11:36AM It's hard for me to know what are your strategic choices, how you want to handle a witness, do you want me to be involved or not? I was prepared, of course, to do so. I wasn't asked to do so. I wanted certainly for you to get to the point.

When you ask questions to an exceedingly hostile witness like are you the same person who testified before, it's likely you're going to get an exceedingly hostile response, and I didn't know how this was going to play out, whether she was going to deny her prior statement or not, but, in any event, what happened has happened. 11:37AM

The question is do you want me to do something going forward? I'm going to deny the request for a mistrial. If you want me to strike it, I will strike certainly portions of her testimony, instruct the jury to disregard it, give a curative instruction, but it's your

strategic choice as to how you want me to handle that going forward.

I'm prepared to do anything within reason, and I don't accept the premise, changing subjects slightly, I do not accept the premise that evidence that we all know is false is before the court. I don't accept that, and that somehow is, you know, tainting this proceeding. I don't agree with that.

Just to circle back to where I began, it is by no means clear in any way, shape or form that this evidence was admissible, that I should have admitted it.

Again, I have been deeply troubled about this issue for weeks because it seemed to me to violate Rule 412 and to permit the defendant to trash the victim's name and reputation, and it wasn't clear to me that that was appropriate or fair, and finally decided I would put a thumb on -- well, I would rule in favor of the defense on that issue, but I do have to say it's by no means clear that any of this is admissible.

11:39AM Does the government want to say anything in response? Mr. Richardson.

MR. RICHARDSON: No, your Honor, other than I suppose to respond to the notion that having opposed the introduction of this evidence at all, we somehow are responsible for what happened in court.

THE COURT: All right. Well, I will -- the evidence is not closed. Defense has not rested. If I have a request, a reasonable request for, again, to strike, to disregard anything connected with that, I will certainly entertain it and would be in all likelihood prepared to give it, but I'll leave that to defense to make whatever choice it wants to make in that regard.

One last thing. Assuming that issue is over and I am denying the renewed motion for a mistrial, I'm

11:40AM inferring that there's no issue with the verdict form, which is just a one-line guilty, not guilty form. If that's incorrect, please let me know.

As I indicated, I was convinced that resulting in death is an element of an aggravated offense, not simply a sentencing enhancement, so it's framed accordingly. Anything further from the government?

MS. NUZUM: I have nothing further at this time from the government.

THE COURT: Okay. From the defense?

11:41AM MR. HOOSE: Judge, what's left, we, this morning submitted a thumb drive to Mr. McKillop in an effort to -- you had indicated previously you were giving a chance to clean up the record on some of these issues.

THE COURT: Yes.

MR. HOOSE: So we submitted a thumb drive to

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal Action |
| | ) | |
| LOUIS D. COLEMAN, III, | ) | No. 19-10113-FDS |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 14

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 31, 2022
8:15 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

we clear the courtroom, so I'm going to ask that everyone not affiliated with the government or the defense or the court, if you could leave the Court briefly, I'm going to conduct a brief proceeding under seal.

MR. ZOLYNSKI: Your Honor, may I inquire as to the instruction on consciousness of guilt? I didn't catch what the Court changed and didn't change.

THE COURT: I didn't change anything.

(SEALED HEARING WAS HELD.)

09:00AM THE CLERK: All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE COURT: Ladies and gentlemen, welcome back. I hope you had a nice weekend. I'm sorry to have kept you waiting for a bit of time. We had some last minute things we had to take up. I appreciate your patience.

Also to let you know, Ms. Jean-Baptiste in seat Number 14 sent us a text last night that her car caught fire in Vermont and that she was trapped up there, so I think I'm going to let her go, so we're down to one

09:25AM alternate, but that's why we impanel alternates.

Let me turn to the defense. Is there further evidence?

MR. HOOSE: Good morning, your Honor. The defense rests and renews its motion pursuant to Rule 29.

THE COURT: All right. That motion is denied.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
vs. ) Criminal Action
)
LOUIS D. COLEMAN, III, ) No. 19-10113-FDS
Defendant )
)
)
)

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 14

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

May 31, 2022
8:15 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

shows. What she was trying to do and what Mr. Alqasir told you she was trying to do or wanted to do was to get him through her app as her driver. Nowhere did she say I want a free ride, threaten him, attack him, do anything of the sort.

Finally, there is an argument that the defendant or that the government chose the crime to charge the defendant with. Well, actually what the defendant is charged with is a crime he chose to commit. It may be that 11:44AM this turned out to be, I think the language was "the worst night of his life." It turned out to be Jassy's last night of her life.

THE COURT: All right. Thank you. Why don't we stand and stretch while the clerk delivers the instructions.

JURY INSTRUCTIONS

THE COURT: Ladies and gentlemen, you should each have your own copy of the written jury instructions. I'm going to read them aloud to you, and you can read along 11:46AM with me as I read them. You can take notes on them, and you can take your copy into the jury room with you.

You will recall at the beginning of the case, I gave you some preliminary instructions. I don't think there's anything here that's inconsistent, but if there is, these instructions should control your deliberation and

verdict.

All right. If you would turn to page 2 and please follow along with me.

It is your duty to find the facts from the evidence admitted in this case. To those facts, you must apply the law as I give it to you. The determination of the law is my duty as the Judge. It is your duty to apply the law exactly as I give it to you, whether you agree with it or not.

11:47AM In following my instructions, you must follow all of them and not single out some and ignore others. They are all important.

You must not interpret these instructions or anything I may have said or done as a suggestion by me as to what verdict you should return -- that is a matter entirely for you to decide.

Every person accused of a crime is presumed to be innocent unless and until his guilt is proved beyond a reasonable doubt. The presumption is not a mere formality. 11:47AM It is a fundamental principle of our system of justice.

The presumption of innocence means that the burden of proof is always on the government to prove that the defendant is guilty of the crime with which he is charged beyond a reasonable doubt.

The burden never shifts to the defendant. It is

always the government's burden to prove each of the elements of the crime charged beyond a reasonable doubt. The defendant does not have to prove that he is innocent, or even present any evidence.

The presumption of innocence alone may be sufficient to raise a reasonable doubt and to require the acquittal of the defendant. You may not convict the defendant of any crime charged against him if the government fails, or is unable, to prove every element of that crime beyond a reasonable doubt.

You may not convict the defendant based on speculation or conjecture.

You may not convict the defendant if you decide that it is equally likely that he is guilty or not guilty. If you decide that the evidence would reasonably permit either of two conclusions -- either that he is guilty as charged, or that he is not guilty -- you must find the defendant not guilty.

You may not convict the defendant if you decide that it is only probable, or even strongly probable that he is guilty. A mere probability of guilt is not guilt beyond a reasonable doubt.

The law does not require that the government prove guilt beyond all possible doubt; proof beyond a reasonable doubt is sufficient to convict. There are very few things

in this world that we know with absolute certainty, and in criminal cases, the law does not require proof that overcomes every possible doubt.

Again, the defendant is presumed to be innocent, and the government bears the burden of proving him guilty beyond a reasonable doubt. If, after fair and impartial consideration of all the evidence, you have a reasonable doubt as to the defendant's guilt, it is your duty to acquit him. On the other hand, if, after fair and 11:49AM impartial consideration of all of the evidence, you are satisfied beyond a reasonable doubt as to his guilt, you should vote to convict him.

Like all defendants, the defendant in this case has a constitutional right not to testify. You should not consider or even discuss that fact in your deliberations. No inference of guilt, or of anything else, may be drawn from the fact that the defendant did not testify. For any of you to draw such an inference would be wrong; indeed, it would be a violation of your oath a juror.

Your verdict must be based solely upon the evidence. It would be improper for you to base your verdict on anything that is not evidence.

You may not base your verdict on any personal feelings, prejudices, or sympathies you may have about the defendant or about the nature of the crime with which he is

charged.

As I told you at the beginning of the case, you should take particular care to ensure that your verdict is not based, even in part, on any assumptions or biases based on race, ethnicity, or gender, including any assumptions or biases that may not be open or obvious.

You may not consider or be influenced by any possible punishment that may be imposed on the defendant.

Again, your verdict must be based solely on the evidence and according to the law.

The evidence in this case consists of the sworn testimony of witnesses, both on direct and cross-examination, the exhibits that have been received into evidence, and any facts to which the parties have agreed or stipulated. You should consider all of the evidence, no matter what form it takes, and no matter which party introduced it.

Whether the government has sustained its burden of proof does not depend upon the number of witnesses it has called, or upon the number of exhibits it has offered, but instead upon the nature and quality of the evidence presented.

Certain things are not evidence.

Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they say in

their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them from the evidence differ from the way the lawyers have stated them, your memory of the facts should control.

Questions by lawyers, standing alone, are not evidence. Again, the lawyers are not witnesses. The question and the answer taken together are the evidence.

Objections by lawyers are not evidence. Lawyers have a duty to their clients to object when they believe a question or an exhibit is improper under the rules of evidence. You should not be influenced by any objection or by my ruling on it, and you should not speculate or guess about what the answer might have been or what an exhibit might have said.

Anything that I have struck or instructed you to disregard is not evidence and may not be considered by you.

The indictment is not evidence.

Anything you may have seen or heard when the court was not in session is not evidence. You must decide the case solely on the evidence received at trial. As I advised you at the beginning of the case, it is particularly important that you not conduct any research on your own, and that you not read or watch or listen to anything on the Internet or in news media about the case.

Evidence may take the form of either "direct evidence" or "circumstantial evidence." "Direct evidence" is direct proof of a fact, such as testimony from an eyewitness that the witness saw something. "Circumstantial evidence" is indirect evidence; that is, proof of a fact (or facts)from which you could draw a reasonable inference that another fact exists, even though it has not been proved directly.

You are entitled to consider both direct and 11:53AM circumstantial evidence. The law permits you to give equal weight to both. It is for you to decide how much weight to give to any particular piece of evidence, whether direct or circumstantial.

Although you may consider only the evidence presented in the case, you are not limited to the plain statements made by witnesses or contained in the documents. In other words, you are not limited solely to what you saw and heard as the witnesses testified.

You are also permitted to draw reasonable 11:53AM inferences from the facts if you believe those inferences are justified in light of common sense and personal experience. An inference is simply a deduction or conclusion that may be drawn from the facts that have been established. Any inferences you draw must be reasonable and based on the facts as you find them. Inferences may

not be based on speculation or conjecture.

A particular item of evidence is sometimes received for a limited purpose only. That is, it can be used by you only for one particular purpose and not for any other purpose. I have told you when that occurred and instructed you on the purposes for which the item that can and cannot be used.

Some of the evidence has been received in the form of stipulations. A stipulation simply means that the government and the defendant accept the truth of a particular proposition or fact.

11:54AM

Because there is no disagreement, there is no need for evidence as to that issue apart from the stipulation. You may accept the stipulation as a fact to be given whatever weight you choose.

You do not have to accept the testimony of any witness if you find that the witness is not credible. You must decide which witnesses to believe, considering all of the evidence and drawing upon your common sense and personal experience. You may believe all of the testimony of a witness, or some of it, or none of it. You alone are the judges of the witnesses' credibility.

11:54AM

In deciding whether to believe testimony of the witnesses, you may want to take into consideration such factors as their conduct and demeanor while testifying; any

apparent fairness or unfairness they may have displayed; any interest they may have in the outcome of the case; any prejudice or bias they may have shown; their opportunities for seeing and knowing the things about which they have testified; the reasonableness and unreasonableness of the events that they have related to you in their testimony; and any other evidence that tends to support or contradict their versions of the events.

The testimony of a witness may be discredited or 11:55AM impeached by showing that he or she previously made statements that are inconsistent with his or her present testimony. If a witness made inconsistent statements about any significant matter, you have a right to distrust the testimony of that witness in other respects. You may reject all of the testimony of that witness or give it such credibility as you may think it deserves.

Sometimes, of course, people make innocent mistakes, particularly as to unimportant details; not every contradiction or inconsistency is necessarily important. 11:55AM Again, you alone are the judge of the witnesses' credibility.

You have heard evidence that the defendant made certain statements to government agents or to others.

It is for you to decide whether the defendant made any such statement, and, if so, how much weight to give it.

In making that decision, you should consider all of the evidence concerning the statement, including the circumstances under which the statement may have been made, and any facts or circumstances tending to corroborate or contradict the contents of the statement.

11:56AM You have heard the testimony of law enforcement officers. The fact that a witness may be employed as a law enforcement officer does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of any other witness.

Again, it is for you to decide whether to accept the testimony of any witness and what weight, if any, to give to that testimony.

You have heard testimony from persons who were permitted to explain certain technical issues or to express certain opinions about certain subjects. A witness who has special knowledge, skill, experience, training, or education on a particular topic may testify and provide an explanation or state an opinion concerning such matters.

11:57AM You may accept or reject that testimony, in whole or in part. In weighing the testimony, you should consider the witness's education and experience and the soundness of the reasons given for the opinion. You should also consider the credibility of the testimony, as you would any witness.

You have heard testimony that law enforcement conducted certain testing procedures, and you have heard the results for those tests. You may consider that testimony as you would any other evidence, and give it such weight as you believe it may deserve under the circumstances. You may make reasonable inferences from the fact that certain tests were inconclusive, that certain tests were not conducted, or that certain investigative techniques were not used. Any such inferences, however, should not be based on speculation or conjecture about what the results of such tests or techniques might have been. There is no legal requirement that the government use any specific investigative tests or techniques or all possible tests or techniques to prove its case.

As I indicated at the beginning of the trial, you have been permitted to take notes. You should bear in mind that not everything that is written down is necessarily what was said. When you return to the jury room to discuss the case, do not assume simply because something appears in 11:58AM somebody's notes that it necessarily took place in court. Notes are an aid to recollection, nothing more; the fact that something is written down does not mean that it is necessarily accurate.

The numbers assigned to the exhibits are for convenience and in order to ensure an orderly procedure.

You should draw no inference from the fact that a particular exhibit was assigned a particular number or that there may be gaps in the number sequence.

This case, like most criminal cases, began with an indictment. You will have that indictment with you while you deliberate in the jury room. The indictment is not evidence or proof of guilt, and you may not draw any adverse inference from it. It is simply an accusation -- it is the means by which the defendant is charged with a 11:59AM crime and brought before this court. The defendant has pleaded not guilty to the charge set forth in the indictment.

I am now going to give you some instructions on the nature of the offense charged in the indictment and the elements of that offense that the government must prove beyond a reasonable doubt.

Throughout these instructions, I will use the word, "victim." I'm doing so only for the sake of convenience. You should not draw any inference or 11:59AM conclusion from my use of that word. In particular, you should not assume from that word that the crime charged necessarily occurred or that the defendant has to prove that he is innocent. Again, the burden is on the government to prove his guilt beyond a reasonable doubt.

The indictment charges the defendant with the

crime of kidnapping resulting in death. For the sake of convenience, I will refer to the crime as "kidnapping."

For you to find the defendant guilty of kidnapping, you must be convinced that the government has proved each of the following things beyond a reasonable doubt:

First, that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim;

Second, that the defendant held or detained the victim against her will for ransom or reward or otherwise;

Third, that the defendant caused the transportation of the victim in interstate commerce;

Fourth, that the defendant acted knowingly and willfully; and

Fifth, that the defendant's acts resulted in the death of the victim.

The first element of the crime of kidnapping that the government must prove is that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim.

"Unlawfully" simply means contrary to law.

"Seize," "confine," "kidnap," "abduct" and "carry away" all involve the physical or bodily taking, seizure, or carrying away of a victim.

"Inveigle" and "decoy" both involve the non-forcible taking of a victim, in which a defendant entices or lures the victim in some way into accompanying him or remaining with him.

To "inveigle" means to entice, cajole, or tempt a victim. That may include deceitful means, such as false promises or representations, although such false promises or representations are not required.

To "decoy" means to entice or lure a victim by means of some fraud, trick or temptation.

12:01PM

The fact that the victim may have accompanied the defendant voluntarily at first does not necessarily mean that a kidnapping did not occur. Even if the victim accompanied the defendant voluntarily at first, circumstances might have changed, and the defendant at some later point may be found to have seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim.

The second element of the crime of kidnapping that the government must prove is that the defendant "held or detained" the victim against her will for ransom or reward or otherwise.

12:02PM

A victim may be held or detained against her will if she is restrained against her will if she is restrained or restricted in her movement without her consent, such

that she is not free to leave the location or space in which she is held or detained.

It is not necessary that a victim be held or detained by mechanical restraints, such as locks, chains, or similar methods. A victim may also be held or detained by physical force, threats, or coercion.

As I will explain in a moment, under some circumstances, a victim may also be held or detained against her will if she is deceived or tricked into accompanying or remaining with the defendant, or does so because of the defendant's false pretenses.

12:03PM

There is no specific amount of time that a victim must be held or detained. The victim must, however, be held or detained for an appreciable period against her will.

The government must prove that the defendant held or detained the victim "against her will."

To hold or detain someone "against her will" is to do so without her consent.

12:03PM

If a victim's apparent "consent" is obtained by deceit, trickery, or false pretenses, it is not a valid form of consent. A victim may be found to have been held or detained against her will if she is deceived or tricked into accompanying or remaining with the defendant or induced to do so by false pretenses. Put another way, if a

victim agrees to accompany a defendant or remain in his company, because he has deceived or tricked her as to his true purpose and intent, she has not actually assented to accompany or remain with him and may be found to have been held or detained against her will. Nonetheless, if the victim has given valid consent, she has not been held or detained against her will.

12:04PM

Again, the government must prove that the defendant held or detained the victim against her will for "ransom, reward, or otherwise."

Here, the government alleges that the victim was held not for "ransom or reward," but "otherwise" -- that is, for one or more other purposes.

The term "otherwise" can include holding or detaining a person (1) for purposes of sexual gratification or (2) to prevent detection of a crime or a report to law enforcement.

The third element of the crime of kidnapping that the government must prove is that the defendant willfully caused the transportation of the victim in interstate commerce.

12:04PM

"Interstate commerce" includes travel between one state and another state. A victim is transported in interstate commerce if she moves across straight lines from one state into another.

The government does not have to prove that the defendant knew that state lines were crossed. As long as the defendant willfully caused the victim's transportation and she crossed a state line as a result, this element may be satisfied.

This element may be satisfied regardless of whether the victim was alive when transported across a state boundary.

The fourth element of the crime of kidnapping that 12:05PM the government must prove is that the defendant acted knowingly and willfully.

The defendant acted "knowingly" if he acted with knowledge and awareness of his actions, and did not act out of ignorance, mistake, neglect, or accident.

The defendant acted "willfully" if he acted voluntarily and intentionally and with the specific intent to do something the law forbids or with the specific intent to fail to do something the law requires to be done -- that is, with a bad purpose either to disobey or to disregard 12:05PM the law.

The specific crime that the government must prove that the defendant committed knowingly and willfully is the crime of kidnapping resulting in death and not any other crime.

In assessing the defendant's intent, you may

consider evidence that he took certain actions or engaged in certain conduct after the crime was alleged to have been committed. Such actions or conduct may indicate that the defendant thought he was guilty of one or more crimes and was trying to avoid detection and punishment. You are not required to draw such an inference, but you may do so if it is reasonable to do so under the circumstances. Mere flight, without more, is not necessarily indicative of feelings of guilt. It is up to you to decide what weight, if any, to give to any such evidence.

12:06PM

The fifth element of the crime of kidnapping that the government must prove is that the defendant's acts resulted in the victim's death.

To satisfy this element, the government must prove that the victim is dead, and that her death resulted from the willful and intentional conduct of the defendant. To establish that the defendant's conduct resulted in the death of the victim, the government must prove that but for the defendant's actions, the victim would not have died.

12:07PM

The indictment charges that the offense was committed "on or about" a certain date. Although it is not necessary -- although it is necessary for the government to prove beyond a reasonable doubt that the offense you are considering was committed on or reasonably near the date alleged in the indictment, it is not necessary for the the

government to prove that the offense was committed precisely on the date charged.

I come now to the last part of the instructions, the rules for your deliberations. When you retire, you will discuss the case with the other jurors to reach agreement if you can do so. You shall permit your foreperson to preside over your deliberations, and your foreperson will speak for you here in court. Your verdict must be unanimous -- that is, all of you must agree on the verdict.

12:07PM

Each of you must decide the case for yourself, but you should do so only after considering all the evidence, discussing it fully with the other jurors, and listening to the views of the other jurors.

Do not be afraid to change your opinion if you think you are wrong, but do not come to a decision simply because other jurors think it is right.

It important that you reach a verdict if you can do so conscientiously. You should not hesitate to reconsider your views from time to time and to change them if you are persuaded that this is appropriate.

It is important that you attempt to return a verdict, of course, but only if each of you can do so after having made your own conscientious determination. Do not surrender an honest conviction as to the weight and effect

of the evidence simply to reach a verdict.

I now want to explain to you what is called the verdict form. This is simply the written notice of the decision you will make in this case. It's a single piece of paper. It has the caption, the name of the case, it says "Verdict Form," and it says, "Count One, Kidnapping Resulting in Death," and there's a place to check "not guilty" or "guilty" and then a place for the foreperson to sign and date the verdict form.

12:09PM After you've reached a unanimous agreement on your verdict, your foreperson will fill in the form that has been given to you, sign and date it, and advise the jury officer outside your door that you are ready to return to the courtroom.

After you return to the courtroom, your foreperson will deliver the completed verdict form as directed in open court.

If it becomes necessary during your deliberations to communicate with me, you may send through the jury 12:09PM officer a note signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me on anything concerning the case except by a signed writing, and I will communicate with any member of the jury on anything concerning the case only in writing or orally here in open court. If you send

out a question, I will consult with the parties as promptly as possible before answering it, which may take some time. You may continue with your deliberations while waiting for the answer to any question.

When you are communicating with me, please do not tell me -- or anyone else -- how the jury stands numerically or toward which decision the jury is leaning.

All right. A few matters left to discuss. First, once you get the case, you are the ones who determine your

12:10PM schedule. Again, you can take as little or as much time as you think is necessary and appropriate to reach your decision.

Lunch should be waiting for you in your deliberation space, which, again, I think is Courtroom 20 on the seventh floor.

If I have not heard from you by about ten minutes to five or so, I will reconvene and check and see where you are. If you're close, we can keep going for a little while. The building begins to shut down after awhile. We can only go so late into the evening, but we're here tomorrow, we're here the day after that, and, again, it's entirely up to you how much time you take.

If you have a question concerning your physical comfort, if you're too hot or too cold or something like that, you need to refresh your water, you don't need to

send a signed note to communicate with me, but anything other than your physical comfort does require a signed note so I can discuss it with the parties, and, again, that may take some time to respond to whatever question or communication you might have.

I have one matter that I don't enjoy doing, but I have to. We impaneled 15 jurors at the beginning, but only two, I'm sorry, only 12 are permitted to deliberate and vote. As you know, we lost two jurors in the course of the 12:11PM trial, and there's no guarantee that we're going to keep all 12 of you. So I have to designate one of you as the alternate juror, and I'm going to designate the person who was impaneled last when we first impanelled the jury, and that's Mr. Barstad in seat 9.

To make matters worse, you have to be segregated from the other jurors while they deliberate, and you're not free to leave because, again, we may lose someone depending on how long this takes.

Before I forget, I'm going to discharge 12:12PM Ms. Jean-Baptiste, who, again, was unable to be here today.

The last thing I need to do is to appoint a foreperson. The role of the foreperson is very limited. It's to make sure that the deliberations are conducted in an orderly fashion, to make sure everyone is having a chance to be heard, and then to make sure that the verdict

form accurately reflects the jury's verdict and to sign it and date it and return it here in open court.

The foreperson's views are entitled to no extra weight. You are very much a jury of equals, and all 12 of you have an equal say in the outcome of the case, although, of course, your verdict has to be unanimous, so I'm going to designate Ms. Powers in seat 6 as the jury foreperson, and I instruct you to permit her, again, to preside over your deliberations, and she will be charged with making sure the form accurately reflects your verdict.

12:13PM

Again, thank you for your patience and cooperation throughout this process, and I instruct you to begin your deliberations. We will collect the physical evidence and get that up to you. You should also have a disk with an electronic display so you can review that evidence, if you wish. That may take a few moments to make sure we have everything and it's in the right order, and Mr. McKillop will show you to Courtroom 7, Matt?

THE CLERK: Courtroom 20.

12:14PM

THE COURT: Courtroom 20 on the seventh floor. With that, again, I instruct you to begin your deliberations, and if I've not heard you by ten minutes of five, we'll collect ourselves and see where you are at that point.

MR. ZOLYNSKI: Judge, very briefly, before the

jury begins deliberations, may we approach?

THE COURT: Yes.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: First, from the government?

MR. SHINE: Nothing.

THE COURT: Mr. Zolynski.

MR. ZOLYNSKI: Judge, yes, we do have objections to the jury instructions. I'll read them as quickly as I can, and we can do it now or you could let the jury go for five minutes. I'll go as quickly as I can.

12:15PM

THE COURT: Why don't you do it as quickly as you can. You can renew some of them in shorthand, you know, given the length of the charge conference.

MR. ZOLYNSKI: I'll do my best to go quick and still meet the First Circuit's requirements.

Judge, starting on page 6 of the instructions. On page 6 of the Court's instructions, the last sentence of the first paragraph, we would add, quote, "Testimony or other evidence that has been struck is not evidence, and it cannot be considered by you." It is consistent with addressing the undisclosed opinion by the government's medical examiner in this case.

12:16PM

Turning your Honor to page 7, the last sentence of the first paragraph, we would add that same sentence, which is, quote, "Testimony or other evidence that has been

struck cannot be considered by you."

Turning your Honor to page 23 of the instructions, Mr. Coleman maintains that consistent with the presumption of innocence and the burden of proof beyond a reasonable doubt that the word "victim" should be replaced throughout with "Ms. Correia" and that "the defendant" should be replaced throughout with "Mr. Coleman."

Turning your Honor to page 24 of the Court's instructions, paragraph 3, where you would add to that

12:17PM sentence a quote, "Without her consent." It is Mr. Coleman's position that that is a fundamental element of the crime here, and it is appropriate to place in this portion of the instructions.

That is consistent with the *Chatwin* case, 326 U.S. 455 and also with other circuit courts, which is: *Wright*, 340 F.3d 724, (8th Cir. 2003); *Beers*, 189 F.3d 1297, (10th Cir. 1999); *Powell*, 226 F.3d 1181, (10th Cir. 2000); *Chancey*, 715 F.2d 543, (11th Cir. 1983); and *Hattaway*, 399 F.2d 431, (Fifth Cir. 1968.)

12:18PM We would also add to the next paragraph, which would be paragraph 4, we would strike "otherwise" and add "other benefit to himself," which is consistent with the United States Supreme Court's decision in *Gooch*, which is 297 U.S. 124 (1936).

And to the final sentence, we would have that

sentence state, "Fifth, The defendant's kidnapping resulted in the death of the victim."

Turning now to page 25 of the Court's instructions, we would have had the "inveigle and decoy" portion of the instruction, which is paragraph 4 read: "Inveigle and decoy both involve non-forcible taking of the victim in which a kidnapper entices or lures the victim in some way into accompanying or remaining with him. To find the defendant inveigled or decoyed the victim, you must be convinced beyond a reasonable doubt that the defendant had the willingness and intent to use physical force to complete the kidnapping."

If the deception fails, it is our position that the courts in the Eleventh Circuit and the Fourth Circuit have correctly analyzed this issue, and those cases are: *Boone*, 595 F.2d 1550, (11th Cir. 1992); Gillis, 938 F.3d 1181, (11th Cir. 2019); and *Higgs*, 353 F.3d 281, (4th Cir. 2003).

The following paragraphs we would have asked to have read: "To inveigle means to entice, cajole, or tempt a victim by false pretenses, false representations, or other deceitful means." We would strike the remainder of that paragraph, your Honor, because it suggests or states that false promises or representations are not required, and it is Mr. Coleman's position that false representations

are required. We cite the *Garza-Robles* case out of the Fifth Circuit, which is 627 F.3d; (5th Cir 2010).

Turning then to page 26, we have added to the first sentence at the very end, just, "or carried away the victim, 'without consent,'" as is consistent with the elements of the offenses we have previously argued.

Excuse me, let me back up just a minute. We have actually argued that this particular instruction should not have been given at all, as it gives factual scenarios that 12:21PM would constitute a finding of kidnapping. The Court's jury instructions should instruct upon the law without applying factual scenarios that suggest a verdict or an outcome.

Moving onto page 27, this is the held or detained portion of the instructions. We would strike from the tail end of the first paragraph the "otherwise," and we would add some other benefit to the defendant, which is consistent with the United States Supreme Court's case in *Gooch*.

Skipping down to the final paragraph, we would 12:22PM strike the first sentence so that it did not read, "There is no specific amount of time that a victim must be held or detained," and instead the remainder of that paragraph would read, "The victim must be held or detained without her consent for an appreciable period of time, that is, beyond that inherent in her death and alleged sexual

assault."

That language we find consistent with a series of Supreme Court cases and other circuits beginning with *Chatwin*, which is 326 U.S. 455, *Howard* on the Eleventh Circuit, which is 918 F.2d 1529 (1990), *Government of the Virginia Islands vs. Berry*, B-e-r-r-y, which is 604 F.2d 221, (3rd Cir. 1979), the *Jackson* case out of the Ninth Circuit, which is 24 F.4th 1308, it's a 2022 case and also is consistent with *Gabaldon,* 389 F.3d 1090, which is the Tenth Circuit in a 2004 circuit case.

12:23PM

We do not, as we have previously explained, find that this finding is inconsistent with the First Circuit's decision in *Lowe,* instead find that it would be consistent with the First Circuit's finding in *Lowe*.

Moving onto the next jury instruction, which is the consent instruction, we would have struck most of the Court's instruction and instead indicated that the victim's lack of consent is a fundamental element of the crime of kidnapping that the government must prove beyond a reasonable doubt.

12:24PM

That sentence is supported by the *Chatwin* case out of the Supreme Court, which I'll not cite because it's already been cited, *Wright*, which is 340 F.3d 724, (8th Cir. 2003), *Beers*, which is 189 F.3d 1297, (10th Cir. 1999), *United States vs. Powell*, 226 F.3d 1181,

*United States vs. Chancey*, 715 F.2d 543, (11th Cir. 1983), and Hattaway, 399 F.2d 431, (5th Cir. 1968.)

We find that language is consistent with case law that suggests or states that consent is a fundamental element of the crime or lack of consent.

Moving on, we would then say, "A victim has not consented if consent was obtained by deceit, trickery, or false pretenses and the defendant had the willingness and intent to use physical force to complete the kidnapping if the deception failed."

12:25PM

We would then say, "You have heard evidence that the victim had consumed drugs and alcohol. It is not enough for the government to merely show that the victim was intoxicated to prove that she was incapable of giving consent."

We cite for those positions the *Chatwin* case, which I will not cite again, the *Beers* case, which has been previously cited, the *Davidson* case, which is 312 F.2d 163, 1963, which is an Eighth Circuit case; *Commonwealth vs. Blache*, which is 450 Massachusetts 583, a 2008 case; and *Commonwealth vs. Mountry*, 463 Massachusetts 80, a 2012 case.

12:26PM

Moving onto page 29, your Honor, we would have asked this instruction to read, "Again, the government must prove that the defendant held or detained the victim

against her will for ransom, reward, or other benefit to himself," which is consistent with *Gooch*.

It would then continue to say, "Here, the government alleges that the victim was held not for ransom or reward but for another benefit to himself."

We would also add that the term "otherwise" cannot be for sexual gratification. Also relevant to that final sentence, your Honor, is consistent with our motion to dismiss and for a Bill of Particulars and our motion in limine to exclude evidence of sexual gratification.

12:26PM

We would further add with regards to this element that we believe consistent with the concurrence in the *Kerns* case, which is 9 F.4th 342 that the statutory construction principles when applied to this statute requires that ransom, reward, or otherwise be a pecuniary benefit.

As to page 32 on the consciousness of guilt instruction, your Honor, to the second sentence, the second sentence would have read, "Such actions or conduct may indicate that the defendant thought he was guilty of the crime charged rather than one or more crimes and was trying to avoid detection or punishment."

12:27PM

Further down one more sentence, we would have added a sentence, "It is possible that the fleeing person is innocent but believes that the contact with the police

could be dangerous." It is our position that that instruction is not only consistent with the evidence in this case but also consistent with the *Warren* case out of the Commonwealth of Massachusetts, 475 Massachusetts 530, a 2016 case and *Commonwealth vs. Evelyn*, also a Massachusetts case 485, Massachusetts 691, 220.

12:28PM To the final sentence, your Honor, we would add, it would read, "It is up to you to decide what weight, if any, to give to any such evidence, But consciousness of guilt is never enough by itself to convict a person of a crime."

As to the page 33, which addresses the fifth element, as to the first sentence, we would have struck the kidnapping, we have struck the acts in that sentence, your Honor, and inserted kidnapping so that it said, "The defendant's kidnapping resulted in the victim's death." We believe that is consistent with the statute.

12:29PM We would do the same thing in two places in the following sentence, we would replace "conduct by the defendant" with "a kidnapping of the defendant," and "the defendant's actions" we would replace with "the defendant's kidnapping."

As to page 35, the foreperson's role and unanimity -- never mind, I think the Court gave this portion. Strike that.

As to page 36 of the instructions, your Honor, reaching disagreement, we would strike the final two paragraphs of this instruction. To us, it is too akin to an *Allen* Charge that's being given prior to the jury indicating that it has been hung or cannot make a decision. Unless either of my co-counsel have anything to add, that's all I have.

THE COURT: All right. Those objections are all overruled.

12:30PM MR. ZOLYNSKI: Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: Now I instruct you to retire and begin your deliberations. Thank you for your patience.

THE CLERK: All rise.

(JURORS EXITED THE COURTROOM.)

THE COURT: All right. Where are we on evidence and the JERS disk and all of that?

MS. NUZUM: The JERS disk has been submitted, and I believe we provided a copy to the defense.

12:31PM THE COURT: And I assume the physical exhibits are going up?

MS. NUZUM: Yes, your Honor.

THE COURT: All right. Why don't you make sure that those are correct, that is, both sides. If there's a problem, I'll resolve it, but if you agree, we can send it

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, ) Criminal Action
v. ) No. 19-10113-FDS
LOUIS D. COLEMAN III, Defendant )

BEFORE: THE HONORABLE F. DENNIS SAYLOR IV

SENTENCING HEARING

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, Massachusetts 02210

October 11, 2022
2:01 p.m.

Kathleen Mullen Silva, RPR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 7209
Boston, Massachusetts 02210
E-mail: kathysilva@verizon.net

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

For the United States:

United States Attorney's Office, by ROBERT E. RICHARDSON, ASSISTANT UNITED STATES ATTORNEY, and KENNETH G. SHINE, ASSISTANT UNITED STATES ATTORNEY, and ELIANNA J. NUZUM, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

Federal Public Defender Office, by JANE F. PEACHY, ESQ., and WADE ZOLYNSKI, ESQ., 51 Sleeper Street, Boston, Massachusetts 02210;

Sasson Turnbull Ryan & Hoose, by DAVID P. HOOSE, ESQ., 100 Main Street, Northampton, Massachusetts 01060.

P R O C E E D I N G S

THE CLERK: Court is now in session in the matter of United States v. Coleman, Criminal No. 19-10113.

Would counsel please identify themselves for the record starting with the government.

MR. SHINE: Your Honor, Kenneth Shine. I represent the United States of America.

MR. RICHARDSON: Good afternoon, Your Honor. Robert Richardson, also representing the United Sates.

MS. NUZUM: Good afternoon, Your Honor. Elianna Nuzum for the United States.

THE COURT: Good afternoon all.

MR. HOOSE: David Hoose for Mr. Coleman.

MS. PEACHY: Good afternoon. Jane Peachy for Louis Coleman.

MR. ZOLYNSKI: Good afternoon, Judge. Wade Zolynski for Mr. Coleman.

THE COURT: Good afternoon all.

This is the sentencing of Louis D. Coleman III. I've received and read the presentence report as revised through October 4, the defendant's sentencing memorandum filed October 1, the government's sentencing memorandum filed October 5, with exhibits. And, of course, I presided over the trial. To my knowledge, no other materials have been submitted to the court. Is there anything else I should have seen that I have not?

Mr. Shine?

MR. SHINE: On behalf of the government, no, Your Honor. You have all our materials.

THE COURT: Ms. Peachy?

MS. PEACHY: Nothing further, Your Honor.

THE COURT: Ms. Peachy, I know you've had an opportunity to review the presentence report. Have you gone over it with the defendant?

MS. PEACHY: Yes, Your Honor, we have.

THE COURT: Is that correct, Mr. Coleman?

THE DEFENDANT: Yes.

THE COURT: Okay. Are there victims present who wish to be heard in this proceeding?

MS. NUZUM: Yes, Your Honor. There are at least five members of the victim's family that would like to be heard today.

THE COURT: All right. What I propose that we do is I will deal with the objections to the presentence report, do the guideline calculation, we will then hear from the victims, and then I'll hear from both counsel and give the defendant his right of allocution.

All right. Let me turn first to the objections. Most of the objections were either -- either resulted in an amendment to the presentence report or concerned characterizations of the facts of the case that I don't need to

resolve for sentencing purposes.

The only issue is the guideline calculation, whether the base offense level is 43 or 36. It's, I think, an entirely moot and technical point. The statute does not provide a range of sentences. It provides only for life imprisonment. I have no discretion to impose anything else.

But in any event, the basic guideline question is whether this -- the actions here would constitute first degree murder had they happened in the territorial or maritime jurisdiction of the United States. The statute in question provides that a killing committed in the perpetration of a kidnapping is first degree murder, which means under Section 2A4.1 of the guidelines, level 43 is the appropriate guideline level. And so I'm going to overrule the objection. Again, it's purely a technical issue under the circumstances.

And I don't think I need to resolve any other objections. Am I correct, Ms. Peachy?

MS. PEACHY: That's correct, Your Honor. But please note our continuing objection to the guideline issue.

THE COURT: Yes.

All right. Turning to the guideline calculation then, the base offense level, which is also the final offense level, is 43. His criminal history score is 0. His Criminal History Category is I. That produces a guideline range of life imprisonment, a supervised release range of two to five years,

a fine range of $50,000 to $500,000, a special assessment of $100. Restitution is mandatory if requested.

Where do we stand to that issue, Mr. Shine?

MR. SHINE: We will be requesting an order of restitution, Your Honor. However, at this time the amount has not been determined. We'd ask the court to hold that in abeyance until we get a final amount.

THE COURT: My understanding is I can defer entering the restitution order, and I will do that.

Ms. Peachy.

MS. PEACHY: I would just ask that we have an opportunity to respond to the government's request once it's filed --

THE COURT: Yes, of course.

MS. PEACHY: -- and submit it to the court?

THE COURT: Yes.

MS. PEACHY: Thank you.

THE COURT: All right. With that, then, let's turn to the victim statements. Ms. Nuzum.

MS. NUZUM: Thank you, Your Honor. You'll hear first from Joaquin Correia, Jassy's father. He'll be speaking through an interpreter.

THE COURT: Okay. If I could have the people speaking to take the witness stand. No?

THE CLERK: The podium.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>Louis D. Coleman, III | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: 1:19CR10113-FDS<br><br>USM Number: 09325-015<br><br>David P. Hoose, Jane F. Peachy, Wade Zolynski<br>Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) ________

☐ pleaded nolo contendere to count(s) ________ which was accepted by the court.

☑ was found guilty on count(s) 1 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping Resulting in Death | 2/24/2019 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ________

☐ Count(s) ________ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/11/2022
Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV
Signature of Judge

F. Dennis Saylor, IV Chief Judge U.S.D.C.
Name and Title of Judge

10/11/2022
Date

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Life.

☑ The court makes the following recommendations to the Bureau of Prisons:

Defendant serve prison term at the Federal Penitentiary Tucson. If not available or appropriate, a facility as close as possible to Arizona or Southern California.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ______________ ☐ a.m. ☐ p.m. on ______________________ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on ______________________ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______________________ to ______________________

at ______________________ , with a certified copy of this judgment.

______________________
UNITED STATES MARSHAL

By ______________________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

5 years supervised release.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________ Date ____________

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SPECIAL CONDITIONS OF SUPERVISION

1. You are to reside for a period of up to six months in a Residential Re-Entry Center, or until appropriate housing is approved by the Probation Office, and must observe the rules of that facility.

2. You must not knowingly have any contact, direct or indirect, with the victim's family members.

3. You must participate in a mental health treatment program as directed by the Probation Office.

4. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

7. You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (see Special Condition # 3), based on the ability to pay or availability of third-party payment.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until 1/92023. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ ____________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ 100.00 due immediately, balance due

☐ not later than ______________, or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# UNITED STATES DISTRICT COURT

District of Massachusetts

UNITED STATES OF AMERICA
v.
Louis D. Coleman, III

**AMENDED JUDGMENT IN A CRIMINAL CASE**

Case Number: 1:19CR10113-FDS
USM Number: 09325-015

**Date of Original Judgment:** 10/11/2022
*(Or Date of Last Amended Judgment)*

David P. Hoose, Jane F. Peachy, Wade Zolynski
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☑ was found guilty on count(s) 1 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping Resulting in Death | 2/24/2019 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/16/2023
Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV
Signature of Judge

F. Dennis Saylor, IV Chief Judge U.S.D.C.
Name and Title of Judge

3/16/2023
Date

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Life.

☑ The court makes the following recommendations to the Bureau of Prisons:

Defendant serve prison term at the Federal Penitentiary Tucson. If not available or appropriate, a facility as close as possible to Arizona or Souther California.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at ______________ ☐ a.m. ☐ p.m. on ______________ .
- ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☐ before 2 p.m. on ______________ .
- ☐ as notified by the United States Marshal.
- ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______________ to ______________

at ______________ with a certified copy of this judgment.

______________
UNITED STATES MARSHAL

By ______________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :
5 years supervised release

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ____________________ Date __________

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SPECIAL CONDITIONS OF SUPERVISION

1. You are to reside for a period of up to six months in a Residential Re-Entry Center, or until appropriate housing is approved by the Probation Office, and must observe the rules of that facility.

2. You must not knowingly have any contact, direct or indirect, with the victim's family members.

3. You must participate in a mental health treatment program as directed by the Probation Office.

4. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

7. You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (see Special Condition # 3), based on the ability to pay or availability of third-party payment.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 61,362.68 | $ | $ | $ |

☐ The determination of restitution is deferred until ________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Representative of the Estate of Jassy Correia, for benefit of her Minor Child. | $50,000.00 | $50,000.00 | First |
| Massachusetts Victim's Compensation Fund. | $8,800.00 | $8,800.00 | Second (Joint) |
| Federal Crime Victims Fund | $2,562.68 | $2,562.68 | Second (Joint) |
| **TOTALS** | $ 61,362.68 | $ 61,362.68 | |

☐ Restitution amount ordered pursuant to plea agreement $ ________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☑ Lump sum payment of $ 100.00 due immediately, balance due

☐ not later than ____________, or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ (e.g., weekly, monthly, quarterly) installments of $ ________ over a period of ________ (e.g., months or years), to commence ________ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal ________ (e.g., weekly, monthly, quarterly) installments of $ ________ over a period of ________ (e.g., months or years), to commence ________ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS
DISTRICT: District of Massachusetts

# REASON FOR AMENDMENT
**(Not for Public Disclosure)**

**REASON FOR AMENDMENT:**

- ☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
- ☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
- ☐ Correction of Sentence by Sentencing Court (Fed. R.Crim. P. 35(a))
- ☐ Correction of Sentence for Clerical Mistake (Fed. R.Crim. P. 36)
- ☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))
- ☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
- ☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s)to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
- ☐ Direct Motion to District Court Pursuant to
  ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)
- ☑ Modification of Restitution Order (18 U.S.C. § 3664)

# UNITED STATES DISTRICT COURT

District of Massachusetts

UNITED STATES OF AMERICA
v.
Louis D. Coleman, III

**SECOND AMENDED JUDGMENT IN A CRIMINAL CASE**

Case Number: 1:19CR10113-FDS
USM Number: 09325-015

**Date of Original Judgment:** 10/11/2022
*(Or Date of Last Amended Judgment)*

David P. Hoose, Jane F. Peachy, Wade Zolynski
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☑ was found guilty on count(s) 1 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping Resulting in Death | 2/24/2019 | 1 |

The defendant is sentenced as provided in pages 2 through 9 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

4/6/2023
Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV
Signature of Judge

F. Dennis Saylor, IV Chief Judge U.S.D.C.
Name and Title of Judge

4/6/2023
Date

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :
Life.

☑ The court makes the following recommendations to the Bureau of Prisons:

Defendant serve prison term at the Federal Penitentiary Tucson. If not available or appropriate, a facility as close as possible to Arizona or Souther California.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ______________ ☐ a.m. ☐ p.m. on ______________ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on ______________ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______________ to ______________

at ______________ with a certified copy of this judgment.

______________
UNITED STATES MARSHAL

By ______________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :
5 years supervised release

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ____________________ Date __________

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SPECIAL CONDITIONS OF SUPERVISION

1. You are to reside for a period of up to six months in a Residential Re-Entry Center, or until appropriate housing is approved by the Probation Office, and must observe the rules of that facility.

2. You must not knowingly have any contact, direct or indirect, with the victim's family members.

3. You must participate in a mental health treatment program as directed by the Probation Office.

4. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

7. You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (see Special Condition # 3), based on the ability to pay or availability of third-party payment.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 61,362.68 | $ | $ | $ |

☐ The determination of restitution is deferred until __________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Representative of the Estate of Jassy Correia, for benefit of her Minor Child. | $50,000.00 | $50,000.00 | First |
| Massachusetts Victim's Compensation Fund. | $8,800.00 | $8,800.00 | Second (Joint) |
| Federal Crime Victims Fund | $2,562.68 | $2,562.68 | Second (Joint) |
| **TOTALS** | $ 61,362.68 | $ 61,362.68 | |

☐ Restitution amount ordered pursuant to plea agreement $ __________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:
CASE NUMBER:

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

The Defendant is required to pay $25.00 in restitution per quarter, provided such schedule is subject to change based on a material change in financial circumstances, and further provided that the government is not precluded from identifying and applying other assets of defendant to satisfy the restitution obligations.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☑ Lump sum payment of $ 100.00 due immediately, balance due

☐ not later than __________, or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ______ (e.g., weekly, monthly, quarterly) installments of $ ______ over a period of ______ (e.g., months or years), to commence ______ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal ______ (e.g., weekly, monthly, quarterly) installments of $ ______ over a period of ______ (e.g., months or years), to commence ______ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ______ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS
DISTRICT: District of Massachusetts

# REASON FOR AMENDMENT

**(Not for Public Disclosure)**

**REASON FOR AMENDMENT:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☐ Correction of Sentence by Sentencing Court (Fed. R.Crim. P. 35(a))
☐ Correction of Sentence for Clerical Mistake (Fed. R.Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s)to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
☐ Direct Motion to District Court Pursuant to
  ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)
☑ Modification of Restitution Order (18 U.S.C. § 3664)