UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

Nos. 22-1882, 23-1315, 23-1322
_____

_____

UNITED STATES,
Appellee,

v.

LOUIS D. COLEMAN III,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

REPLY BRIEF OF DEFENDANT-APPELLANT
LOUIS D. COLEMAN III
_____

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................... i

TABLE OF AUTHORITIES.................................................... vi

STATEMENT OF THE CASE................................................1

ARGUMENT.........................................................................3

I.  Coleman was convicted based on allegations that were not
    presented to the grand jury, and the indictment was constitutionally
    insufficient...................................................................3

    A.  The admission of evidence that Coleman kidnapped Correia for
        sexual gratification violated the Fifth Amendment's presentment
        clause. This claim is not foreclosed by precedent. (Reply to GBr.38-
        42.)...........................................................................4

    B.  The indictment was constitutionally insufficient. (Reply to
        GBr.32-38.) ............................................................8

    C.  The court erroneously denied the motion for a bill of particulars.
        (Reply to GBr.42-43.)............................................13

II.   The search-warrant affidavits did not establish probable cause. (Reply to GBr.44-57.)...................................................................15

   A.   The affidavits did not provide probable cause to believe that Coleman kidnapped Correia. ...............................................15

   B.   Some of the warrant affidavits did not provide probable cause to believe that evidence of kidnapping would be found in the places to be searched..........................................................................16

   C.   The good-faith exception does not justify these searches. ..............18

III.  The court committed various errors related to the government's case.........................................................................................19

   A.   The court erroneously denied a mistrial after Vershvovsky's unexpected testimony. (Reply to GBr.105-112.) ...............................19

   B.   The court erroneously permitted the government to use the term "sexual assault." (Reply to GBr.91-93.) ...............................................22

   C.   The court erroneously admitted prejudicial testimony about Correia's plans. (Reply to GBr.93-96.) .................................................23

IV.   The government did not present sufficient evidence to sustain
       Coleman's conviction. (Reply to GBr.58-84.) .....................................24

   A.   There was insufficient evidence to satisfy the seizure
        element...................................................................................................25

   B.   There was insufficient evidence that Coleman held Correia
        against her will for an appreciable time. ...........................................27

      i.    Kidnapping requires an appreciable hold....................................28

      ii.   Coleman did not hold Correia before or during their
            walk. ................................................................................................32

      iii.  The argument that a holding must be an appreciable holding
            beyond that inherent in any other offense is not foreclosed by
            precedent. ........................................................................................35

      iv.   Under any of the possible tests, Coleman did not hold Correia
            for an appreciable period. .............................................................38

   C.   There was insufficient evidence that Coleman held Correia for
        ransom, reward, or otherwise. ...........................................................43

   D.   There was insufficient evidence that Coleman intended to
        kidnap Correia........................................................................................46

V.   The court prevented Coleman from adequately presenting his
     theory of defense. ........................................................................49

  A.   See the sealed supplemental reply brief. ...........................................49

  B.   See the sealed supplemental reply brief. ...........................................49

  C.   The court erred in not giving the jury instructions Coleman
       requested. (Reply to GBr.113-37.) .......................................................50

     i.    The court failed to sufficiently inform the jury that it could not
           consider evidence that had been struck. ......................................50

     ii.   The seizure-element instructions were erroneous. .....................50

     iii.  Holding-element and purpose-element instructions were
           erroneous. ........................................................................54

     iv.   Consciousness-of-guilt instruction was erroneous. ....................55

     v.    Other errors. ....................................................................56

VI.    Issues of structural racism were not appropriately addressed, resulting in an unfair trial. .......................................................58

    A.    The court incorrectly denied Coleman's motion to show jurors an implicit-bias video. (Reply to GBr.84-91.)..........................................58

    B.    The court improperly excluded expert testimony explaining the impact of negative encounters with police on Black men. (Reply to GBr.96-105.) ................................................................................61

VII.    Cumulative error. (Reply to GBr.138-39.) .........................................66

VIII.    Pro se brief. (Reply to GBr.140-55.) ...................................................67

CONCLUSION ........................................................................................68

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................69

CERTIFICATE OF SERVICE .................................................................70

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allen v. United States,*
    164 U.S. 492 (1896) .............................................................. 56, 57

*Cardozo v. United States,*
    315 A.3d 658 (D.C. 2024) ....................................................*passim*

*Chatwin v. United States,*
    326 U.S. 455 (1946) ...................................... 28, 29, 30, 31, 32, 37

*Government of Virgin Islands v. Berry,*
    604 F.2d 221 (3d Cir. 1979)..................................................*passim*

*Government of Virgin Islands v. Ventura,*
    775 F.2d 92 (3d Cir. 1985)..........................................................41

*Hall v. United States,*
    410 F.3d 653 (4th Cir. 1969).............................................. 13, 14

*Hamling v. United States,*
    418 U.S. 87 (1974) ......................................................................9

*Loux v. United States,*
    389 F.2d 911 (9th Cir. 1968)......................................................11

*Ristaino v. Ross,*
    424 U.S. 589 (1976) ..................................................................58

*Russell v. United States,*
    369 U.S. 749 (1962) ...........................................................3, 4, 11

*Stirone v. United States*,
    361 U.S. 212 (1960) ........................................................................3

*United States v. Atchison*,
    524 F.3d 367 (7th Cir. 1975)....................................................10, 13

*United States v. Bahena-Cardenas*,
    411 F.3d 1067 (9th Cir. 2005)........................................................65

*United States v. Bentley*,
    310 F.2d 685 (6th Cir. 1998)..............................................10, 11, 13

*United States v. Boone*,
    959 F.2d 1550 (11th Cir. 1992)......................................33, 50, 51

*United States v. Brown*,
    938 F.2d 1482 (1st Cir. 1991) ................................................ 58, 59

*United States v. Calderon*,
    77 F.3d 6 (1st Cir. 1996) ........................................................10, 11

*United States v. Caldwell*,
    81 F.4th 1160 (11th Cir. 2023) ....................................................60

*United States v. Carrion-Caliz*,
    944 F.2d 220 (5th Cir. 1991)............................................... 33, 51

*United States v. Condron*,
    98 F.4th 1 (1st Cir. 2024) ............................................................16

*United States v. Cordero-Rosario*,
    786 F.3d 64 (1st Cir. 2015) ..........................................................17

*United States v. Cruikshank*,
    92 U.S. 542 (1875) ......................................................................11

Case: 22-1882    Document: 00118203229    Page: 9    Date Filed: 10/17/2024    Entry ID: 6675049

*United States v. Encarnacion*,
    26 F.4th 490 (1st Cir. 2022) ........................................................22

*United States v. Etsitty*,
    130 F.3d 420 (9th Cir. 1997)........................................................40

*United States v. Falcón-Nieves*,
    79 F.4th 116 (1st Cir. 2023) ........................................................25

*United States v. Ferguson*,
    65 F.4th 806 (6th Cir. 2023) ....................................30, 36, 37, 54

*United States v. Fisher*,
    3 F.3d 456 (1st Cir. 1993) ..............................................................8

*United States v. Flores-Rivera*,
    56 F.3d 319 (1st Cir. 1995) .......................................................7, 8

*United States v. Higgs*,
    353 F.3d 281 (4th Cir. 2003)........................................................51

*United States v. Hoog*,
    504 F.2d 45 (8th Cir. 1974)................................................... 51, 52

*United States v. Howard*,
    918 F.2d 1529 (11th Cir. 1990).......................................... 29, 30

*United States v. Hughes*,
    716 F.2d 234 (4th Cir. 1983)..........................................33, 51, 52

*United States v. Jackson*,
    24 F.4th 1308 (9th Cir. 2022) ...............................................*passim*

*United States v. Katana*,
    93 F.4th 521 (1st Cir. 2024) ..........................................................5

viii

*United States v. Krivoi,*
    80 F.4th 142 (2d Cir. 2023).................................................................*passim*

*United States v. Lentz,*
    383 F.3d 191 (4th Cir. 2004).......................................................................40

*United States v. Lowe,*
    145 F.3d 45 (1st Cir. 1998) .................................................................35, 36

*United States v. McInnis,*
    601 F.2d 1319 (5th Cir. 1979)............................................................32, 33

*United States v. Mercado-Gracia,*
    989 F.3d 829 (10th Cir. 2021)............................................................59, 60

*United States v. Morillo,*
    158 F.3d 18 (1st Cir. 1998) ..........................................................................24

*United States v. Mubayyid,*
    658 F.3d 35 (1st Cir. 2011) .............................................................................9

*United States v. Murphy,*
    100 F.4th 1184 (10th Cir. 2024) .................................................29, 38, 41

*United States v. Murphy,*
    762 F.2d 1151 (1st Cir. 1985) ....................................................................11

*United States v. Pagán-Ferrer,*
    736 F.3d 573 (1st Cir. 2013) ......................................................................19

*United States v. Parker,*
    872 F.3d 1 (1st Cir. 2017) ............................................................................59

*United States v. Peden,*
    961 F.2d 517 (5th Cir. 1992)................................................................ 40, 41

*United States v. Resendiz-Ponce,*
    549 U.S. 102 (2007) .................................................................4, 9

*United States v. Rodríguez-Rodríguez,*
    663 F.3d 53 (1st Cir. 2011) ...........................................................3

*United States v. Roman,*
    942 F.3d 43 (1st Cir. 2019) .............................................16, 17, 18

*United States v, Santa Manzano,*
    842 F.2d 1 (1st Cir. 1988) ...................................................... 11, 12

*United States v. Sheehan,*
    70 F.4th 36 (1st Cir. 2023) ..........................................................18

*United States v. Si Lu Tian,*
    339 F.3d 143 (2d Cir. 2003)........................................................34

*United States v. Stands,*
    105 F.3d 1565 (8th Cir. 1997)................................................ 33, 51

*United States v. Stepanets,*
    879 F.3d 367 (1st Cir. 2018) .........................................................8

*United States v. Stimler,*
    864 F.3d 253 (3d Cir. 2017)................................................. 30, 41

*United States v. Verduzco,*
    373 F.3d 1022 (9th Cir. 2004)............................................. 64, 65

*United States v. Webster,*
    162 F.3d 308 (5th Cir. 1998).......................................................10

*United States v. Williamson,*
    903 F.3d 124 (D.C. Cir. 2018) .....................................................9

*United States v. Zayac*,
    765 F.3d 112 (2d Cir. 2014) ........................................................................38

**U.S. Constitution**

Fifth Amendment ............................................................................................3, 4

**Rules**

Fed. R. Crim. P. 16 .........................................................................................61

Fed. R. Evid. 403 ............................................................................................61

Fed. R. Evid. 702 ............................................................................................61

## STATEMENT OF THE CASE[1]

The government's statement of the case includes information that needs clarification or correction.

The government leaves out some details of Correia and Coleman's meeting. GBr.7-10. People on the street other than Coleman watched Correia. JA.VIII.1-20. Correia turned and spoke to passersby. *Id.* at 3:18-3:25.[2] A man approached her, spoke to her, and walked away. *Id.* at 3:52-4:12. The government says Coleman "took [Correia's] hand." GBr.7; *see also* GBr.10. Coleman offered his hand to Correia, and she took it. *Id.* at 4:45-4:51; JA.1098-99. While Correia and Coleman were talking, a woman approached Correia, touched her, spoke to her, and walked away. *Id.* at 5:15-5:19. There was no audio of Coleman and Correia's conversation.

The government says that as Coleman and Correia walked away, Correia looked back. GBr.10. In fact, they both did. JA.VIII.1-21 at 1:34-1:38.

---

[1] Citations are as follows: JA.X and SA.X refer to Volume X of the joint and sealed appendices; DE to a district court docket entry; Br. to Coleman's opening brief; SBr. to Coleman's sealed opening brief; GBr. to the government's brief; and GSBr. to the government's sealed brief. JA.VIII and SA.IV contain media exhibits; the citations correspond to exhibit numbers as listed on the drives.

[2] Times cited refer to the time elapsed in the video, not to any clock-based timestamp shown on the videos.

1

The government incorrectly says that "Coleman never let go of Correia's hand." GBr.10. Before Correia jumped on Coleman's back, they released hands. JA.VIII.1-22 at 0:44-0:50. To get on his back, Correia jumped up, grabbed his shoulders, and reached back on when he had a hard time lifting her. *Id*. At Coleman's car, Correia got off his back, got in the passenger door of the car on her own, and closed it on her own, while Coleman was walking to the driver's side. JA.VIII.1-26 at 0:47-1:12; JA.VIII.104-10 at 0:15-0:40; JA.VIII.114-02 at 0:07-0:27.

The government says Coleman took a "circuitous route" after leaving this parking spot. GBr.11. This is not an accurate characterization. Coleman took a large U-turn. *See* JA.V.2639-40. He drove for a minute on Tremont in the direction his car was pointing, away from the highway. *Id*. He stopped at the corner of Tremont and Dartmouth Street for about 3 minutes. *Id.* Coleman began driving again, taking four turns that put the car back on Tremont traveling toward the highway. *Id*. This 2-minute drive covered less than a mile, and the ending point was about half a mile from the starting point. *Id*. The government notes that Coleman did not pass "three stopped police vehicles with flashing lights" on Aguadilla Street. GBr.12.

2

These vehicles had blocked the road and had their emergency lights flashing, leaving no room for cars to pass. JA.VIII.9-25.

The government writes that Coleman's car had power door locks that were controlled from the driver's side. GBr.23. There were functional controls for these locks on both the driver's and passenger's side. JA.1653-55, 1663-64, 2844. If locked, the passenger door could also be opened by pulling the door handle twice. *Id.* The passenger door had an indicator that popped up when the door was unlocked. *Id.*

The government's statement of the case does not acknowledge that Vershvovsky opined that some of Correia's injuries could have been caused by her earlier falls and fights. GBr.23-25; JA.1465-67, 1491-93.

## ARGUMENT

## I.     Coleman was convicted based on allegations that were not presented to the grand jury, and the indictment was constitutionally insufficient.

"[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). This rule protects an accused's Fifth and Sixth Amendment rights. *United States v. Rodríguez-Rodríguez*, 663 F.3d 53, 58 (1st Cir. 2011). Coleman's indictment tracked the statutory language without "descending

3

to the particulars," permitting conviction based on "facts not found by, and perhaps not even presented to, the grand jury…." *Russell v. United States*, 369 U.S. 749, 770 (1962); JA.I.63-66.

**A.     The admission of evidence that Coleman kidnapped Correia for sexual gratification violated the Fifth Amendment's presentment clause. This claim is not foreclosed by precedent. (Reply to GBr.38-42.)**

Coleman argued that the admission of evidence that he kidnapped Correia for sexual gratification violated the presentment clause because this allegation was not presented to the grand jury. Br.28-37. The government asserts that this argument is foreclosed because indictments cannot be challenged on the basis that insufficient or incompetent evidence was presented to the grand jury. GBr.38-42 (citing cases). The government misapprehends Coleman's argument. Coleman's claim that his conviction did not "arise out of the theory of guilt presented to the grand jury" does not require assessing the quantity or caliber of evidence presented to the grand jury. *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007).

4

The government argues that constructive-amendment claims require a showing that the trial presentation changed the indictment.[3] GBr.40. Constructive-amendment claims arise when the theory presented to the grand jury, as memorialized in the indictment, does not match the theory presented at trial. *United States v. Katana*, 93 F.4th 521, 530 (1st Cir. 2024). This vague indictment essentially obscured a constructive amendment, leaving the government free to pursue any theory, even one not presented to the grand jury, without seeming to alter the indictment. Br.28-42. Even accepting that the government presented sufficient evidence of *some* purpose at the grand jury, this claim remains—the government presented different theories at the grand jury than at trial. Given the timing of the discovery of evidence of sexual contact, different theories were presented to the grand jury and trial jury. Br.34-36. None of the cases cited by the government confront this factual scenario. GBr.38-42.

The government did not argue below, and does not argue on appeal, that evidence of sexual gratification was presented to the grand jury. *Id*.; Br.36. Nor does it challenge Coleman's assertion that the government did

---

[3] The government apparently concedes that it would be a constructive amendment if it had "charged one purpose but proved another." GBr.40.

not have evidence of sexual assault at the time of the indictment. *Id*. The

government cites the search-warrant affidavits to show that "the detailed

evidence the government possessed at the time of indictment" "supported

an inference of sexual gratification as one possible purpose." GBr.41. The

search-warrant affidavits do not support this inference. The government

has listed the evidence supporting its theory of sexual gratification:

> the defendant had been making sexual advances to L.H., another
> woman at Venu early morning February 24, until her brothers
> rebuffed his attempts; the defendant led and then carried the visibly
> intoxicated victim to his car after she was pushed out of an Uber; his
> semen was found in the victim's vagina and his DNA was found in
> her anus; there was evidence of a violent struggle inside the car,
> suggesting that the victim had been sexually assaulted, including a
> cracked windshield containing both the victim's and defendant's
> DNA and injuries to the defendant's face and scalp consistent with
> the victim having fought back as she was assaulted.

SA.I.233-34; GBr.76-81. The search-warrant affidavits do not include this

evidence. JA.110-16. They describe videos showing Correia walking away

from Venu with Coleman. *Id*. They detail what happened after Coleman

returned to his apartment. *Id*. They do not describe the 12-minute stop on

Tremont, note that DNA was found on Correia, explain that the windshield

was cracked on the inside, mention the DNA found near the windshield

cracks, or describe Correia's injuries or manner of death. *Id.* These

affidavits suggest that the government was seeking evidence of a motive or purpose. JA.I.148 ("This time frame includes the days leading up to the kidnapping so investigators can determine if Coleman and the victim were in contact, and/or co-located, with one another prior to the abduction.").

The government argues that there is no error because its trial theory involved "sexual gratification, not sexual assault." GBr.41. It does not explain how, in the context of this case, sexual gratification could mean anything other than sexual assault. If Coleman sought consensual sex with Correia, there was no kidnapping. If Coleman asked Correia to have sex and she agreed, he did not seize or hold her as alleged by the government. *See infra* Arg.IV. If she consented, there was no kidnapping. The government's allegations of a kidnapping for sexual gratification necessarily entail sexual assault. *Cf.* SA.III.1400 ("Sexual assault is certainly at the core of this case…."). Even if this distinction has some force, the government had no evidence of sex, consensual or otherwise, at the time of indictment. Br.34-36 (noting autopsy revealed no semen, sperm, or genital injuries).

The government incorrectly argues that harmless-error analysis applies. GBr.41-42 (citing *United States v. Flores-Rivera* 56 F.3d 319, 328 (1st

Cir. 1995)). *Flores-Rivera* applied harmlessness review to an error that occurred "before the grand jury" that could be cured by the protections of trial. *Id.* The error Coleman claims is of constitutional magnitude and not subject to harmless-error analysis. *Cf. United States v. Fisher*, 3 F.3d 456, 463 (1st Cir. 1993). The government's trial theory was not presented to the grand jury. Trial did not cure this constitutional error. Even if the government presented evidence of a purpose to the grand jury, it presented different evidence of a different purpose at trial. The insufficient indictment obscured this mismatch, but the constitutional error remains and requires reversal of the conviction. *See also* Br.28-36.

### B.     The indictment was constitutionally insufficient. (Reply to GBr.32-38.)

The government argues that this indictment was sufficient because indictments can track the statutory language without supplying a "detailed factual recitation." GBr.33-34. However, the cases it cites recognize that an indictment that tracks the statute is not always sufficient. *See United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) ("[A]n indictment that tracks a statute's terms is legally sufficient *if* the indictment itself gives the defendant adequate notice of the charges she must meet." (emphasis

added)); *Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (noting that statutory language must be accompanied by sufficient facts to "inform the accused of the specific offense"); *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007) ("[W]hile an indictment parroting the language of a federal criminal statute is often sufficient, there are crimes that must be charged with greater specificity."); *United States v. Williamson*, 903 F.3d 124, 131 (D.C. Cir. 2018).

The government argues that it did not need to allege the means because indictments can charge alternate theories. GBr.35. The case it cites is distinguishable. In *United States v. Mubayyid*, the defendant argued that the evidence was insufficient to prove a scheme to conceal material information where the indictment described two facts he allegedly concealed, but the trial evidence only established one. 658 F.3d 35, 69-70 (1st Cir. 2011). The *Mubayyid* indictment did more than track the statute, and the defendant did not argue that it was insufficient. *Id.* Coleman's indictment listed distinct statutory alternatives without factual specificity. The government's assertion that different statutory terms could have applied throughout this encounter, GBr.35, does not excuse the lack of

9

specificity. The government could have listed only the applicable verbs and/or identified when each verb applied.

The government urges this Court to conclude that a kidnapping indictment need not specify a purpose.[4] GBr.35-36. This Court has held that the reward/ransom/otherwise clause is an element of kidnapping that must be pled. *United States v. Calderon*, 77 F.3d 6, 9-10 (1st Cir. 1996). Some of the cases the government cites conflict with *Calderon* by relying on the conclusion that purpose is not an element of kidnapping. *See United States v. Webster*, 162 F.3d 308, 328-30 (5th Cir. 1998) (approving instruction permitting jury to consider any benefit because "essential elements, stripped to the bones, are transporting and holding against consent with a *mens rea*"); *United States v. Atchison*, 524 F.3d 367, 370-71 (7th Cir. 1975) ("[I]t now appears to be well settled that purpose is not an element of the offense of kidnaping and need not be charged or proved to support a conviction under the kidnaping statute…."). *Cf.* GBr.36, n.30 (partially acknowledging this conflict). Others provide little analysis. *See United*

---

[4] Elsewhere, the government seems to recognize that an indictment must specify a purpose, suggesting that the indictment would have been "altered" if it "charged one purpose but proved another." GBr.40.

*States v. Bentley*, 310 F.2d 685, 685-86 (6th Cir. 1998); *Loux v. United States*, 389 F.2d 911, 916 (9th Cir. 1968). Under *Calderon*, purpose is an element of kidnapping that must be pled in a manner sufficient to give the defendant notice of the allegations. This indictment did not do so.

The government argues that the indictment did not need to specify "how the kidnapping transpired." GBr.36-38. It attempts to distinguish *Murphy* and *Russell* by arguing that culpability in those cases "depended on its relationship to an external event…the identity of which might be deemed essential to understanding the basis for the charge." GBr.37 (citing *Russell*, 369 U.S. at 749 and *United States v. Murphy*, 762 F.2d 1151 (1st Cir. 1985). *Russell*, on which *Murphy* relied, cannot be read so narrowly. It held that if a statute includes generic terms, an indictment must "'descend to the particulars.'" *Russell*, 369 U.S. at 765 (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875)); *see also Murphy*, 762 F.2d at 1153-55. The government does not discuss *United States v, Santa Manzano*, a case Coleman cited where culpability did not depend on the government identifying "an external event." 842 F.2d 1 (1st Cir. 1988); Br.30, 33-34, 40. This indictment was insufficient because "it did not state (and thus it did not tell [Santa

11

Manzano]) with reasonable specificity the facts making up the essential elements of the crime ….″ 842 F.2d at 4.

The government argues that Coleman had sufficient notice because the indictment charged ″a single kidnapping of a single victim on a particular date and place and the circumstances suggest no possibility of confusion as to the course of conduct the indictment targeted.″ GBr.38. This argument elides the indeterminacy of this indictment.[5] The government never considers the cumulative impact of the indictment's failure to specify any of the elements of kidnapping. This indictment left the government free to pursue any theory—from arguing that Coleman lied to get Correia to leave with him and killed her shortly after their meeting in his car in Massachusetts to arguing that he physically seized her and killed her sometime later in his apartment in Rhode Island. The court's erroneous decision to allow the case to proceed requires reversal of the conviction and dismissal of the indictment. *See also* Br.37-41.

---

[5] This argument also implies that Coleman did not need notice because he knew what he had done. This implication relies on an assumption of guilt. Coleman cannot be expected to understand the government's theory of guilt for a crime he maintains he did not commit.

**C.      The court erroneously denied the motion for a bill of particulars. (Reply to GBr.42-43.)**

The government calls Coleman's assertion that he did not have knowledge of the government's theory "a dubious basis for a bill of particulars." GBr.42. Coleman's request for a bill of particulars was far from dubious, given the breadth of possible government theories. *See* JA.I.284 ("[G]iven that the means of committing the kidnapping are pleaded in the indictment in the conjunctive, [Coleman] is on notice that he must be prepared to defend against them all."). Many of the cases the government cites to support its argument that the indictment was sufficient contemplate that a bill of particulars would be appropriate if a kidnapping indictment followed the statute without providing additional information. *See Atchison*, 524 F.3d at 370-71 ("If the defendant required more information on this collateral matter, a bill of particulars could have been requested."); *Bentley*, 310 F.2d at 685-86 ("If appellant had desired information as to the specific motive or purpose claimed in the kidnapping indictment, he could have secured it by asking for a Bill of Particulars, as did his co-defendant…."); *see also Hall v. United States*, 410 F.3d 653, 660 n.3 (4th Cir. 1969) ("The words 'or otherwise' in the statute invite the

draftsman to supply a reason other than ransom or reward. Why he declined the invitation in the context of this case is beyond our comprehension.").

The government argues that defendants are not entitled to detailed evidentiary disclosures. GBr.42-43. Coleman did not seek details beyond those required to protect his constitutional rights.

The government asserts that Coleman did not explain how the lack of a bill of particulars undermined his trial preparation. GBr.42-43. It notes that he knew about the alleged sexual assault before trial. *Id.* The omission of an alleged purpose was just one of the ways the indictment was vague. Br.37-41. A bill of particulars would have prevented Vershvovsky's "unexpected" testimony. *Id*. If the government had committed to a theory of the case, including when Correia died, it would have determined these specifics with the help of its witnesses. Coleman either would have known that the government alleged Correia was alive in Rhode Island or the government would have coordinated with Vershvovsky to ensure her testimony and the indictment aligned. Had the error nonetheless occurred, it would have been less prejudicial if the government had committed to a

14

single, clear theory. The court's decision denying a bill of particulars

requires reversal. *See also* Br.41.

## II. The search-warrant affidavits did not establish probable cause. (Reply to GBr.44-57.)

### A. The affidavits did not provide probable cause to believe that Coleman kidnapped Correia.

The government summarizes the affidavits to support its contention

that there was probable cause to find that a kidnapping occurred. GBr.46-

49. Most of this information described what happened after Coleman

returned home. *Id*. These events may support an inference that Coleman

tried to conceal Correia's death, but they do not support the inference that

the earlier events constituted a kidnapping. The government acknowledges

that "one can imagine circumstances in which all of this occurred *without*

Correia being unlawfully seized and held against her will." GBr.49. The

affidavits describe Correia going with Coleman to his car. JA.I.110-16. They

do not support an inference that Coleman seized, inveigled, or deceived[6]

---

[6] The government argues that there was sufficient evidence that Correia was seized because "her sole wish when Coleman approached her was to get back to Mondesir's apartment." GBr.58-61. It cites trial evidence that it believes supports this inference. *Id.* The affidavits do not describe the evidence that the government relies on to prove that Correia was seized. JA.110-16.

Correia or that he held her against her will for an appreciable period.[7] The warrant was not supported by probable cause, and the fruits of these warrants should have been suppressed. JA.I.148; *see also* Br.44-46.

**B.**    **Some of the warrant affidavits did not provide probable cause to believe that evidence of kidnapping would be found in the places to be searched.**

The government suggests that Coleman waived the argument that there was no probable cause that evidence of kidnapping would be found on his cellphone, associated records, Google records, laptop, or computer tower. GBr.50-51. Coleman's brief argues that the affidavits did not provide sufficient facts to establish probable cause to believe that evidence of kidnapping would be found in these places. Br.46-49. Nothing more is required. *Contrast United States v. Condron*, 98 F.4th 1, 18 n.24 (1st Cir. 2024).

The government cites no cases supporting its contention that there was probable cause to support a finding of nexus. GBr.50-57. It does not discuss *United States v. Roman*, 942 F.3d 43, 51 (1st Cir. 2019). *See* Br.46-49.

The government's argument that there was a nexus between kidnapping and the computer tower rests on the inference that people do

---

[7] The affidavits stated that Coleman's windshield was cracked, not that Correia's DNA was found inside the windshield. JA.110-16.

not normally take computer towers on road trips. GBr.51-53. The affidavit does not state this. JA.I.184-206. Nor does the statement in the affidavit that Coleman "likely used" the computer tower connect it with the alleged kidnapping. The government describes statements in the affidavit as "predictions." GBr.52. These "predictions" were not grounded in observations or experience sufficient to establish a nexus. Br.46-49.

The government acknowledges that the inference that people do not typically travel with computer towers does not apply to laptops. GBr.53-54. General explanations of the capacities of computers coupled with a conclusory statement that Coleman "likely used" the laptop in connection with a kidnapping do not establish nexus. Br.46-49.

The government's argument that there was probable cause to search Coleman's cellphone relies on the standard functions of cellphones. GBr.54-57. The affidavit described how people typically use cellphones and noted that Coleman had social-media accounts. *Id.* This information may show that Coleman was a typical cellphone user, but it does not connect this phone to the crime being investigated. It is not enough for the affidavit to explain what information a device might contain; it must explain why. *United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015); *Roman*, 942

17

F.3d at 50-51, 54. The government argues that inferences that evidence

would be on one device can be applied to all devices. GBr.56-57. This

reasoning would allow law enforcement to search any electronic device

held by anyone suspected of committing a crime based on the general

assertion that people often use computing devices. These warrants did not

sufficiently establish a nexus, and the fruits should have been suppressed.

*See also* Br.46-49.

**C.    The good-faith exception does not justify these searches.**

The government has not carried its burden of proving that the good-

faith exception applies. *See United States v. Sheehan*, 70 F.4th 36, 51 (1st Cir.

2023). It states that the affidavits were not bare bones because they

provided "extensive" information about the investigation. GBr.57.

Regardless of length, the affidavits did not supply probable cause that a

kidnapping occurred or that evidence of it would be found on these

devices. Br.49-50. These affidavits were obviously inadequate, the good-

faith exception should not apply, and the evidence derived from these

warrants should have been suppressed. *Id*. Reversal is required.

18

III.   **The court committed various errors related to the government's case.**

A.    **The court erroneously denied a mistrial after Vershvovsky's unexpected testimony. (Reply to GBr.105-112.)**

The government suggests that counsel waited too long to object to Vershvovsky's testimony. GBr.105-07. This suggestion is belied by the record. Timestamps on the transcripts show that counsel objected less than a minute after Vershvovsky gave this unexpected testimony and asked to be heard during a break less than ten minutes later. JA.III.1462-68; GBr.106; *see also* JA.I.544 (directing counsel to object without arguing before jury). Counsel reacted quickly to bring the impact of this unanticipated testimony to the court's attention.

The government argues that "Coleman does not meaningfully challenge the substance of the district court's curative instruction…." GBr.109. Coleman does not raise a freestanding claim that the curative instruction was reversible error. Considering whether the court gave "an appropriate curative instruction" is part of the mistrial inquiry. GBr.108 (quoting *United States v. Pagán-Ferrer*, 736 F.3d 573, 586 (1st Cir. 2013)). The insufficiency of the court's instruction supports the conclusion that the court erred by denying a mistrial. Coleman preserved this argument by

19

renewing his motion for a mistrial after the court gave the instruction. JA.III.1467-72.

The government argues that this testimony did not prejudice Coleman because it presented the same theory in opening and closing. GBr.109-10. It describes Coleman as "positing" that the government would have used this testimony if it had not been struck. *Id.* His argument that the government would have used this testimony is not hypothetical. Parts of the government's opening implied that Correia died in Massachusetts, but kept things vague. *Contrast* JA.II.846 (arguing Coleman "lured [Correia] into his car, confined her there, sexually assaulted her, strangled her to death, and transported her across state lines into Rhode Island") *with* JA.II.829, 836-38 (describing Coleman carrying Correia's "limp body" into his apartment and "Correia's body" being found in Delaware). The closing was not ambiguous in this way. JA.IV.2315 (arguing Correia's "dead body" was next to Coleman after the 12-minute stop on Tremont). After Vershvovsky's testimony was struck, the government planned to argue that Coleman subdued Correia "to the point where she's at least unconscious" before driving to Rhode Island. JA.IV.2185-88. The court precluded this argument based in part on the government's representation

20

that "[w]e all pretty much agree that the murder occurred inside the car."

JA.IV.1838, 2185-88.

The government argues that it had a "shared premise" with the

defense: Correia died as the result of an altercation in Coleman's car.

GBr.112. This statement elides important differences. Until foreclosed by

the court, the government left open the possibility that Correia was alive in

Rhode Island. JA.II.829, 836-38; JA.IV.2185-88, 2315. The government

eventually argued that everything happened during the 12-minute stop on

Tremont Street. JA.IV.2311-15. Coleman questioned whether everything

could have happened during that time. JA.IV.2331-35; *see* GBr.153-54. The

parties disagreed about what happened in the car and when, leaving open

the question of when Correia died.

The government cites other evidence that Correia was dead in Rhode

Island. GBr.110-11. That evidence was not strong enough to make the

government abandon the theory that Correia could have been alive in

Rhode Island; it only abandoned that theory on court order. JA.IV.2185-88.

Compared with an expert who testified for nearly an entire day of trial,

GBr.105, this circumstantial evidence was unpersuasive. Vershvovsky's

testimony caused extreme prejudice that was not cured by the court's

instruction, and Coleman's conviction should be reversed. *See also* Br.50-54.

### B. The court erroneously permitted the government to use the term "sexual assault." (Reply to GBr.91-93.)

The government suggests that Coleman had to object to every use of

the term sexual assault to preserve this issue. GBr.92, n.54. Coleman's

objection to the term "sexual assault" was not to the introduction of

evidence, but rather to its characterization. He raised this issue in a motion

in limine, and the court unconditionally concluded that the term was not

unfair or inflammatory. JA.I.453. No additional objection was needed. *See*

*United States v. Encarnacion*, 26 F.4th 490, 503-04 (1st Cir. 2022).

The government's assertion that the term was used infrequently does

not diminish this argument. Describing what happened as "sexual assault"

removed the question of consent from the jury. The government repeats its

argument that it needed to prove that Coleman's purpose was sexual

gratification, not sexual assault. GBr.92-93; *supra* Arg.I.A. The

government's case rested on the conclusion that Coleman sexually

assaulted Correia. *See supra* Arg.I.A. If Correia and Coleman had

consensual sex, Correia was not seized and held as the government argued.

*Id.* Permitting the use of the term "sexual assault" removed this issue from the jury and requires reversal. *See also* Br.54-57.

### C. The court erroneously admitted prejudicial testimony about Correia's plans. (Reply to GBr.93-96.)

The government incorrectly suggests that Coleman did not preserve his objection to evidence of Correia's plans. GBr.95, n.55; Br.58. Coleman opposed the government's motion to introduce this testimony. DE267. He noted his "continuing objection" to testimony about Correia's plans. JA.II.622-23. When the government asked Hiltz what Correia's plans were, Coleman objected. JA.II.875. Before the government called the shelter employee, Correia's child's grandmother, and Correia's employer, it flagged "an evidentiary issue." JA.II.996. Coleman responded that the court "overruled our motion in limine on this testimony to begin with. So we just restate our objection…." JA.II.996-97. The court allowed the testimony. JA.II.996-98. Nothing more was required to preserve this objection.

The government argues that this testimony was probative because it "gave added weight to the inference that Correia had planned to enjoy an evening celebrating her birthday with her friends and then return." GBr.95. This testimony indicated that Correia had a pass to be out of the shelter

until 5pm on the 24th and planned to get her daughter on the 24th. It did

not explain her plans for the night of the 23rd-24th. Correia and her friends

planned to go out to eat after Venu, a plan Hiltz and Thomas followed.

GBr.6; JA.II.930, 972-75, 989-90. When Coleman and Correia met, she had

just fought with and separated from Mondesir. JA.VIII.1-20. Correia was

out celebrating her birthday and was drunk and high. JA.IV.2089-99. It is

reasonable to infer that she did not want to return to Mondesir's house

immediately. This testimony was not relevant to the critical timeframe, and

it was calculated to make Correia more sympathetic. *Cf.* GBr.3 (noting that

Correia lived in shelter and had young child). This testimony was

prejudicial, had no probative value, and its admission requires reversal. *See*

*also* Br.57-60.

## IV.    The government did not present sufficient evidence to sustain Coleman's conviction. (Reply to GBr.58-84.)

The parties agree that this preserved claim is reviewed de novo and

that the court must view the evidence "in the light most favorable to the

verdict." *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998) (internal

quotations omitted). If there is "equal or nearly equal circumstantial

support to a theory of guilt and a theory of innocence of the crime charged,

24

this court must reverse the conviction." *Id.*; *see also United States v. Falcón-Nieves*, 79 F.4th 116, 126 (1st Cir. 2023). The evidence cannot sustain a kidnapping conviction, and Coleman's conviction should be overturned. *See also* Br.60-68.

## A.   There was insufficient evidence to satisfy the seizure element.

The government argues that there was "ample basis to find that Correia's sole wish when Coleman approached her was to get back to Mondesir's apartment." GBr.59. The evidence the government cites shows that Correia was trying to leave Venu and that she planned to return to her own home in the afternoon on the 24th. *Id.* There was evidence suggesting that Correia did not plan to return to Mondesir's house immediately. Correia and her friends planned to go out to eat after leaving Venu. GBr.6; JA.II.930, 972-75, 989-90. When Coleman and Correia met, Correia had just fought with and separated from Mondesir, JA.VIII.1-20, suggesting that she did not want to return immediately to Mondesir's house. Hiltz knew that Correia would sometimes "go off with someone for a few days." JA.II.940.

The government does not address evidence indicating that Coleman planned to have a normal night out. GBr.59-61; Br.63-64. It notes that

Coleman concedes that there was circumstantial evidence that Correia joined him because he offered her a ride home. GBr.60. He does not concede that this evidence showed that he lied to her or intended to seize or hold her. *See* Br.63. Nor is this concession incompatible with the idea that Correia agreed to have sex with Coleman before going home. *Id*.

The government suggests that Coleman and Correia went from a public area to a secluded one. GBr.60. This characterization is not supported by the record. The area around Venu was busy with people leaving the clubs. JA.VIII.1-20, 1-21, 1-22, 1-23. As Coleman and Correia walked to his car, they passed groups of people. *Id*. When they got to his car there were cars passing, and another group of people got in a car parked a few spaces behind them. JA.VIII.1-26. When Coleman parked on Tremont for 12 minutes, they were on a well-lit urban street in a business district, and cars continued to drive by. JA.VIII.9-24.

The government argues that the jury could "reasonably infer from Correia's extensive injuries that the sex that occurred was *not* consensual." GBr.61. However, Correia had no injuries to her genitals. JA.III.1457-58, 1482, 1485, 1493. Although the medical examiner said this was not necessarily inconsistent with sexual assault, JA.III.1457, the jury could infer

26

that nonconsensual sex that was violent enough to leave "extensive injuries" would include injuries to the genitals. JA.IV.2334-35. Assuming, arguendo, that an inference of nonconsensual sex could be drawn, that inference does not establish that Coleman had that intent from the time he met Correia.

### B. There was insufficient evidence that Coleman held Correia against her will for an appreciable time.

In considering whether Coleman held Correia for an appreciable time, it is useful to break down the 27 minutes the government argues constitute the holding. GBr.64-65.



| 1 minute | • Correia pushed out of Uber.<br>• Coleman approaches Correia and extends his hand, which she takes.<br>• Woman approaches and talks to Correia.<br>• Coleman and Correia walk away.<br>• *See* JA.VIII.1-20. |
| 5 minutes | • Correia and Coleman walk through Boston to his car on Tremont.<br>• *See* JA.VIII.1-21, 1-22, 1-23. |
| 3 minutes | • Correia and Coleman arrive at his car.<br>• Correia gets in passenger side and closes door.<br>• Coleman gets in driver's side and closes door.<br>• Group of people get in nearby parked car.<br>• Coleman drives away.<br>• *See* JA.VIII.1-26, 114-02. |
| 1 minute | • Coleman drives short distance. JA.2639. |
| 3 minutes | • Car stops at Tremont and Dartmouth Street. JA.2639. |
| 2 minutes | • Coleman drives in loop putting car back on Tremont heading toward highway. JA.2640. |
| 12 minutes | • Coleman parallel parks car on Tremont.<br>• Car lights turn on.<br>• Coleman leaves parking spot.<br>• *See* JA.VIII.9-24. |

      *i.*    *Kidnapping requires an appreciable hold.*

The government wrongly suggests that kidnapping does not require that the victim be held for an appreciable time. GBr.61-62. The Supreme Court stated: "The act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an

28

appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin v. United States*, 326 U.S. 455, 460 (1946); *see also United States v. Murphy*, 100 F.4th 1184, 1201-02 (10th Cir. 2024) ("The *Chatwin* Court's overarching interpretive guidance was clear….").

As the D.C. Court of Appeals stated: "The federal circuit courts that have confronted the issue have uniformly rejected the view that momentary seizures are kidnappings." *Cardozo v. United States*, 315 A.3d 658, 674 (D.C. 2024); *see also Government of Virgin Islands v. Berry*, 604 F.2d 221, 226-27 (3d Cir. 1979) (concluding that seizure or detention "incidental" to another crime is not kidnapping, and describing four-factor test); *Murphy*, 100 F.4th at 1199 ("requiring an appreciable temporal period of detention (i.e., holding) beyond that necessary to commit any other offense" without relying on *Berry* test); *United States v. Krivoi*, 80 F.4th 142, 153 (2d Cir. 2023) (adopting "somewhat simplified" version of *Berry* test permitting kidnapping conviction "only if the defendant held the victim for a period that was appreciably longer than the time required to commit the other offense"); *United States v. Jackson*, 24 F.4th 1308, 1314 (9th Cir. 2022) (adopting and applying *Berry* test); *United States v. Howard*, 918 F.2d

1529, 1536-37 (11th Cir. 1990) (adopting and applying *Berry* test); *Cardozo*, 315 A.3d at 676-78.

The government cites *United States v. Stimler*, 864 F.3d 253 (3d Cir. 2017), for the proposition that *Chatwin* does not require a holding for an appreciable period. GBr.62. With little analysis, *Stimler* affirmed a conviction where the jury instructions did not include a temporal element. 864 F.3d at 270-71. It stated that even if such instructions were required, the error was harmless. *Id. Stimler* did not consider the implications of a kidnapping statute with no temporal limitation. *Id. Contrast Cardozo*, 315 A.3d at 670 ("If every momentary seizure were a kidnapping, that would transform virtually every battery, robbery, and groping into a thirty-year offense, despite legislative determinations that those offenses do not merit that degree of punishment."); *United States v. Ferguson*, 65 F.4th 806, 812 (6th Cir. 2023) ("A liberal conception of the holding element not only creates sweeping criminal liability such that virtually any crime involving contact with the person of another could be charged as a kidnapping, but it also strains the text."); *Krivoi*, 80 F.4th at 153; *Jackson*, 24 F.4th at 1311-13. *Stimler* did not cite *Berry*, which it cannot overrule.

30

The government states that there are few cases addressing and
defining "appreciable period." GBr.62. It does not discuss *Cardozo*, an en
banc decision of the D.C. Court of Appeals decided after Coleman filed his
brief and before the government filed its brief. *Cardozo*, 315 A.3d at 658. The
court overruled its prior interpretation of the D.C. kidnapping statute,
which is similar to the federal one, and concluded:

> Consistent with *Chatwin*'s warnings, dictionary definitions, and the
> bulk of authority on the topic, we conclude that to hold or detain
> somebody in the context of the kidnapping statute means to detain
> them against their will for a substantial period of time, so that the
> perpetrator could fairly be described as holding another captive like a
> hostage or a prisoner.

*Id.* at 675-76. The court did not "adopt[] any particular bright line," but it
described as "sensible" cases treating "detentions of less than thirty
minutes as short of a kidnapping and incidental to other offenses" and
"detentions of more than an hour as sufficient to constitute kidnappings
and non-incidental to other offenses." *Id.* at 677-78. It suggested that
"detentions between thirty minutes and an hour may be sufficient to
constitute kidnappings when they bear some other hallmarks of a
kidnapping, such as moving the victim a considerable distance or eliciting
a ransom." *Id.*

>       ii.    *Coleman did not hold Correia before or during their walk.*

The government argues that the holding began when Correia walked away from Venu with Coleman. GBr.63. It does not cite cases supporting the proposition that walking with someone down public streets can be a holding. GBr.63-64. Coleman offered his hand to Correia, she took it, and they held hands as they walked, but he did not drag or pull her. JA.VIII.1-20, 1-21, 1-22, 1-23, 1-26, 104-10, 114-02; JA.II.1098-99. When they stopped, she jumped on his back, grabbed his shoulders, and helped pull herself on when he had a hard time lifting her. JA.VIII.1-22. They walked down well-lit, populated streets. JA.VIII.1-20, 1-21, 1-22, 1-23. When they got to Coleman's car, he put her down, and she got into the passenger side of the car and shut the door on her own. JA.VIII.1-26, 104-10, 114-04.

Correia was not confined or detained during this walk, and it cannot be considered part of the holding. Even accepting that a person can be "'held' by deception," they must not only be deceived but also confined. *See Chatwin*, 326 U.S. at 460 (holding "necessarily implies an unlawful physical or mental *restraint* for an appreciable period against the person's will and with a willful intent so to *confine* the victim" (emphasis added)). *United States v. McInnis*, 601 F.2d 1319, 1325-27 (5th Cir. 1979) (finding that

32

plan to cause victim to go to Mexico where conspirators would kidnap him did not involve holding victim against his will in United States). During the walk, Correia was not confined, detained, or held.

The cases the government cites support the conclusion that this walk was not a holding. GBr.63. In *United States v. Hughes*, the defendant talked to the victim in an alley for 10-20 minutes before she got in his truck. 716 F.2d 234, 236-37 (4th Cir. 1983). The court held that the seizure and detention were involuntary where his misrepresentations caused her "to enter his vehicle." *Id.* at 239; *see also United States v. Stands*, 105 F.3d 1565, 1576 (8th Cir. 1997) (finding sufficient evidence where defendant "encouraged" victim "to get into and remain in the car when he might otherwise have wished to go his own way"); *United States v. Boone*, 959 F.2d 1550, 1556 (11th Cir. 1992) (finding sufficient evidence where defendant "inveigled" victim into driving with him and "remained in a position where he could use force" if deception failed). The defendant in *United States v. Carrion-Caliz* helped undocumented people enter the United States and kept them in his home for days while demanding money from their family. 944 F.2d 220, 221-22 (5th Cir. 1991). The court concluded that the hold element of the Hostage Taking Act was satisfied where defendant

33

"frightened or deceived" victims into "remain[ing] in his house" against their will. *Id.* at 225-26; *see also United States v. Si Lu Tian*, 339 F.3d 143, 154 (2d Cir. 2003) (finding undocumented immigrant who paid to be smuggled into United States was held where fear and vulnerability "caused her to remain in…apartment against her will").

The government incorrectly asserts that Coleman cannot argue that Correia was not "held by deception" or make any argument about these cases because he did not cite them in his opening brief. GBr.64. The government recognizes that Coleman raised and developed the argument that there was insufficient evidence of a holding. GBr.58, 61. He does not raise a different argument now. Coleman's argument does not turn on whether someone can be held by deception. Even if Correia was deceived, the holding could not have started before she entered Coleman's car because she was not detained or confined. Even if the holding could have started during the walk, there is insufficient evidence of an appreciable hold. *See infra* Arg.IV.B.iv. Coleman's argument that there was insufficient evidence of a holding is not waived.

       *iii.*    *The argument that a holding must be an appreciable holding*
             *beyond that inherent in any other offense is not foreclosed by*
             *precedent.*

Coleman argued that the government was required to prove that he held Correia for an appreciable time beyond the period of any holding that was inherent in another offense. Br.64-66. The government incorrectly asserts that First Circuit precedent forecloses this argument.[8] GBr.67-69 (citing *United States v. Lowe*, 145 F.3d 45 (1st Cir. 1998)). Lowe was charged with carjacking, kidnapping, and interstate transportation in violation of the Mann Act. *Lowe*, 145 F.3d at 47. Lowe argued that "since kidnapping is *coextensive* with the Mann Act, which also requires transportation or confinement, the district court may not convict him of kidnapping if the degree of transportation or confinement imposed to commit the kidnapping is no greater than that required for the Mann Act." *Id.* at 52 (emphasis added). The district court here and the Ninth Circuit understood *Lowe* as a double-jeopardy case, not as one addressing the appreciable hold requirement. *See Jackson*, 24 F.4th at 1313, n.8 (reading *Lowe* as double-

---

[8] To the extent this Court concludes that *Lowe* bars the adoption of any incidental-related test, Coleman concedes that he cannot satisfy the exceptions to the law-of-the-circuit doctrine.

jeopardy case); JA.IV.2163-69, 2175, 2285 (interpreting *Lowe* as double-jeopardy case). *Lowe* did not delve into *Berry*, or consider how "hold" should be defined in the kidnapping statute. 145 F.3d at 52. It held that "The Mann Act and federal kidnapping charges are separate and distinct offenses." *Id.* It listed the elements of each offense and explained that the government provided sufficient evidence of each. *Id. Lowe* does not bar the adoption of a rule that a kidnapping conviction requires proof of an appreciable hold beyond that inherent in any other offense.

The government argues that such a test would "import a troubling degree of indeterminacy into the scope and applicability of the kidnapping statute" and "raise[] fair notice concerns for defendants." GBr.69-70. On the contrary, such a test protects defendants by ensuring that the kidnapping statute is not substituted for less serious charges. *See Cardozo*, 315 A.3d at 670; *Ferguson*, 65 F.4th at 812; *Krivoi*, 80 F.4th at 153; *Jackson*, 24 F.4th at 1311-13. Nor do such tests require speculation. The government argued that Coleman committed other crimes. JA.IV.2312-14. Considering whether the restraint was inherent in those crimes and not part of a kidnapping is required.

36

The government argues that *Chatwin* does not support the adoption of such a test because §1201 has been amended. GBr.70-72. *Chatwin* remains good law. *See supra* Arg.IV.B.iii. These amendments broadened the jurisdictional element of kidnapping and do not diminish *Chatwin*'s force. GBr.70-72. This broadening increases the importance of ensuring that crimes that are charged as federal kidnapping merit those penalties. *Cf. Cardozo*, 315 A.3d at 670; *Ferguson*, 65 F.4th at 812; *Krivoi*, 80 F.4th at 153; *Jackson*, 24 F.4th at 1311-13. Congress has not amended the holding element to make transitory holdings sufficient in response to *Chatwin*, *Berry*, or other similar cases.

> ### iv. Under any of the possible tests, Coleman did not hold Correia for an appreciable period.

Whether this holding is considered 9 minutes,[9] 12 minutes,[10] 15 minutes,[11] 21 minutes,[12] or 27 minutes long as urged by the government,[13] it was not an appreciable hold.[14] Whether this Court applies the *Berry* test, a simplified version of the *Berry* test like in *Murphy* and *Krivoi*, or the time

---

[9] The government posits that the holding would be 15 minutes long if 12 minutes incidental to sexual assault and murder are subtracted. GBr.73. Subtracting the 6-minute meeting and walk as well yields a 9-minute hold. *See supra* Arg.IV.B.ii.

[10] The court concluded the hold was 12 minutes. JA.IV.1951-53.

[11] The government posits that the holding would be 15 minutes long if 12 minutes incidental to sexual assault and murder are subtracted. GBr.73.

[12] The government's 27-minute hold minus the 6-minute meeting and walk. GBr.65; *supra* Arg.IV.B.ii.

[13] *See* GBr.65.

[14] In a footnote, the government suggests that an unlawful holding can continue after the victim's death. GBr.66, n.41 (citing *United States v. Zayac*, 765 F.3d 112 (2d Cir. 2014)). *Zayac* cannot be read outside of its context. *Zayac* considered a kidnapping accomplice's duress defense. *Id.* at 119-23. In determining whether the accomplice had a reasonable opportunity to escape, the court had to decide when the offense of kidnapping was ongoing. *Id.* It concluded that the offense was ongoing at least until they abandoned the victim's body. *Id.* The court did not consider how such a holding could be against the victim's will, even if the overall crime was ongoing. *Id.* This Court should not adopt this extreme understanding of the kidnapping statute based on a single holding made in a different context to which the government devotes a single footnote.

and circumstance based approach of *Cardozo*, there was not sufficient evidence of an appreciable hold.

The government argues that Coleman waived the argument that a variant of the *Berry* test applies. GBr.72. Coleman argued that to sustain a conviction, the government must prove an appreciable holding beyond the restraint inherent in another crime. Br.64-66. He cited cases adopting various standards for determining when a holding is appreciable. *Id.* Nothing more is required to preserve this argument.

The government argues that this holding was sufficient because Coleman held Correia for 27 minutes. GBr.65-66. This is before subtracting 6 minutes because the meeting and walk was not a holding and an additional 12 minutes because under the government's theory, the time spent parked on Tremont was incidental other offenses. *See supra* Arg.IV.B.iv; GBr.73. However, even a 27-minute hold would be insufficient. "Courts tend to treat detentions of less than thirty minutes as short of a kidnapping" and "of more than an hour as sufficient to constitute kidnappings." *Cardozo*, 315 A.3d at 677-78. Nor does this case bear "other hallmarks of kidnapping"; Correia was not "bound or moved a significant distance," and no ransom was sought. *Id.* Applying the *Cardozo* test,

39

Correia was not held "for a substantial period of time, akin to holding her captive as a hostage or a prisoner." *Id.* at 679.

The cases the government cites are distinguishable. GBr. 65-66, 74. *Krivoi* estimated that the holding "was likely not much more than 30 minutes," and concluded that although it was "relatively brief," it was appreciable because the victim was forced into a car "under threat of violence," "physically restrained," taken "to a more secluded location," threatened with a knife, and beaten repeatedly. 80 F.4th at 150-54. The victim's kidnapping was part of an extortion scheme. *Id.* at 154. These additional facts do not exist here. In *United States v. Lentz*, the victim was never found, and few facts were known about how long she may have been held. 383 F.3d 191, 202-03 (4th Cir. 2004). The court concluded that the jury could have found this hold appreciable without estimating a particular timeline. *Id.* The majority in *United States v. Etsitty* concluded that kidnapping and assault charges did not merge, without considering the appreciable-hold issue. 130 F.3d 420, 426-28 (9th Cir. 1997); *see also Jackson*, 24 F.4th at 1313 (discussing *Etsitty*). *United States v. Peden* concluded that sexual abuse and kidnapping charges were not duplicitous, without considering whether the 30-minute hold was appreciable. 961 F.2d 517,

40

522-23 (5th Cir. 1992). *Stimler* states that the court had "upheld convictions where an individual was held for mere minutes." 864 F.3d at 270-71, n.74. In support, it cites a case involving a different statute with no hold element that criminalizes abducting a person with the intent to commit rape. *Id.* (citing *Government of Virgin Islands v. Ventura*, 775 F.2d 92, 96-98 (3d Cir. 1985)).

Any holding here was insufficient under the *Murphy* or *Berry* tests. The Tenth Circuit held that §1201 requires proof of "an appreciable temporal period of detention (i.e., holding) beyond that necessary to commit any other offense." *Murphy*, 100 F.4th at 1199; *see also Krivoi*, 80F.4th at 153-54. The government argues that if this test applies, the jury could have found that the murder and sexual assault took place during the 12-minute stop on Tremont and that Correia was held "for an additional 15 minutes." GBr.73. During 6 of these 15 minutes, Coleman and Correia were walking to Coleman's car. Correia was not restrained or confined during these 6 minutes, and they cannot constitute a holding. *See supra* Arg.IV.B.ii. That leaves 9 minutes of holding that was not inherent in another offense. A holding of 9, or even 15, minutes is not appreciable. *See, e.g.*, *Jackson*, 24 F.4th at 1314 (finding 7-minute hold insufficient); *Cardozo*, A.3d at 677-78.

41

The 4-factor *Berry* test requires considering: "(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *Berry*, 604 F.2d at 227. This detention was less than 30 minutes, a length courts often find insufficient to support a kidnapping conviction. *Cardozo*, 315 A.3d at 677-78. The government argued that Coleman sexually assaulted and killed Correia, and any kidnapping occurred during the commission of those offenses. The government suggests that 12 minutes of the detention was inherent in the assault and homicide.

The government argues that the asportation enhanced the danger to Correia and created a significant risk independent of the separate offenses because Coleman took Correia to a less public place in a moving car. GBr.75. Coleman did not take Correia to a substantially less public place. They walked down well-lit, populated sidewalks, and cars and people continued to pass as they got in Coleman's car. JA.VIII.1-20, 1-21, 1-22, 1-23, 1-26. The short drive returned them to the same well-lit commercial street.

JA.VIII.9-24; JA.V.2639-40. The government misapprehends the *Berry* test. The question is not whether Correia was in less danger before she joined Coleman. The question is whether the walk and car ride increased the danger beyond that inherent in the sexual assault and homicide. This walk and drive did not create a significant independent danger.

It does not matter whether this alleged kidnapping fits "the traditional conception of the crime." GBr.75. The government did not sufficiently establish the holding element. Even accepting, arguendo, that Coleman held Correia for 27 minutes, this was not an appreciable hold beyond that inherent in other offenses. Coleman's conviction should be vacated. *See also* Br.64-66.

### C. There was insufficient evidence that Coleman held Correia for ransom, reward, or otherwise.

The government was required to prove that Coleman held Correia *for* ransom, reward, or otherwise. JA.IV.2379. Coleman argued that the government's theories of guilt depended on accepting that a sexual assault occurred. Br.67-68. The government responds that it had to prove that

Coleman's purpose was "sexual gratification," not "sexual assault." [15]

GBr.77; *see supra* Arg.IV.B. Coleman and Correia had sex. If the sex was

consensual, as Coleman maintains, then Correia was not held against her

will prior to or during the sexual activity. Under the government's theory,

if the sex was consensual, the possible holding time decreases to mere

minutes, which would not support a conviction regardless of Coleman's

purpose.[16] *See supra* Arg.IV.B.iv. Without sexual assault, the government

did not present sufficient evidence of kidnapping.

The government did not present sufficient evidence of sexual assault.

Br.67-68. The government argues that it had "strong evidence that Correia

simply wanted to go home" and would not have consented to sex. GBr.78.

There was evidence that Correia planned to return to Mondesir's house

eventually, not that she wanted to do so immediately. She and her friends

planned to go out to eat after leaving Venu, not go straight home. GBr.6;

JA.II.930, 972-75, 989-90. Correia had just fought with and separated from

---

[15] The government's argument distinguishing sexual gratification from
sexual assault conflicts with its reliance on proof of a sexual assault to
support the conviction. *See, e.g.*, GBr.26, 62-63, 65, 73-74, 81.

[16] The government acknowledges that a holding for the purpose of
preventing Correia from reporting a sexual assault would be shorter than a
holding for the purposes of sexual gratification. GBr.80-81.

Mondesir, making it unlikely she wanted to go straight to Mondesir's house. Hiltz testified that "[s]ometimes [Correia] would go off with someone for a few days, and [Hiltz] wouldn't hear from her until afterwards." JA.II.940. The government notes that Correia had "extensive injuries." GBr.79. The medical examiner testified that a lack of genital injuries does not mean that there was no sexual assault. JA.III.1457. However, it is implausible that a sexual assault violent enough to cause "extensive injuries" would do no damage to the victim's genitalia.

The government argues that the jury found Coleman's defense "wholly implausible." GBr.80. Coleman did not bear the burden of convincing the jury of his innocence, and the focus of this inquiry is on whether the government presented sufficient evidence, not whether Coleman's alternatives were convincing. The government states that the jury could have concluded that 12 minutes was not enough time for Coleman and Correia to have consensual sex and an argument resulting in a violent struggle that led to her death. GBr.80. However, Coleman did not argue that all the relevant events occurred during those 12 minutes. JA.IV.2332-35.

45

The government repeats its assertion that Coleman "held Correia from the time he encountered her." GBr.80. Their meeting and walk were not a holding. *See supra* Arg.IV.B.ii. The government did not present sufficient evidence that Coleman held Correia for sexual gratification/sexual assault or to prevent her from reporting sexual assault. *See also* Br.67-68.

### D.   There was insufficient evidence that Coleman intended to kidnap Correia.

The government's argument that there was sufficient evidence that Coleman intended to kidnap Correia overstates some evidence and leaves out other evidence. It argues that Coleman "approached [Correia] for the purpose of having sex with her." GBr.81. Even accepting, arguendo, that he did, this falls far short of approaching Corriea with the intent to unlawfully seize and hold her to sexually assault her. There was insufficient evidence that Coleman had such intent. He left home anticipating a normal night—he went to a club he had been to before and invited friends to join him. JA.III.1780-84. He had a normal interaction with another woman that night—giving her truthful information, kissing her, and separating from

her when her brother wanted her to go home.[17] JA.VII.3389-90;

JA.VIII.1701-06, 1713-16; JA.VIII.71.1-71.8 There was no evidence in his

phone suggesting that he planned to commit a kidnapping. JA.1779-80.

Coleman's haphazard actions after Correia's death show that he did not

plan these events. JA.IV.2328-31.

The government wrongly argues that Coleman's intent can be

inferred from his behavior when he met Correia. GBr.82. Like many club

patrons, Coleman and Correia were on the street after the clubs closed.

JA.VIII.1-20, 1-21, 1-22, 1-23, 1-26. Like others on the street, Coleman

watched Correia's interaction with the Uber driver. JA.VIII.1-20. Another

man approached Correia before Coleman, and Correia spoke with

passersby. *Id*. When the driver pushed her out, Coleman approached with

---

[17] The government says that Coleman left Horace because her brother and friend "physically interposed themselves" between Coleman and Horace. GBr.83-84. Horace's brother testified that he did so because he was protective and was ready to take his sister home, not because of anything Coleman did or said. JA.III.1711-16. Coleman was not threatening or violent, and he did not try to approach Horace after her brother decided to take her home. *Id.* Horace continued to text Coleman, including about how her brother was overprotective. JA.VI.3285-90. The government implies that Coleman did something nefarious when he said he would go to the bathroom with Horace at the end of the night. GBr.9. However, the men's and women's bathrooms were near each other. JA.III.1713-14.

his hand extended, and Correia took it. *Id*.; JA.1098-99. Before they walked away, a woman approached Correia and spoke with her. JA.VIII.1-20. Coleman's actions are consistent with curiosity and a desire to help, not with an intent to kidnap.

The government is wrong that Coleman's actions during the walk and drive reveal an intent to kidnap. GBr.82-83. The government implies that Coleman forced Correia to hold his hand. *Id.* Coleman offered his hand and Correia took it. JA.VIII.1-20; JA.1098-99. There is no indication that Correia tried to remove her hand or that Coleman was dragging, rushing, or forcing her to walk. *Id*.; JA.VIII.1-20, 1-21, 1-22, 1-23, 1-26, 104-10, 114-04. The government emphasizes that Correia looked back, GBr.82-83, but they both did. JA.VIII.1-21. They let go of each other when Correia jumped on Coleman's back, grabbed his shoulders, and helped pull herself on his back. JA.VIII.1-22. When they arrived at his car, Coleman put Correia down, she got in the passenger side and shut the door on her own. JA.VIII.1-26, 104-10, 114-04. The government emphasizes that Coleman drove Correia in a circle. GBr.81. This circle was a U-turn—Coleman drove in the direction his car was facing, and took a series of turns that led back to Tremont traveling in the opposite direction and toward the highway.

48

JA.2639-40. The loop was less than a mile, and the ending point was about half a mile away from the starting point. *Id*.

The government's argument about Correia's phone does not support an inference that Coleman intended to kidnap Correia from the beginning of their interaction. Correia's phone was on and receiving calls during their walk and part of the drive. GBr.83. During the 12-minute stop, her phone stopped receiving signals. *Id.* This series of events suggests that the phone ran out of batteries[18] or was turned off during the stop, not during the drive. Notably, Hiltz testified that Correia's "phone died all the time." JA.II.939. Even assuming, arguendo, that Coleman turned off the phone, this action says nothing about his intent prior to this stop.

## V.    The court prevented Coleman from adequately presenting his theory of defense.

### A.    See the sealed supplemental reply brief.

### B.    See the sealed supplemental reply brief.

---

[18] The government suggests that the phone did not run out of batteries because someone turned it on the next evening. GBr.83, n.49. There was no evidence about who found Correia's phone, where they found it, or whether it still had power when they did. GBr.154-55.

**C.    The court erred in not giving the jury instructions Coleman requested. (Reply to GBr.113-37.)**

> *i.    The court failed to sufficiently inform the jury that it could not consider evidence that had been struck.*

Coleman identified three places that he wanted the court to instruct the jury that it could not consider evidence that had been struck. Br.71-73. The court added this information to one of the three. *Id*. The government's argument that this instruction did not need to be repeated ignores the context of this trial. Coleman twice moved for a mistrial based on Vershvovsky's prejudicial and unreliable testimony. *See supra* Args.III.A, V.B. When the court denied the second motion for a mistrial, it promised curative instructions. JA.IV.2215-16. Yet, when Coleman requested such instructions, the court refused to give them. JA.IV.2387-88. Given the extreme prejudice from Vershvovsky's testimony, repeated instructions were necessary. *See also* Br.71-73.

> *ii.    The seizure-element instructions were erroneous.*

Coleman asked the court to instruct jurors that to prove a seizure by inveigling or decoying, the government had to prove that he "had the willingness and intent to use physical force to complete the kidnapping if the deception failed." JA.IV.2257, 2389, 2392; *see Boone*, 959 F.2d at 1556-57

50

("To determine whether a kidnapping by inveiglement has occurred prior to transportation, a fact finder must ascertain whether the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed."). The government asserts that there is a Circuit split on this question. GBr.116-18. However, the government misreads the cases it cites. *Id. Walker* held that kidnapping was not a crime of violence because it does not require proof of the use or threatened use of physical force. 934 F.3d at 378-79. *Carrion-Caliz* held that the Hostage Taking Act did not require proof of the use or threatened use of physical force. 944 F.2d at 225-26. *Stands* found sufficient evidence to support a kidnapping conviction where the victim, who was later assaulted, was not forcefully abducted. 105 F.3d at 1576. These cases addressed whether a seizure must be accompanied by force or threatened force, not whether the government must prove that the defendant *intended* to use force if the deception failed.

For similar reasons, *United States v. Hughes* and *United States v. Hoog* do not conflict with *United States v. Higgs*. *See* GBr.117, n.63. Citing *Boone*, *Higgs* required proof that the defendant intended to use force if deception failed. 353 F.3d 281, 313 (4th Cir. 2003). As part of its determination of

51

whether a kidnapping occurred before interstate travel, *Hughes* held that someone who was deceived into taking a ride had been seized under the kidnapping statute. 716 F.2d 234, 238-39 (4th Cir. 1983). It did not consider whether proof of intent to use force if necessary was required. *Id.; see also Hoog*, 504 F.2d 45, 50-51 (8th Cir. 1974) (finding sufficient evidence without discussing whether proof of intent to use force was necessary).

The government argues that the instruction did not need to be given because it wrongly required an intent to use physical force rather than to use physical or psychological force. GBr.117-18. Even accepting, arguendo, that the physical or psychological language should have been used, the overall instruction—that deception must be accompanied by the intent to use force if needed—was correct and integral to Coleman's defense. *See also* Br.73-76.

The court instructed that inveiglement did not require deceit; Coleman asked it to instruct that it did. Br.74. The government asserts that Coleman's argument is insufficiently developed, not grounded in the text, and waived. GBr.118-19. The government agrees that the kidnapping statute requires proof that the victim did not consent to the seizure or holding. *Id.* Coleman's argument flows logically from this requirement and

is not waived or inadequately briefed. *See* Br.74. If Correia agreed to go

with Coleman because he flattered or coaxed her, her consent was

voluntary, and she was not seized or held against her will. To be

kidnapped by way of inveiglement, the victim's consent must be induced

by deceit. The government does not explain how someone could be

kidnapped by flattery or coaxing. The cases the government cites quote

dictionary definitions of inveigle without confronting the issue raised here.

GBr.119.

     The court did not sufficiently explain that Coleman had to seize or

inveigle Correia without her consent. Br.74-75. The court's failure to do so,

combined with its failure to properly define inveiglement, makes the

seizure instruction insufficient. *See also* Br.73-76. The government argues

that any error in defining inveiglement was nonprejudicial because it

argued that Coleman deceived Correia. GBr.120. There was no direct

evidence of what Coleman said to Correia, and the jury may not have

adopted the government's theory. Whether there was consent, when it was

given, and why were critical in this case, particularly because findings

about consent impact the determination of whether any holding was

appreciable. *See supra* Arg.IV.B.

Coleman objected to the court's inclusion of factual scenarios. Br.75-76. The government responds that these instructions are not erroneous because they are supported by precedent. GBr.122. The cases it cites involve factual scenarios in which the victim consented and later withdrew consent; they do not discuss the propriety of instructions like this one. *Id*. This instruction improperly bolstered the government's theory, denigrated Coleman's defense, and suggested the verdict.[19] *See also* Br.73-76.

> ### iii.   *Holding-element and purpose-element instructions were erroneous.*

Coleman argued that the court erred by not defining "otherwise" as "other benefit" and by including sexual gratification as a possible purpose. Br.76-77. The government responds that "otherwise" can encompass any reasons, not just a benefit to the defendant. GBr.122-24. This expansive reading would make a broad statute nearly limitless. *Cf. Cardozo*, 315 A.3d at 670; *Ferguson*, 65 F.4th at 812; *Krivoi*, 80 F.4th at 153; *Jackson*, 24 F.4th at 1311-13. The government argues that Coleman's claim about sexual

---

[19] This instruction permitted Coleman's conviction based on a seizure and holding that began after Correia got in the car. JA.IV.2377. Under the government's theory that Correia died in the car on Tremont Street, this holding was, at most, 21 minutes long. *See supra* Arg.IV.B. Even if this holding is considered 27 minutes long, it is not an appreciable holding. *Id.*

gratification fails for the same reason as his presentment-clause claim.
GBr.122-24. The government argues in part that any presentment error was
harmless. GBr.41-42. If this Court were to reject Coleman's presentment
claim as harmless, the issue of whether the instruction was erroneous
remains.

   iv.    *Consciousness-of-guilt instruction was erroneous.*

Coleman identified three deficits in the court's consciousness-of-guilt
instruction. Br.77-79. The government incorrectly argues that Coleman
waived two of these three arguments. GBr.124-27. Coleman presented the
argument, explained why his requested instruction was correct and
necessary, and nothing more is required for preservation. Br.77-79. The
government does not contend that Coleman's proposed instruction was
legally incorrect. GBr.124-27. It concedes that "Coleman could not be
convicted solely based on consciousness of guilt evidence," but argues that
this did not need to be "clarified" for the jury. GBr.127. Much of the
government's evidence concerned what happened after Correia died, and
this evidence was inflammatory. *See* DE247; JA.I.453-55. The risk that the
jury would convict Coleman based solely on his actions after Correia's

death was real, and the court erred by not instructing that such a conviction would be improper.

The government argues that the court did not need to instruct that it had to be consciousness of guilt of the crime charged because there was one crime charged. GBr.125-27. This argument ignores Coleman's defense. Coleman argued that he did not commit kidnapping, while acknowledging that his actions led to Correia's death. JA.IV.2326-27. The jury needed to distinguish between evidence that he was guilty *of kidnapping* and that he fled due to his fear of law enforcement after causing Correia's death during an unexpected altercation. The court's instruction presented the government's theory without including the defense's.

          *v.*    *Other errors.*

The government argues that Coleman waived the argument that the court should not have used the terms defendant and victim. GBr.127-28. Coleman explained what language he wanted excluded from the instructions and why. Br.79. Nothing more is required to preserve the argument.

Coleman objected to a charge about reaching a verdict. Br.79. The government argues that this charge was not similar to an *Allen* charge.

GBr.128-32; *see Allen v. United States*, 164 U.S. 492 (1896). Even though an *Allen* charge may be longer and "stronger," this instruction raised the same concerns and without mitigating the risks.

Coleman objected to the court's failure to explain that Correia's death had to result from *kidnapping*. Br.80. The government agrees that it had to prove that Correia's death resulted from kidnapping, not other acts. GBr.133. It argues that Coleman's requested instruction was confusing because any death that resulted from a kidnapping, including if unintended, would satisfy the statute. GBr.133-34. Coleman argued that he did not commit kidnapping, and none of the confusion the government posits was presented by the facts here.

The government argues that the requested instruction was unnecessary because the information was conveyed by other instructions. GBr.133-37. The instructions failed to adequately explain to the jury that if it considered the acts that led to Correia's death something other than a kidnapping, it had to acquit. The court's instruction reinforced the idea that

Coleman's actions were a kidnapping, bolstering the government's case.[20]

Coleman acknowledged that Correia's death resulted from his actions,

making it was critically important to reinforce the fact that he did not agree

that those actions constituted kidnapping.

## VI.    Issues of structural racism were not appropriately addressed, resulting in an unfair trial.

### A.    The court incorrectly denied Coleman's motion to show jurors an implicit-bias video. (Reply to GBr.84-91.)

Coleman's brief detailed research supporting the importance of

educating jurors about implicit bias. Br.81-87. The government did not

address this research or cite contrary information. GBr.84-91. It responded

that the court did not abuse its discretion because the case did not raise

race-based concerns and this Court has not required individual voir dire

about racial bias. *Id.* Neither of these arguments is persuasive.

Race was explicitly "'bound up with the conduct'" of Coleman's trial.

*United States v. Brown*, 938 F.2d 1482, 1485 (1st Cir. 1991) (quoting *Ristaino v.*

*Ross*, 424 U.S. 589, 597 (1976)); *see also* Br.89-90. The government relied on

---

[20] The government notes the court said that it was allowing Mondesir's testimony to put "a thumb on the scale for the defense." GSBr.6. This characterization is incorrect. The court's influence in favor of the government is evident in the jury instructions.

Coleman's actions after Correia died as consciousness-of-guilt evidence shedding light on his intent. JA.IV.2320-24; GBr.80. Coleman responded that his behavior was driven by his experience, as a Black man, with law enforcement. JA.IV.2328-31. To understand this defense, jurors needed to appreciate the experiences of Black men and to set aside biases, both implicit and explicit, about Black men. *See infra* Arg.VI.B. No Black jurors took part in deliberations. [21] *See Brown*, 938 F.2d at 1485.

United States v. Parker* does not control. *See* Br.87-88. *Parker* rejected the argument that if race-related voir dire is required, "only an *individual* voir dire will do." 872 F.3d 1, 7-8 (1st Cir. 2017). This Court concluded that group voir dire "captured the essence of what Parker wanted asked during the hoped-for individual voir dire." *Id.* Coleman does not argue that particular voir dire questions were necessary or that they had to be asked individually. *See United States v. Mercado-Gracia*, 989 F.3d 829, 840 (10th Cir.

---

[21] The government says it is unclear when the only Black juror was dismissed, and notes that Coleman did not ask the court to address this when it happened. GBr.90, n.53. The sole Black juror was dismissed before closings due to issues with her car. JA.IV.2276-78, 2297, 2402. Coleman could not have renewed his voir dire request at that time. Even if the jury had contained one Black person, the issue remains that most jurors would likely not be familiar with the lived experience of Black men.

2021) (distinguishing between cases requiring voir dire questioning and issue regarding implicit-bias video). He argues that given the nature of his defense and the developing understanding of implicit bias, the court abused its discretion by not showing an implicit-bias video.

The two out-of-Circuit cases the government cites are not persuasive. GBr.90. *United States v. Caldwell* does not explain how that case involved race-based concerns requiring an implicit-bias video. 81 F.4th 1160 (11th Cir. 2023). The court's description of the Washington video misstates its tone and tenor.[22] *Id.* at 1176. *Mercado-Gracia* held that the court did not abuse its discretion in denying a motion to show an implicit-bias video in part because "each side had an opportunity to pose questions to prospective jurors" and defense counsel did not ask about anti-Mexican bias. 989 F.3d at 841. Coleman's attorneys were not allowed to question jurors this way, and the court's questions did not sufficiently explain implicit bias or replace the requested videos. *See also* Br.83-90. Neither case examines the research showing that education about implicit bias reduces

---

[22] The Washington video is available at:
www.wawd.uscourts.gov/jury/unconscious-bias.

its negative impact. The court erred by not showing an implicit-bias video, and reversal is required. *See also* Br.81-90.

### B. The court improperly excluded expert testimony explaining the impact of negative encounters with police on Black men. (Reply to GBr.96-105.)

Coleman offered expert testimony to support his argument that he fled because of fear, not consciousness of guilt. Br.90-100. The court improperly excluded this testimony under Federal Rule of Criminal Procedure 16 and Federal Rules of Evidence 702 and 403. JA.IV.1987-91. The proffered testimony is far more than "a race-based generalization" or "an expert's opinion that all Black people fear the police." GBr.99, 102.

The government seemingly concedes that this evidence should not have been excluded under Rule 16. GBr.103; Fed.R.Crim.P.16. However, it argues that Coleman's "two-sentence description" of Fagan's proffered testimony was insufficient. GBr.97, 98, 102. Fagan's testimony bore on a simple yet critical part of Coleman's defense. The government argued that Coleman's flight (including his efforts to hide Correia's death) supported the conclusion that he intended to kidnap Correia. JA.IV.2320-24. Coleman countered that he had no such intent and fled because of his experience as a Black man in America. JA.IV.2328-31. Fagan's testimony would have put

Coleman's defense into a broader social context. His testimony, based on peer-reviewed studies, would have explained that Black men experience higher rates of injury and death at the hands of police, causing fear and anxiety in Black men, and that this fear, rather than consciousness of guilt, may explain flight. JA.1982-83. The description of Fagan's testimony was short but complete. When asked, Coleman provided more information. JA.VI.3523-26.

The government concedes that Fagan was "qualified and considered reliable studies." GBr.103. It argues that "his extrapolation of conclusions from his studies" may not have been reliable. GBr.103-04. Coleman provided the studies and explained what Fagan would say. JA.IV.1981-91; JA.VI.3523-26. Fagan was not going to "extrapolate" from the studies; he was going to explain that multiple studies had shown that due to repeated negative encounters, Black people have a particular anxiety of interacting with law enforcement and that this fear can manifest as flight. *Id.*

The government argues that Fagan's testimony was not relevant because Coleman's flight manifested as "a days'-long effort apparently aimed at disposing of Correia's body and other incriminating evidence." GBr.103. The government could have cross-examined Fagan on this point.

62

Finding himself in an unexpected situation, Coleman could have gone to the police or tried to flee. That Coleman's flight required more effort than running away from a visible officer does not make it any less flight. Coleman's defense was that his choice is explained by his background and life experiences, not by consciousness of guilt. JA.IV.2328-31. Fagan's testimony would have put Coleman's defense in a larger context and explained its basis to a jury that contained no Black people.

The government argues that Fagan's testimony was irrelevant because it did not show that the "effects described in the studies could be attributed to Coleman" or address how they "could explain Coleman's efforts to dispose of and destroy evidence." GBr.104. The government ignores Coleman's own experiences with police. GBr.99. Coleman not only heard about negative interactions between the police and Black people from friends, family, and the media; he was assaulted by officers during a routine encounter. JA.IV.1968-74, 2020-22; JA.VI.3392-3417, 3430-40; JA.VIII.101.

The government confuses the meaning of community in this context. GBr.97, n.58, 102. It implies that there was no connection between Fagan's testimony and this case because Coleman did not argue that Providence is

63

overpoliced. GBr.97, n.58; *see also* GBr.102 ("[M]ost of the studies addressed the deleterious impacts to individuals and communities that are themselves subject to intensive policing and/or 'racial profiling,' something not alleged here.") The relevant community is Black people, especially Black men. Fagan's testimony concerned the frequency with which Black people experience police violence and the impact of that repeated violence. Not only was Coleman part of this group; he had been the victim of violent policing. JA.IV.1968-74, 2020-22; JA.VI.3392-3417, 3430-40; JA.VIII.101.

Coleman explained how Fagan's testimony fit into his defense by giving a broader context to his own explanation of why he fled. Given the circumstances, Coleman's flight involved an effort to hide Correia's death. The studies did not have to explain Coleman's every decision. It is enough that they would have helped to explain his defense—that he ran because of fear and anxiety born from his experience as a Black man—to a jury with no Black jurors.

The government cites two cases for the proposition that expert testimony may be excluded if it is a racial stereotype. Neither is persuasive. The defendant in *United States v. Verduzco* proffered expert testimony about

violent Tijuana drug cartels and the reluctance of people socialized in

Mexico to go to the police. 373 F.3d 1022, 1032 (9th Cir. 2004). The court

noted that it was appropriate to be "chary of 'cultural stereotyping'

testimony," but concluded that this testimony was properly excluded in

part because Verduzco was an American citizen who was not socialized in

Mexico and it would not help Southern California jurors who know about

Mexican drug cartels. *Id.* at 1033-35. The defendant in *United States v.*

*Bahena-Cardenas* offered expert testimony about one study of 56 people in

which 5 or 6 respondents "reported lying to Mexican officials in order to

get a Mexican birth certificate" to suggest that the defendant's father had

done so. 411 F.3d 1067, 1078 (9th Cir. 2005). The court noted that there was

no abuse of discretion because "[g]eneralizing from this scant evidence to

reach conclusions in this particular case could encourage jurors to resort to

cultural stereotypes." *Id.* The cases cited by the government predate recent

developments in our understandings of racism, prejudice, and police

encounters. Neither suggests that the testimony Coleman offered should

have been excluded. Fagan's testimony applied to Coleman, would have

helped the jury understand his defense, and was based on multiple peer-

reviewed studies. Its exclusion impaired Coleman's right to present a defense and requires reversal. *See also* Br.90-100.

## VII. Cumulative error. (Reply to GBr.138-39.)

Each of the errors discussed above and in the opening briefs requires reversal. Even if none alone suffices, the cumulative-error doctrine demands reversal. *See also* Br.103-05. The government argues that Coleman made no "attempt, beyond mere assertion," to show the interconnectedness of the errors. GBr.139. The structure of Coleman's brief showed the connection between the errors by grouping them into four main categories.[23] Br.104; *see also* Br.2-3. The government did not organize its brief the same way Coleman did, suggesting an effort to disrupt the connections between the issues. Throughout the opening brief, Coleman cross-referenced issues and discussed the connections between them. *See, e.g.*, Br.2-3, 40, 67-68, 72, 77.

The government contends, without support or cross-reference, that it presented "compelling evidence" that Coleman kidnapped Correia.

---

[23] The government collapsed Coleman's four categories into three. *Compare* Br.104 *with* GBr.138.

GBr.139. On the contrary, the government's evidence that Coleman

*kidnapped* Correia was largely circumstantial. *See supra* Arg.IV.

## VIII.  Pro se brief. (Reply to GBr.140-55.)[24]

In addressing Coleman's pro se brief, the government states that its

"sole argument at trial was that Coleman 'seized' Correia by inveigling and

decoying when he lied to her to get her to leave with him, and that a

'holding' was shown by his subsequent travel with her on foot, on his back,

and in his car up to and through the stop on Tremont Street." GBr.152-53.

This is an incorrect summary of the government's arguments. The

government accepted that multiple factual scenarios could have occurred—

including that Correia joined Coleman voluntarily and was seized and held

later. JA.IV.2289 (noting government theories that Corriea was inveigled

from outset or that "circumstances changed" in car). The court recognized

this and explained this possibility in the jury instructions. *Id.*; JA.IV.2377.

---

[24] Coleman plans to file a pro se reply brief discussing the government's
treatment of his pro se brief.

## CONCLUSION

For the foregoing reasons, as well as those contained in his opening briefs and the sealed supplemental reply brief, Coleman asks this Court to vacate his conviction and order the court to dismiss the case, to vacate and remand for a new trial, or to vacate his sentence and remand for resentencing.

Respectfully Submitted,

*/s/ Christine DeMaso*

Christine DeMaso (Id No. 1168061)
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street – 5th Floor
Boston, MA 02210
(617) 223-8061

Dated: October 16, 2024

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

> This Court issued an order, dated October 9, 2024, granting leave to
> file oversized briefing such that the reply brief and sealed
> supplemental reply brief, together, may contain no more than 17,000
> words.

> This brief contains 13,268 words and the sealed supplemental reply
> brief contains 2,605 words, for a total of 15,873 words, excluding the
> parts of the briefs exempted by Fed. R. App. P. 23(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface
> using Microsoft Word and 14-point Book Antiqua font.

*/s/ Christine DeMaso*
Christine DeMaso

Attorney for Appellant

Dated: October 16, 2024

## CERTIFICATE OF SERVICE

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, AUSA Randall Ernest Kromm, as identified on the Notice of Electronic Filing on October 16, 2024.


*/s/ Christine DeMaso*
Christine DeMaso